# EXHIBIT 1



**CENTRE INTERNATIONAL POUR LE RÈGLEMENT DES DIFFÉRENDS RELATIFS
AUX INVESTISSEMENTS**

1818 H STREET, NW  |  WASHINGTON, DC 20433  |  É.U.A.
TÉLÉPHONE +1 (202) 458 1534  |  TÉLÉCOPIE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T

## AHS NIGER ET MENZIES MIDDLE EAST AND AFRICA S.A.

### C.

## RÉPUBLIQUE DU NIGER

### (AFFAIRE CIRDI No. ARB/11/11)

Je certifie par la présente que le document annexé est une copie conforme à l'original de la Sentence rendue le 15 juillet 2013 par le Tribunal arbitral.

Meg Kinnear
Secrétaire générale

Washington, D.C., le 2 octobre 2023

**CENTRE INTERNATIONAL POUR LE RÈGLEMENT DES DIFFÉRENDS RELATIFS AUX INVESTISSEMENTS**
WASHINGTON, D.C.

Dans une procédure entre

**AHS NIGER ET MENZIES MIDDLE EAST AND AFRICA SA**

Demanderesses

et

**LA RÉPUBLIQUE DU NIGER**

Défenderesse

**Affaire CIRDI No. ARB/11/11**

---

# SENTENCE

---

*Membres du Tribunal*
Monsieur Fernando Mantilla-Serrano, Président
Monsieur Patrick Hubert
Monsieur Gaston Kenfack-Douajni

*Secrétaire du Tribunal*
Madame Aurélia Antonietti

*Date d'envoi aux Parties: 15 juillet 2013*

## REPRÉSENTATION DES PARTIES

Les Demanderesses sont représentées par :

La Défenderesse a été représentée jusqu'au 14 mars 2012 par :

Me Rasseck Bourgi,
10, rue du Chevalier de Saint George
75001 Paris
France

Me. Ibrahim M. Djermakoye
4, rue de la Tapoa, Ancien Plateau
BP 12651 Niamey
Niger

et par

Le Ministre des Transports
et le Directeur des Transports
Immeuble Caisse Nationale de Sécurité Sociale
(Quartier Terminus) Niamey
BP 12.130 Niamey
Niger
et
Le Directeur du Contentieux de l'État
Secrétariat Général du Gouvernement
BP 550 Présidence de la République
Niamey
Niger

Depuis le 13 mars 2012, la Défenderesse fait défaut.

I.      INTRODUCTION ET PARTIES ...................................................................................1

II.     HISTORIQUE DE LA PROCEDURE .........................................................................2

III.    FAITS .............................................................................................................................6

        III.1    L'Agrément d'AHS Niger et la Convention d'Investissement .............................6

        III.2    Retrait de l'agrément et dénonciation de la Convention
                 d'Investissement ...................................................................................................9

        III.3    Recours au Niger ................................................................................................12

IV.     RESUME DE LA POSITION DES PARTIES............................................................13

        IV.1    Position des Demanderesses ...............................................................................13

        IV.2    Prétentions des Demanderesses ..........................................................................15

        IV.3    Position de la Défenderesse ................................................................................16

V.      ANALYSE DU TRIBUNAL ARBITRAL...................................................................16

        V.1     Dénonciation de la Convention d'Investissement ..............................................17

                A.  La durée de la Convention d'Investissement.................................................17

                B.  La dénonciation de la Convention d'Investissement......................................19

                C.  Conclusion du Tribunal .................................................................................22

        V.2     Expropriation ......................................................................................................23

VI.     DOMMAGES ...............................................................................................................24

        VI.1    Préjudice économique : gain manqué et actif saisis ...........................................24

                A.  Sur le gain manqué .......................................................................................24

                B.  Sur la valeur des biens saisis ........................................................................26

        VI.2    Préjudice moral...................................................................................................27

                A.  Préjudice .......................................................................................................28

                B.  Indemnisation ...............................................................................................29

VII.    INTERETS....................................................................................................................29

VIII.   FRAIS DE PROCEDURE............................................................................................30

IX.     DISPOSITIF.................................................................................................................31

## GLOSSAIRE

| | |
|---|---|
| AHS | Aviation Handling Services S.A. |
| AHS Niger | Aviation Handling Services Niger S.A. |
| Arrêté 1 | Arrêté n° 000001/MT/AC/DAC du 5 janvier 2010 |
| Arrêté 2 | Arrêté n° 000002/MT/AC/DAC du 5 janvier 2010 |
| Arrêté 15 | Arrêté n° 015/MT/T/DAC du 19 février 2004 |
| Arrêté 16 | Arrêté n° 016/MT/T/DAC du 19 février 2004 |
| Arrêté 66 ou Cahier de Charges | Arrêté n°066 MT/DAC du 30 décembre 2003 « *portant Cahier des charges pour l'exercice de l'activité d'assistance ou d'auto assistance en escale dans les aéroports du Niger* » |
| Arrêté 103 | Arrêté n° 103/MTT/A/DAC du 14 décembre 2010 |
| Arrêté 104 | Arrêté n° l04/MTT/A/DAC du 14 décembre 2010 |
| Arrêté 105 | Arrêté n° l05/MTT/A/DAC du 14 décembre 2010 |
| Arrêté 106 | Arrêté n° 106/MTT/A/DAC du 14 décembre 2010 |
| Arrêté 108 | Arrêté n° 00108/MTT/A/DRF/M du 29 décembre 2010 |
| C | Pièce Demanderesses |
| CIRDI ou le Centre | Centre international pour le règlement des différends relatifs aux investissements |
| Code des Investissements | Code des Investissements de la République du Niger du 8 décembre 1989, modifié par ordonnance en 1997, 1999 et par loi en 2001 |
| Convention CIRDI ou Convention de Washington | Convention pour le règlement des différends relatifs aux investissements entre États et ressortissants d'autres États du 18 mars 1965 |
| Convention d'Investissement | Convention d'Investissement conclue le 15 décembre 2004 entre AHS Niger et la République du Niger |
| Décision sur la Compétence | Décision sur la Compétence rendue dans l'affaire CIRDI No. ARB/11/11, envoyée aux Parties le 13 mars 2013 |
| Décision 799 | Décision n° 00799/MTT/A/DAC du 14 décembre 2010 |
| Défenderesse ou Déf. | Niger |
| Déf. Mém. | Mémoire de la Défenderesse du 6 avril 2011 |
| Demanderesses ou Dem. | AHS Niger et Menzies Middle East and Africa S.A., conjointement |
| Dem. Mém. | Mémoire des Demanderesses du 14 novembre 2011 |
| Dem. Mém. mis à jour | Mémoire des Demanderesses du 11 avril 2013 |
| MAG | Menzies Aviation Group |
| MMEA | Menzies Middle East and Africa S.A. (dénommée avant le 18 mars 2011 Menzies Afrique S.A.) |
| Niger | République du Niger |
| R | Pièce Défenderesse |
| Règlement d'arbitrage | Règlement de procédure relatif aux instances d'arbitrage du CIRDI |
| Requête | Requête d'arbitrage des Demanderesses du 4 mars 2011 |

iv

## I.    INTRODUCTION ET PARTIES

1.    Cette affaire concerne un différend soumis au Centre international pour le règlement des différends relatifs aux investissements (« CIRDI ») sur le fondement de la Convention d'Investissement conclue en 2004 entre AHS Niger et la République du Niger (« Convention d'Investissement »), du Code des Investissements de la République du Niger du 8 décembre 1989, modifié par ordonnance en 1997, 1999 et par loi en 2001 (« Code des Investissements ») et sur le fondement de la Convention pour le règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats du 18 mars 1965, en vigueur depuis le 14 octobre 1966 (la « Convention CIRDI »). Le différend porte sur la régularité du retrait par la République du Niger d'un agrément accordé à AHS Niger pour l'assistance en escale à l'aéroport international de Niamey, ainsi que sur la validité de la dénonciation de la Convention d'Investissement.

2.    Les demanderesses sont les sociétés Aviation Handling Services Niger S.A. (« AHS Niger ») et Menzies Middle East and Africa S.A. (dénommée avant le 18 mars 2011 Menzies Afrique S.A.) (« MMEA ») (ci-après conjointement les « Demanderesses »). Le siège social d'AHS Niger est sis Aéroport International de Niamey, BP 10006[1] ; celui de MMEA est sis 127, rue de Mühlenbach, L-2168, Luxembourg[2].

3.    La défenderesse est la République du Niger (ci-après le « Niger » ou la « Défenderesse ») prise en la personne du Ministre des Transports, du Directeur des Transports et du Directeur du Contentieux de l'Etat.

4.    Les Demanderesses et la Défenderesse seront ci-après collectivement appelées les « Parties ». Les représentants respectifs des Parties et leurs adresses sont mentionnés ci-dessus.

5.    Le Tribunal a lu et analysé l'ensemble des allégations et des preuves apportées par les Parties et se limitera à évoquer dans sa sentence les faits, les allégations et les preuves qui lui semblent les plus pertinents pour expliquer ses conclusions et son raisonnement.

6.    Le Tribunal présentera dans un premier temps un historique de la procédure (II) et un rappel des faits (III). Le Tribunal présentera ensuite son analyse des arguments des Parties sur le fond (IV), et sur les dommages (VI), intérêts (VII) et frais (VIII).

---

[1] Pièces C1 et C44.
[2] Pièces C2 et C36.

1

## II.    HISTORIQUE DE LA PROCEDURE

7.    Le 11 mars 2011, le CIRDI a reçu une requête d'arbitrage en date du 4 mars 2011 des sociétés AHS Niger et Menzies Afrique SA contre la République du Niger, accompagnée des pièces C1 à C30 et des pièces de jurisprudence JP1 à JP10 (la « Requête »).

8.    Par lettres des 16 et 30 mars 2011, le Centre a posé des questions aux Demanderesses dans le cadre de l'examen de la Requête. Les Demanderesses y ont répondu par lettre du 21 mars 2011 avec les pièces C31 à C35 et JP11 et JP12, et par lettre du 5 avril 2011 avec les pièces C36 à C42 et JP13 à JP16.

9.    Le 6 avril 2011, Me Ibrahim M. Djermakoye a soumis pour le compte du Niger un « Mémoire en défense » « tendant à démontrer l'incompétence du CIRDI à connaître du litige » accompagné des pièces 1 à 9 (« Déf. Mém. »).

10.    Les Demanderesses y ont répondu par lettres en date des 7 avril (accompagnée des nouvelles pièces C43 à C45) et 18 avril 2011, et le Niger y a répliqué par lettre du 15 avril 2011.

11.    Le 26 avril 2011, le Secrétaire général du Centre a enregistré la Requête conformément à l'article 36(3) de la Convention CIRDI. Les Parties ont été notifiées de cet enregistrement le même jour. Dans sa Notification d'enregistrement, le Secrétaire général a invité les Parties à procéder dès que possible à la constitution du Tribunal arbitral conformément à l'article 7 du Règlement d'introduction des instances.

12.    Les Parties ont convenu, conformément à l'article 37(2)(a) de la Convention CIRDI, que le Tribunal serait composé de trois arbitres, chaque partie nommant un arbitre et le président étant nommé par les co-arbitres. Les Demanderesses ont nommé M. Patrick Hubert, de nationalité française, qui a accepté sa nomination. La Défenderesse a nommé le Dr. Gaston Kenfack-Douajni, de nationalité camerounaise, qui a accepté sa nomination. Messieurs Hubert et Kenfack-Douajni ont nommé M. Fernando Mantilla-Serrano en tant que président du Tribunal. M. Mantilla-Serrano, de nationalité colombienne, a accepté sa nomination.

13.    Conformément à l'article 6(1) du Règlement de procédure relatif aux instances d'arbitrage du CIRDI (« Règlement d'arbitrage »), le Secrétaire général a notifié aux Parties le 22 juillet 2011 que les trois arbitres avaient accepté leur nomination et que le Tribunal était réputé constitué et l'instance engagée à cette date. Les Parties ont également été informées de ce que Mme Aurélia Antonietti, Conseiller juridique au CIRDI, était la Secrétaire du Tribunal (la « Secrétaire »).

2

14.    Le 15 septembre 2011, le Tribunal a tenu sa première session avec les Parties. Il était convenu que chaque partie serait représentée lors de la première session mais la veille de la session, le 14 septembre 2011, M. le Directeur du Contentieux de l'État a informé le Centre qu'aucun représentant de la République du Niger ne serait présent à la session, faisant référence à une lettre adressée à AHS Niger S.A. le 13 septembre 2011 et indiquant la volonté de la Défenderesse « *d'entamer des négociations directes avec AHS-NIGER en vue d'un règlement amiable et consensuel du différend qui les oppose et sollicitait par la même occasion une suspension de la procédure d'arbitrage initiée devant le CIRDI pour permettre aux parties de conclure dans les meilleurs délais un accord sauvegardant leurs intérêts respectifs* ». Le conseil des Demanderesses s'est opposé le jour même par courriel à la suspension de la procédure et au report de la session. Le 14 septembre 2011, la Secrétaire a informé les Parties par courriel que le Tribunal avait décidé de maintenir la session du lendemain. Le 15 septembre 2011, le Tribunal a tenu sa première session en présence des représentants des Demanderesses et a discuté des points de l'ordre du jour qui avait été communiqué aux Parties le 2 août 2011. Par courrier du Centre en date du 19 septembre 2011, un projet de procès-verbal de la première session a été adressé aux Parties pour commentaires. Par lettres des 20 et 30 septembre 2011, les Demanderesses ont soumis leurs commentaires et la Défenderesse a fait part de ses commentaires par lettre du 30 septembre 2011. Le procès-verbal définitif de la première session en date du 5 octobre 2011 signé par le Président et la Secrétaire a été adressé aux Parties le 6 octobre 2011.

15.    Le procès-verbal de la première session relève que les Parties ont constaté la régularité de la constitution du Tribunal et ont indiqué ne pas avoir d'objections concernant les déclarations de ses membres. Il a été également convenu que le Règlement d'arbitrage applicable serait celui entré en vigueur en janvier 2003, que le lieu de la procédure serait Washington, DC et que la procédure se déroulerait en langue française.

16.    Dans la mesure où la Défenderesse n'avait pas encore indiqué si elle entendait soulever officiellement un déclinatoire de compétence, le Tribunal a décidé que le calendrier pour l'échange des écritures serait le suivant :

-    Les Demanderesses déposeraient leur Mémoire sur le fond avant le 15 novembre 2011.

-    La Défenderesse déposerait son Contre-Mémoire sur le fond et/ou tout déclinatoire de compétence avant le 16 janvier 2012. Elle indiquerait dans sa soumission si elle requérait la bifurcation de la procédure.

-    Au plus tard le 30 janvier 2012, les Demanderesses répondraient à toute demande de bifurcation. Le Tribunal déciderait alors rapidement sur la bifurcation.

17.    Le 14 novembre 2011, les Demanderesses ont déposé leur Mémoire sur le fond (« Dem. Mém. ») accompagné des pièces C46 à C72, de la jurisprudence A17 à A20,

3

de l'attestation de témoin de M. Pierre Agbogba, de l'attestation de témoin de M. Rachid Riffi, de l'attestation de témoin de M. Forsyth Black, du rapport de M. John S. Willis et de l'avis juridique de M. le Professeur Serge Sur.

18. Le 15 janvier 2012, la République du Niger n'a pas déposé de soumission. Le 17 janvier 2012, le Centre a reçu une lettre du Secrétaire général du Gouvernement en date du 13 janvier 2012 demandant un délai supplémentaire pour organiser sa défense. Il a alors été demandé au Niger de bien vouloir indiquer au Centre combien de jours lui seraient nécessaires pour présenter ses écritures. Le 25 janvier 2012, le Niger a de nouveau été invité à bien vouloir indiquer dans les plus brefs délais le fondement de sa demande d'extension ainsi que la durée de l'extension demandée.

19. Le 27 janvier 2012, les Demanderesses ont déposé une requête aux fins de constater le défaut de la Défenderesse et de prononcer une sentence par application de l'article 42 du Règlement d'arbitrage. Cette demande a été officiellement notifiée au Niger par lettre du Centre en date du 1er février 2012. Dans la même lettre, la Défenderesse a été invitée à indiquer avant le 6 février 2012 le fondement de sa demande d'extension, le nombre de jours d'extension requis, et si elle entendait faire valoir ses prétentions dans cette instance. Le Tribunal a indiqué qu'il souhaitait vivement que cette procédure suive son cours en présence de toutes les Parties. Par lettre du Centre en date du 7 février 2012, le Tribunal a constaté l'absence de réaction de la République du Niger dans le délai imparti. Dans ces circonstances, et en application de l'article 42(2) du Règlement d'arbitrage, le Tribunal a fixé un délai jusqu'au 29 février 2012 pour que « [l]a Défenderesse dépose son Contre-Mémoire sur le fond et/ou tout déclinatoire de compétence et indique aussi si elle requiert la bifurcation de la procédure », conformément au procès-verbal de la première session du Tribunal arbitral du 15 septembre 2011.

20. Par lettre du 13 mars 2012, le Tribunal a constaté l'absence de dépôt par la Défenderesse de son Contre-Mémoire sur le fond et/ou d'un déclinatoire de compétence. Dans ces circonstances, le Tribunal a indiqué :

- faire droit à la requête des Demanderesses en date du 27 janvier 2012 aux fins de constater le défaut de la Défenderesse et de prononcer une sentence en application de l'article 42 du Règlement d'arbitrage ;

- que si la partie en défaut s'abstenait de comparaître ou de faire valoir ses moyens, elle n'en serait pas pour autant réputée acquiescer aux prétentions de l'autre partie ;

- qu'aux termes de l'article 42(3) et (4) du Règlement d'arbitrage, il allait donc examiner si le différend est ou non de sa compétence et si, dans l'affirmative, les conclusions sont bien fondées en fait et en droit ; et

- qu'il pourrait à tout moment demander aux Demanderesses de déposer des observations, de nouvelles preuves ou de fournir des explications orales.

21. Par lettre du 14 mars 2012, Me Djermakoye, conseil de la Défenderesse, a informé le Tribunal de son déport dans ce dossier depuis le 8 mars 2012.

4

22. Par lettre du 18 avril 2012, le Centre a informé les Parties que le Tribunal entendait revenir vers les Parties concernant l'état de ses travaux et avec d'éventuelles questions.

23. Par lettre du 10 août 2012, le Tribunal a posé aux Parties neuf questions auxquelles elles étaient invitées à répondre avant le 3 septembre 2012. Les Demanderesses y ont répondu le 31 août 2012 et ont communiqué les pièces C73 à C76 et A21 à A23.

24. Par lettre du 25 septembre 2012, et afin de s'assurer que la Défenderesse disposait du dossier complet de cette affaire, le Centre adressait une copie papier de toutes les correspondances échangées dans ce dossier par courrier électronique depuis le début de l'année 2012 au Ministre des Transports et à la Direction du Contentieux de l'État, en copiant l'Ambassade du Niger à Washington, DC, afin que cette dernière transmette le dossier aux services concernés de l'État du Niger. Les conseils des Demanderesses confirmaient par courriers des 5 et 29 novembre 2012 les changements intervenus au sein du Gouvernement.

25. Par lettre du 23 octobre 2012, les Demanderesses transmettaient au Tribunal une copie de l'arrêt de la Cour d'État du Niger, Chambre Administrative no. 12-054 du 10 octobre 2012 et de sa notification, dont il sera discuté ci-après.

26. Par lettre du 16 janvier 2013, les Demanderesses réitéraient leur requête afin que le « *Tribunal arbitral statue sur les seuls chefs de conclusions qui lui ont été soumis* » par les Demanderesses dans l'ensemble de leurs écritures.

27. La Décision sur la compétence (v. *supra*, § 88) a été envoyée aux Parties par lettre du CIRDI du 13 mars 2013, par laquelle le CIRDI a sollicité que les Parties exposent leurs observations avant le 28 mars 2013 sur l'organisation de la suite de la procédure et indiquent si elles souhaitent faire de nouvelles soumissions et être entendues oralement.

28. Par lettre du 15 mars 2013, les Demanderesses ont répondu, indiquant ne pas avoir l'intention de présenter de nouvelles soumissions et être à la disposition du Tribunal si ce dernier estime nécessaire d'entendre les Parties, et demandant au Tribunal de statuer sur le fond dans les meilleurs délais.

29. La Défenderesse n'a pas réagi à la lettre du CIRDI du 13 mars 2013.

30. Par lettre du 1ᵉʳ avril 2013 adressée aux Parties, le Tribunal arbitral a invité les Demanderesses à évoquer et développer les effets de l'Arrêt No. 12-054 du 10 octobre 2012 de la Cour d'État du Niger, Chambre Administrative, et leur a donné un délai jusqu'au 16 avril 2013 pour ce faire. Le Tribunal a indiqué que la Défenderesse disposerait alors d'un délai équivalent, soit jusqu'au 1ᵉʳ mai 2013, pour y répondre.

31. Le 11 avril 2013, les Demanderesses ont soumis leur Mémoire au fond mis à jour dans lequel elles ont évoqué et développé les effets de l'Arrêt No. 12-054, accompagné de nouvelles pièces C77 à C82.

32. La Défenderesse, dûment notifiée de ce mémoire, n'y a pas répondu.

33. Par lettre du 3 mai 2013 adressé aux Parties, le CIRDI, au nom du Tribunal, a pris note encore une fois du défaut de la Défenderesse.

34. Par lettre du 6 mai 2013, les Demanderesses ont à nouveau demandé au Tribunal de faire application des dispositions de l'article 42 du Règlement d'arbitrage en statuant sur les seuls chefs de conclusions soumis par les Demanderesses dans leurs écritures versées au débat.

35. Par lettre du 16 mai 2013, les Demanderesses ont versé une copie de l'arrêt n°13-028 de la Cour d'Etat du Niger, Chambre Administrative (Pièce C83). Par lettre du 4 juin 2013, les Demanderesses ont versé une copie de la notification de cet arrêt par le Greffier en Chef de la Cour d'Etat, Chambre Administrative (Pièce C84).

36. Par lettre en date du 24 juin 2013, les Parties ont été invitées, conformément à l'article 28(2) du Règlement d'arbitrage, dans un délai expirant le 8 juillet 2013, à communiquer au Tribunal arbitral l'état des dépenses qu'elles ont engagées ou supportées au cours de la procédure. Les Demanderesses ont déposé un Mémoire et un Mémoire Additionnel de Frais et Honoraires d'Arbitrage, avec justificatifs, les 25 et 28 juin 2013. Le Niger n'a rien communiqué au Tribunal arbitral concernant les frais et dépenses engagés par le Niger.

37. Par lettre en date du 8 juillet 2013, les Parties ont été informées, conformément à l'article 38 du Règlement d'arbitrage, de la clôture de l'instance.

## III. FAITS

### III.1 L'Ảgrément d'AHS Niger et la Convention d'Investissement

38. Le Tribunal fera un rappel des faits tels qu'ils ressortent des écritures des Demanderesses, du Mémoire de la Défenderesse soumis avant l'enregistrement de la Requête et des pièces versées aux débats.

39. En décembre 2003, à la suite du dépôt de bilan en janvier 2002 d'Air Afrique, qui était chargée de l'assistance en escale notamment à l'aéroport de Niamey, l'État du

Niger a lancé un appel d'offres international pour l'assistance en escale sur les aéroports du Niger (ci-après l'« Appel d'Offres »)[3].

40. Par Arrêté n° 066/MT/DAC du 30 décembre 2003 (ci-après, l'« Arrêté 66 ») portant Cahier des Charges pour l'exercice de l'activité d'assistance ou d'auto assistance en escale dans les aéroports du Niger, le Ministre des Transports a défini, entre autres, les services à fournir et les conditions d'agrément des prestataires pour ces services. La durée prévue pour l'agrément de l'activité d'assistance en escale était de 5 ans et de 3 ans pour l'auto assistance[4].

41. Par courrier du 29 janvier 2004, le groupement Menzies Aviation Group-AHS a soumis son offre technique et son offre financière[5]. Dans son offre, le groupe s'engageait à :

- investir 1,7 milliards de F CFA ;
- acquérir pour 295 millions de F CFA, le matériel de l'ex Air Afrique ;
- à reprendre les anciens salariés d'Air Afrique nécessaires au fonctionnement de l'activité et non atteints par la limite d'âge ; et
- à verser à l'État 5% de son chiffre d'affaires brut au titre de redevance de concession.

42. Par lettre du 26 janvier 2004, Menzies Aviation Group-AHS a demandé que la licence soit de 10 ans, durée d'amortissement des investissements[6].

43. Par lettre du 8 février 2004, le Ministre des Transports a informé le groupe qu'il avait été déclaré adjudicataire[7].

44. Conformément au Dossier d'Appel d'Offres, une société de droit nigérien devait être constituée pour assurer les prestations visées par l'Appel d'Offres. AHS Niger fut ainsi constituée le 18 février 2004[8]. Son actionnaire principal était à 75% MMEA. Les 25% restants étant détenus par deux actionnaires nigériens, AHS International Limited ne possédant qu'une seule action[9].

45. Le 19 février 2004, un arrêté n° 015/MT/T/DAC (ci-après, l'« Arrêté 15 ») a été pris pour l'activité d'assistance ou d'auto assistance en escale dans les aéroports du Niger, modifiant le Cahier des Charges de 2003. Cet arrêté indiquait que la validité de l'agrément était de dix ans et limitait le nombre de prestataires agréés à un seul

---

[3] Pièce C4.
[4] Pièce C6.
[5] Pièces C8 et C31.
[6] Pièce C46.
[7] Pièce C48, adressée à Monsieur le Président de Aviation Handling Services S.A. (AHS S.A.) à Dakar indiquant que: « *Votre groupe a été déclaré adjudicataire* ».
[8] Pièce C1.
[9] Pièce C33.

7

prestataire pour l'assistance en escale à l'aéroport de Niamey[10]. Cet arrêté précisait que « [l]e *nombre de prestataires agréés sur cette plate-forme peut être modifié par arrêté ministériel si le nombre de passagers dépassent* [sic] *cinq cent mille (500 000) par an et sous réserve de l'absence de contraintes particulières en matière d'espace ou de capacité des installations et du respect des contraintes de sécurité et de sûreté de l'aéroport et des passagers* ».

46.    Le même jour, l'arrêté n° 016/MT/T/DAC (ci-après, l'« Arrêté 16 ») portant agrément pour une période de 10 ans de la société « *Aviation Handling Services Niger S.A. (Menzies Aviation Group Partner) pour l'exercice de l'activité d'assistance en escale sur l'aéroport International Diori Hamani de Niamey* » a été pris[11]. Il y était indiqué que l'activité en escale comprenait l'assistance passagers, bagage, fret et poste, opération en piste, nettoyage et service de l'avion, entretien en ligne, opérations aériennes et administration des équipages, transport en vol et service commissariat. Cet arrêté disposait que « *la durée de la validité de l'agrément est de dix (10) ans renouvelables* »[12].

47.    Le 15 décembre 2004, le Gouvernement de la République du Niger et AHS Niger ont signé une Convention d'Investissement qui avait pour objet « *... de définir les conditions dans lesquelles la Société AVIATION HANDLING SERVICES NIGER s.a. exercera ses activités ainsi que les engagements des deux parties contractants* (sic) *à savoir le Gouvernement de la République du Niger et la Société AVIATION HANDLING SERVICES NIGER s.a.* »[13].

48.    Selon les Demanderesses, conformément aux termes du Cahier de Charges[14], AHS Niger a sollicité et obtenu une licence l'exploitation pour l'activité d'assistance en escale[15].

49.    Par la Convention d'Investissement, AHS Niger s'est engagé à :

« - *investir un montant minimum de un milliards sept cent soixante sept millions deux cent trente deux mille cent cinquante sept (1.767.232157) F CFA en hors taxes et hors fonds de roulement ;*
*- créer au moins 83 emplois permanents ;*
*- fournir au Ministère chargé de l'industrie, à la fin de chaque exercice, les états financiers ;*
*- permettre aux agents du Ministère chargé de l'Industrie et du Ministère charge des Finances de contrôler le respect des conditions de la présente Convention d'Investissement ;*

---

[10] Pièce C5.
[11] Pièce C3.
[12] Pièce C3, article 4.
[13] Pièce C7, article 1.
[14] Pièce C6, articles 3 et 13-18.
[15] Dem. Mém. mis à jour, § 52.

8

*- respecter la réglementation nigérienne en matière sociale »*[16].

50.   D'après les Demanderesses, sur la période des cinq premières années, à partir du 15 décembre 2004, AHS Niger a investi 2.418.500.792 F CFA, créé 101 emplois et s'est conformée à ses obligations comptables et financières[17].

51.   Selon les Demanderesses, AHS Niger a « *parfait*[ement] » respecté ses obligations[18]. Les Demanderesses soulignent aussi les bénéfices pour le Niger des activités d'AHS Niger, soit l'injection de plus de 7,6 milliards de F CFA dans l'économie du pays en salaires, redevances et taxes, entre autres[19].

52.   Selon les Demanderesses, aucun manquement n'a été reproché[20], et aucune mise en demeure n'a été adressée, à AHS Niger[21].

53.   C'est ainsi, selon les Demanderesses, que la licence de AHS Niger a été renouvelée tous les ans depuis l'année 2005[22]. Le dernier renouvellement a eu lieu le 8 mars 2010[23].

### III.2   Retrait de l'agrément et dénonciation de la Convention d'Investissement

54.   Par arrêté du 5 janvier 2010 n° 000001/MT/AC/DAC (ci-après, l'« Arrêté 1 ») modifiant l'Arrêté 16, la durée de la Convention d'Investissement a été ramenée à 5 ans et toutes les dispositions antérieures contraires ont été abrogées[24]. Un second arrêté du même jour n° 000002/MT/AC/DAC (ci-après, l'« Arrêté 2 ») a modifié et complété l'Arrêté 66 de 2003 en fixant, entre autres, le nombre des prestataires pour l'aéroport de Niamey à trois (assistance en escale, assistance en escale « Fret et Poste », auto assistance)[25].

55.   Par lettre du 6 janvier 2010 adressée à AHS Niger, le Ministre des Transports, citant « *des contradictions dans les textes régissant l'activité d'assistance et d'auto assistance en escale* » à Niamey, a indiqué que conformément au Cahier des Charges de 2003 le nombre de prestataires était de trois (assistance en escale, assistance en escale « Fret et Poste », auto assistance) et que la durée de la Convention d'Investissement était de 5 ans[26]. Cette même lettre demandait à AHS Niger de

---

[16] Pièce C7, article 4.
[17] Requête, § 27.
[18] Dem. Mém. mis à jour, §§ 53-64.
[19] Dem. Mém. mis à jour, §§ 63-64.
[20] Dem. Mém. mis à jour, § 59.
[21] Dem. Mém. mis à jour, § 62.
[22] Dem. Mém. mis à jour, § 60. A part la licence de 2010 (Pièce C43), les licences n'ont pas été versées au débat.
[23] Pièce C43.
[24] Pièce C12.
[25] Pièce C13.
[26] Pièce C11.

prendre les dispositions utiles en vue du renouvellement de son agrément arrivé à terme le 18 février 2009.

56. AHS Niger s'est opposée à cette mesure par lettre du 25 janvier 2010[27].

57. AHS Niger a continué, prétendument avec l'accord du Gouvernement, à opérer le service d'assistance en escale et a obtenu le 8 mars 2010 le renouvellement de la licence annuelle d'exploitation pour la période 2010-2011[28].

58. Selon la Défenderesse, « [c]*ourant décembre 2010, une inspection diligentée par les autorités de la transition concluait à l'irrégularité de l'octroi de l'agrément à AHS Niger s.a., au non respect de ses engagements vis-à-vis de l'État du Niger ainsi qu'au non respect de la législation nigérienne, entre autres manquements relevés* »[29].

59. Le 14 décembre 2010, le Ministre des Transports du Niger a pris l'arrêté n°106/MTT/A/DAC (ci-après, l'« Arrêté 106 »)[30] abrogeant immédiatement l'Arrêté 16, ainsi que la décision n° 00799/MTT/A/DAC (ci-après, la « Décision 799 ») portant dénonciation de la Convention d'Investissement[31]. D'après les Demanderesses, ces deux documents ont été notifiés à AHS Niger le 15 décembre 2010 en main propre.

60. Les arrêtés suivants ont également été pris :
- l'arrêté n° 103/MTT/A/DAC du 14 décembre 2010 (ci-après, l'« Arrêté 103 ») « *portant création d'une cellule d'assistance en escale à l'Aéroport International DIORI HAMANI de Niamey* [la Cellule d'Assistance en Escale]». Il était précisé que cette cellule était chargée d'assurer, sous la direction d'un comité de gestion, la continuité du service public en matière d'assistance aux aéronefs[32] ;
- l'arrêté n° 104/MTT/A/DAC du 14 décembre 2010 (ci-après, l'« Arrêté 104 ») « *portant réquisition du personnel de la société AHS affecté à l'assistance en escale à l'Aéroport International DIORI HAMANI de Niamey* »[33] ;
- l'arrêté n° 105/MTT/A/DAC du 14 décembre 2010 (ci-après, l'« Arrêté 105 ») « *portant réquisition du matériel d'assistance en escale mis à la disposition de la société AHS* »[34] ;
- l'arrêté n° 00108/MTT/A/DRF/M du 29 décembre 2010 (ci-après, l'« Arrêté 108 ») « *portant création et attribution d'un Comité chargé de la gestion financière des ressources de l'exercice de l'assistance en escale à l'Aéroport International DIORI HAMANI de Niamey* »[35].

---

[27] Pièce C14.
[28] Pièce C43.
[29] Déf. Mém., p. 3.
[30] Pièce C17.
[31] Pièce C18.
[32] Pièce C21.
[33] Pièce C22.
[34] Pièce C23.
[35] Pièce C24.

61.   Le 15 décembre 2010, selon les Demanderesses, elles ont été expropriées de leur investissement.

62.   Les Demanderesses affirment qu'à cette date, le le Directeur de l'Aviation Civile par Intérim a convoqué le personnel d'AHS Niger lui signifiant qu'il était désormais le nouveau Directeur Général de la Cellule d'Assistance en Escale.

63.   Elles prétendent également que, le même jour, le Directeur Général de AHS Niger, M. Rachid Riffi, un ressortissant marocain, a été contraint de quitter son lieu de travail sous la menace et que, accompagné d'une délégation comprenant l'ancien responsable comptable d'AHS Niger, le Directeur Général de l'ASECNA[36] (membre du comité de gestion de la cellule), deux huissiers, un gendarme et l'avocat d'AHS Niger (arrivé sur les lieux entretemps), il a été contraint de faire le tour des banques dans lesquelles des comptes étaient ouverts au nom de AHS Niger pour disposer des soldes des comptes, des signatures sur les comptes et du droit d'accéder aux comptes ; ce à quoi il s'est opposé. Il a alors été expulsé de son bureau et son véhicule de fonction a été réquisitionné.

64.   Selon les Demanderesses, depuis le 15 décembre 2010, « *AHS Niger n'a plus eu accès à son siège et ses équipements, la Cellule d'Assistance en Escale ayant par ailleurs confisqué les documents et pièces comptables d'AHS Niger qui s'est trouvée dans l'impossibilité matérielle de satisfaire à ses obligations fiscales* »[37].

65.   Les Demanderesses continuent en affirmant ce qui suit :

> « *92. En outre, la Cellule d'Assistance en Escale pour les besoins de cette expropriation opère avec le matériel et les équipements de AHS Niger.*
>
> *93. C'est d'ailleurs bien vainement que, pour tenter de cacher son forfait, la Cellule d'Assistance en Escale a fait ôter au début de l'année 2011 l'ensemble des logos et marquages portant le nom de AHS sur le matériel de AHS Niger alors qu'elle avait opéré avec le même matériel, portant mention des logos et marquages MENZIES-AHS.*
>
> *94. Toutefois, la Cellule d'Assistance en Escale et l'ensemble du personnel continue à opérer dans les uniformes de AHS Niger avec les insignes du groupe AHS-MENZIES en violation flagrante du droit de propriété de ces dernières leur réservant l'usage exclusif du nom et de l'enseigne du groupe enregistrés et déposés.*
>
> *95. Depuis cette date, aucune mesure n'a été prise par l'État du Niger pour remédier à ces différentes voies de fait* »[38].

---

[36] Agence pour la Sécurité de la Navigation Aérienne en Afrique et à Madagascar.
[37] Dem. Mém. mis à jour, § 116.
[38] Dem. Mém. mis à jour, §§ 118-121.

11

### III.3    Recours au Niger

66.    Le 17 décembre 2010, AHS Niger a introduit deux recours gracieux contre l'Arrêté 106 et la Décision 799[39]. Le 12 janvier 2011, AHS Niger a introduit quatre recours gracieux contre les quatre autres arrêtés mentionnés ci-dessus (v. *supra*, § 60)[40]. Tous ces recours étaient adressés à M. le Ministre des Transports, du Tourisme et de l'Artisanat de la République du Niger.

67.    N'ayant reçu aucune réponse du Gouvernement, AHS Niger a saisi en mai 2011, dans le délai imparti de deux mois à la suite du rejet implicite par le Gouvernement des recours gracieux, la Chambre Administrative de la Cour d'État de trois requêtes contentieuses en excès de pouvoir à l'encontre de l'Arrêté 106, de la Décision 799 et des quatre autres arrêtés mentionnés ci-dessus[41].

68.    L'arrêt n° 12-054 du 10 octobre 2012, transmis par les Demanderesses le même jour, indique que les recours en annulation contre l'Arrêté 106, la Décision 799, les Arrêtés 103, 104, 105, et 108 ont été jugés recevables par la Chambre Administrative de la Cour d'État du Niger, et que le recours en annulation contre la décision implicite de rejet du Ministre des Transport a été déclaré irrecevable. Sur le fond, la Cour a annulé l'Arrêté 106 pour avoir été pris « *sans motifs, en violation des articles 4 et 5 de la convention d'investissement et de l'article 9 de l'arrêté no. 066/MTT/A/DAC du 30 décembre 2003* » portant Cahier des Charges. Partant, les Arrêtés 103, 104, 105, 106, 108 et la Décision 799 ont été également annulés par la Cour, qui a, par ailleurs, mis les dépens à la charge du Trésor public.

69.    Le 6 novembre 2012, le Niger a exercé un recours en rétractation à l'encontre de cet arrêt[42]. Le 8 mai 2013, par arrêt n°13-028, la Cour d'Etat du Niger, Chambre Administrative, a rejeté ce recours[43].

70.    Les Demanderesses ont indiqué dans leur mémoire du 11 avril 2013 que « *depuis le mois de décembre 2010, la Cellule d'Assistance en Escale mise en place par le Défendeur continue d'exploiter le matériel et d'utiliser le personnel desdites Demanderesses pour poursuivre l'activité d'assistance en escale à l'aéroport international de Diori Hamani de Niamey* »[44], et « *que depuis plus de deux ans, l'Etat du Niger utilise également le savoir-faire des Demanderesses internationalement reconnu en la matière pour percevoir des redevances des compagnies aériennes* »[45]. Le Niger ne conteste pas ces allégations. Par conséquent, à ce jour, aucune remise en

---

[39] Pièces C19 et C20.
[40] Pièce C25.
[41] Pièces C50 et C52.
[42] Pièce C79.
[43] Pièce C83.
[44] Dem. Mém. mis à jour, § 328 ; pièce C82.
[45] Dem. Mém. mis à jour, § 329.

12

état de la Convention d'Investissement ni aucune restitution, même partielle, des actifs dont les Demanderesses s'estiment expropriées, n'ont eu lieu.

## IV.    RESUME DE LA POSITION DES PARTIES

### IV.1    Position des Demanderesses

71.    Pour les Demanderesses, sont notamment applicables dans ce différend le Code des Investissements, le Règlement d'Appel d'Offres, le Cahier des Charges de 2003, les Arrêtés de 2004 et la Convention d'Investissement.

72.    Les Demanderesses considèrent que le Niger a dénoncé la Convention d'Investissement et retiré l'agrément pour l'exercice d'assistance et d'auto assistance en escale de manière irrégulière, infondée et fautive, et a ainsi violé la Convention d'Investissement, la loi applicable et le droit international coutumier[46].

73.    Le Niger n'a pas respecté les préalables contractuels et légaux, à savoir la mise en demeure préalable et écrite, la possibilité de suspension de l'agrément puis retrait et, en tout état de cause, la recherche d'une solution amiable au différend[47].

74.    S'agissant de l'abrogation de l'Arrêté d'agrément, le retrait ne pouvait intervenir qu'après une phase de mise en demeure de remédier aux manquements dans un délai de deux mois et à défaut une suspension temporaire de six mois[48].

75.    Par ailleurs, les Demanderesses relèvent l'absence au fond de toute justification à la dénonciation et au retrait mentionnés ci-dessus[49]. Elles considèrent qu'AHS Niger n'a manqué à aucune de ses obligations au regard de la Convention d'Investissement, du Code des Investissements et du Cahier des Charges.

76.    Le Niger a violé de manière manifeste ses obligations commettant ainsi un excès de pouvoir[50] et a mis ces mesures en application par voie de contrainte, constitutive d'une voie de fait contraire aux articles 2 et 7 du Code des Investissements[51]. Une voie de fait se définit comme « *un comportement constitué lorsque l'autorité administrative prend une décision ou commet une action manifestement insusceptible de se rattacher à un texte législatif ou réglementaire. C'est donc la gravité de l'irrégularité qui dénature l'action de l'administration, au point de la faire sortir du*

---

[46] Dem. Mém. mis à jour, § 321.
[47] Dem. Mém. mis à jour, §§ 256-270.
[48] Dem. Mém. mis à jour, §§ 271-292.
[49] Dem. Mém. mis à jour, §§ 294 *et seq.*
[50] Dem. Mém. mis à jour, § 338.
[51] Dem. Mém. mis à jour, § 339.

*champ administratif »*[52]. Elle est constituée lorsque l'action de l'Administration porte une atteinte grave à la propriété et comporte une irrégularité.

77.    AHS Niger a fait l'objet d'une expropriation que rien ne justifiait[53].

78.    Les Demanderesses soulignent que le Tribunal a compétence pour apprécier les conséquences financières et matérielles nonobstant l'existence d'un recours gracieux[54], lequel a fait l'objet d'un rejet implicite, qui a été annulé, avec la décision contestée, par la Cour d'État (v. *supra*, § 68).

79.    Les Demanderesses étaient en droit d'exploiter l'activité d'assistance et d'auto assistance en escale pendant encore quatre ans.

80.    Elles ont droit à la réparation intégrale de leur préjudice matériel et moral, qui se décompose en un préjudice économique (perte de gain manqué et perte de ses biens), un préjudice moral, une atteinte à ses droits de propriété intellectuelle ainsi qu'au remboursement des frais relatifs à l'arbitrage, ce qui inclut les frais de conseils et d'expert[55].

81.    L'évaluation du gain manqué est fondée sur une projection des bénéfices nets escomptés pour la période courant du 15 décembre 2010 jusqu'en février 2014, résultant entre autres des projections d'évolution du chiffre d'affaires pour les années 2011 à 2014, soit un total de 2.634.302.000 F CFA (4.015.967,51 €)[56].

82.    S'agissant de l'évaluation du préjudice au titre de l'expropriation des investissements réalisés par les Demanderesses (à savoir 2,1 milliards F CFA sur la période 2004-2010), elle est fondée sur la valeur nette comptable des Actifs et sur les Créances estimés à la somme globale de 944.336,95 €, soit F CFA 619.444.433 se décomposant en 410.382.837 F CFA pour la valeur nette comptable des Actifs et 209.061.596 F CFA pour les Créances[57].

83.    Les sommes dues au titre d'avances et de prêts faits au personnel équivalent à 40.758.174 F CFA, soit 62.135,44 euros[58].

84.    Les Demanderesses demandent également réparation pour atteinte à leur image et à leur réputation commerciale. Elles invoquent, en outre, une atteinte à leurs droits de propriété intellectuelle (sigle et noms commerciaux) dans le cadre de l'exploitation

---

[52] Dem. Mém. mis à jour, § 357 citant l'avis juridique du Prof. Sur.
[53] Dem. Mém. mis à jour, §§ 343-351.
[54] Dem. Mém. mis à jour, § 341.
[55] Dem. Mém. mis à jour, § 359.
[56] Dem. Mém. mis à jour, §§ 374-375.
[57] Dem. Mém. mis à jour, § 376.
[58] Dem. Mém. mis à jour, § 378.

14

par le Niger des équipements et uniformes sur lesquels les noms et sigles de Menzies et AHS sont apposés. Ce préjudice est estimé à 2.200.000 €[59].

### IV.2   Prétentions des Demanderesses

85.    Les Demanderesses dans leur Mémoire du 11 avril 2013 demandent au Tribunal de :

« 441. Constater le défaut du Défendeur et, conformément aux articles 45 de la Convention CIRDI et 42 du Règlement d'arbitrage CIRDI, et en conséquence, statuer sur les seuls chefs de conclusions qui lui ont été soumis par les Demanderesses dans leur Mémoire au fond daté du 14 novembre 2011 tel qu'actualisé dans le présent mémoire ainsi que dans l'ensemble de leurs écritures qui ont précédé ledit mémoire ;

442. Constater la dénonciation irrégulière, infondée et fautive par l'Etat du Niger de la Convention d'Investissement ;

443. Constater le retrait irrégulier, infondé et fautif par l'Etat du Niger de l'Arrêté d'Agrément ;

444. Constater que les Demanderesses se sont parfaitement conformées à leurs obligations contractuelles résultant de la Convention d'Investissement ;

En conséquence,

445. Déclarer que l'Etat du Niger n'a pas respecté ses obligations contractuelles aux termes de la Convention d'Investissement ;

446. Déclarer que l'Etat du Niger a également violé ses obligations légales au titre tant du Code des Investissements, que du Cahier des Charges ;

447. Déclarer que l'Etat du Niger a abusivement et sans motif dénoncé la Convention d'Investissement et abrogé l'Arrêté d'agrément ;

448. Par conséquent, condamner l'Etat du Niger au paiement des sommes couvrant l'intégralité du préjudice subi par AHS Niger et MMEA :

- Quatre millions quinze mille neuf cent soixante sept euros et cinquante et un cents (4.015.967,51 €) en compensation du gain manqué par AHS Niger et MMEA du fait de la résiliation anticipée irrégulière, infondée et fautive de la Convention d'Investissement et de l'arrêt brutal et immédiat des activités d'AHS Niger et MMEA ;

- Neuf cent quarante quatre mille trois cent trente six euros et quatre vingt quinze cents (944.336,95 €) en réparation du préjudice subi par AHS Niger et MMEA, réparation consistant au remboursement de la valeur nette comptable des Actifs expropriés et des Créances perdues ;

- Soixante deux mille cent trente cinq euros et quarante quatre cents (62.135,44 €) en indemnisation des sommes dues par le personnel d'AHS Niger réquisitionné par l'Etat du Niger, au titres d'avances et de prêts consentis par AHS Niger ;

---

[59] Dem. Mém. mis à jour, §§ 398-435.

15

- *Deux millions deux cent mille euros (2.200.000 €) en indemnisation du préjudice moral subi par AHS Niger et MMEA au titre de l'atteinte à leur image et à leur réputation sur le continent africain et le proche Orient, ainsi qu'à leurs droits de propriété intellectuelle ;*

- *Les intérêts avec capitalisation sur les montants susvisés et ce, à compter du 14 décembre 2010, date de l'abrogation de l'Arrêté d'agrément ;*

- *Tous les frais relatifs à l'arbitrage, incluant les honoraires d'avocats, ainsi que les frais de tout expert, notamment financier et juridique, engagé par AHS Niger et MMEA dans le cadre de la présente procédure ».*

### IV.3   Position de la Défenderesse

86. Dans son Mémoire du 6 avril 2011 soumis avant l'enregistrement de la Requête, le Niger s'est opposé à l'enregistrement par le Centre de la Requête, au motif que le différend excéderait manifestement la compétence du Centre.

87. Tel que constaté par le Tribunal arbitral à plusieurs reprises, le Niger fait défaut depuis le 13 mars 2012. Le Tribunal doit donc prononcer une sentence conformément à l'article 42 du Règlement d'arbitrage.

## V.   ANALYSE DU TRIBUNAL ARBITRAL

88. Le Tribunal rappelle que, en vertu de sa Décision sur la Compétence qui fait partie intégrante de cette sentence, il a décidé que :

1. le Tribunal est compétent pour connaître des demandes des Demanderesses à l'encontre de la République du Niger ;

2. les frais de l'arbitrage feront l'objet d'une décision du Tribunal au terme de cette procédure ; et

3. l'organisation de la prochaine phase de la procédure fera l'objet d'une ordonnance de procédure du Tribunal.

89. La compétence du Tribunal arbitral est fondée, notamment, sur les articles 6 de la Convention d'Investissement et du Code des Investissements.

90. L'article 6 de la Convention d'Investissement du 15 décembre 2004 dispose :

*« Les différends nés de l'interprétation ou de l'application du présent Protocole sont réglés à l'amiable. A défaut d'accord amiable entre les 2 parties, les différends donneront lieu à un règlement par voie d'arbitrage conformément aux dispositions en vigueur au Niger en matière de règlement de différends relatifs aux investissements ».*

91. L'article 6 du Code des Investissements de 1989 dispose :

16

« *Art.6.-* *Le règlement des différends relatifs à la validité, à l'interprétation ou à l'application de l'acte d'agrément et à la détermination éventuelle de l'indemnité due à la méconnaissance ou à la violation des engagements fera l'objet de l'une des procédures d'arbitrage ci-après à déterminer dans l'acte d'agrément.*

*1) [arbitrage ad hoc et* ex aequo bono*].*

*2) La possibilité pour les non nationaux de recourir au Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI) créé par la convention du 18 mars 1965 de la Banque Internationale pour la Reconstruction et le Développement (BIRD) ».*

92.     Le Tribunal doit donc déterminer s'il y a eu violation de la Convention d'Investissement et, éventuellement, du Code des Investissements et, le cas échéant, les conséquences de ces manquements.

### V.1    Dénonciation de la Convention d'Investissement

### A.      La durée de la Convention d'Investissement

93.     En ce qui concerne sa durée, la Convention d'Investissement stipule à son article 2 :

« *a). En phase de réalisation des investissements :*

*- exonération totale des droits et taxes perçus par l'Etat à l'exclusion de la taxe statistique y compris la Taxe sur la Valeur Ajoutée (TVA) sur les matériaux, outillages et équipements de production et concourant directement à la réalisation du programme agrée;*

*- exonération des droits et taxes perçus par l'Etat y compris la taxe sur la valeur ajoutée, sur les prestations de services, sur les travaux et services concourant directement à la réalisation du programme d'investissement agrée.*

*Toutefois, en cas de disponibilité des produits équivalents fabriqués localement, l'importation des matériaux, outillages et équipements ne donne pas lieu à exonération.*

*La phase de réalisation des investissements est fixée à* cinq (5) ans.

*b). En phase d'exploitation, exonération totale pendant* cinq (5) ans *:*

*- de la patente ;*

*- de la taxe immobilière;*

*- de l'impôt sur le bénéfice industriel et commercial (B.I.C.);*

*- de l'impôt minimum forfaitaire (I.M.F). »*[60] (soulignement ajouté).

94.     Selon les Demanderesses, cette disposition devrait être interprétée comme une reconnaissance que le terme de la Convention d'Investissement est de dix ans :

« *A cet égard, nous nous permettons de rappeler en outre les stipulations de la Convention d'investissement conclue le 15 décembre 2004 entre AHS*

---

[60] Pièce C7, article 3.

*NIGER et l'Etat du Niger dont il ressort que la durée convenue de la concession est fixée à dix (10) ans, les deux phases d'investissement et d'exploitation étant arrêtée chacune à cinq ans »*[61].

95.    La durée de la Convention d'Investissement ressort également du contexte réglementaire à sa source (voir, supra, §§ 45 à 46). Lors de l'appel d'offres, Menzies-AHS avait sollicité que la durée de l'agrément soit portée à dix ans, étant donné l'ampleur des investissements à réaliser. Par l'Arrêté 15, le Niger a modifié les articles 7 et 19 du Cahier de Charges (Arrêté 66). La durée de l'agrément a été portée à dix ans. Ceci est confirmé par l'Arrêté 16 qui prévoit que « *la durée de la validité de l'agrément est de dix (10) ans, renouvelable* ». Il faut rappeler que dans sa Décision sur la Compétence (§ 166) le Tribunal a conclu « *que 'l'acte d'agrément', auquel fait référence l'article 6 du Code des Investissements, ne peut être que la Convention d'Investissement* ».

96.    Ainsi, le Tribunal trouve que le Niger s'est engagé par la Convention d'Investissement à octroyer à AHS Niger les droits objet de cette convention pendant au moins dix ans, c'est-à-dire jusqu'au 15 décembre 2014.

97.    Selon la Défenderesse, « [l]*e 05 Janvier 2010, en raison de contradictions relevées dans les textes régissant l'activité d'assistance et d'auto assistance en escale dans les Aéroports du Niger, le Ministre en charge des transports prenait l'Arrêté n° 001/MT/ACIDAC par lequel la durée de validité de l'agrément était ramenée à cinq (05) ans* »[62]. La Défenderesse semble ainsi suggérer que les Arrêtés 15 et/ou 16 seraient effectés par certaines irrégularités.

98.    Pourtant, la Défenderesse n'apporte aucun élément attestant de cette irrégularité. En outre, la Défenderesse n'avance pas non plus de motifs justifiant la suspension ou le retrait de l'agrément effectué par l'Arrêté 16.

99.    Par conséquent, la Convention d'Investissement n'était pas encore venue à terme le 14 décembre 2010, lorsque le Ministre des Transports a émis l'Arrêté 106 et rendu la Décision 799 portant dénonciation de la Convention d'Investissement.

100.   La Convention d'Investissement n'étant pas arrivée à expiration le 14 décembre 2010, il revient au Tribunal de déterminer si cette convention a été valablement dénoncée.

---

[61] Dem. Mém. mis à jour, § 69
[62] Lettre du 6 avril 2011, p. 2.

B.     La dénonciation de la Convention d'Investissement

1.  Convention d'Investissement, Article 5

101.   Pour les Demanderesses, la dénonciation de la Convention d'Investissement était infondée[63], et au surplus, cette dénonciation n'aurait pas respecté la procédure prévue dans le Cahier de Charges (Arrêté 66)[64].

102.   Le Tribunal considérera donc successivement les aspects de fond et de procédure de cette question.

a)  Fond

103.   Les « [c]onditions de dénonciation » de la Convention d'Investissement sont prévues à son article 5 :

> « Le non respect de tout ou partie des engagements ci-dessus mentionnés à l'article 4 peut entraîner la dénonciation de la présente Convention par l'Etat du Niger. Dans ce cas, la société remboursera à l'Etat tous les droits, impôts et taxes, normalement exigibles, qui ont été exonérés. »[65]

104.   A son tour, l'article 4 de la Convention d'Investissement prévoit que AHS Niger s'oblige à :

> « - investir un montant minimum de un milliards sept cent soixante sept millions deux cent trente deux mille cent cinquante sept (1.767.232.157) F CFA en hors taxes et hors fonds de roulement ;
>
> - créer au moins 83 emplois permanents ;
>
> - fournir au Ministère chargé de l'Industrie, à la fin de chaque exercice, les états financiers ;
>
> - permettre aux agents du Ministère chargé de l'Industrie et du Ministère chargé des Finances de contrôler le respect des conditions de la présente Convention d'Investissement ;
>
> - respecter la réglementation nigérienne en matières sociales »[66].

105.   Selon les Demanderesses, AHS Niger a « parfait[ement] » respecté ses obligations[67].

106.   Dans cet arbitrage la Défenderesse s'est bornée à affirmer que :

> « Courant décembre 2010, une inspection diligentée par les autorités de la transition concluant à l'irrégularité de l'octroi de l'agrément à AHS NIGER

---

[63] Dem. Mém. mis à jour, §§ 306-321.
[64] Dem. Mém. mis à jour, §§ 256-270.
[65] Pièce C7, article 5.
[66] Pièce C7, article 4.
[67] Dem. Mém. mis à jour, §§ 53-64.

19

*s.a, au non respect de ses engagements vis à vis de l'Etat du Niger ainsi qu'au non respect de la législation nigérienne entre autres manquements relevés.*

*En exécution des recommandations de la mission d'inspection et par application de l'article 5 de la convention d'investissement du 15 décembre 2004, le Ministre en charge du tourisme dénonçait ladite convention »*[68].

107.   Cette allégation reproduit un langage similaire à celui exprimé dans la Décision 799 :

« *[…] il m'a été donné de constater, à la lumière des différentes inspections dont vous avez fait l'objet, que la société AHS n'a rempli aucun de ses engagements, tels que définis à l'article 4 de ladite Convention.*

*Par ailleurs, je vous rappelle les termes de l'article 5 du même texte qui stipule que le non respect de tout ou partie des engagements ci-dessus mentionnés peut entraîner la dénonciation de la présente Convention d'investissement par l'Etat du Niger […].*

*Aussi, le Gouvernement de la République du Niger par ma voix dénonce la Convention d'investissement signée avec la société AHS et considère dorénavant ladite Convention comme nulle et de nul effet. »*[69].

108.   Le Niger n'a pas apporté la moindre preuve de la réalité de ces inspections ou d'un quelconque manquement de AHS Niger aux obligations découlant de la Convention d'Investissement.

109.   Au contraire, les Demanderesses ont démontré à satisfaction du Tribunal arbitral qu'AHS Niger s'est conformé à la Convention d'Investissement.

110.   Ainsi, concernant l'obligation d'« *investir un montant minimum de un milliard sept cent soixante sept millions deux cent trente deux mille cent cinquante sept (1.767.232.157) F CFA en hors taxes et hors fonds de roulement »*, les Demanderesses ont apporté des éléments démontrant que « *sur la période des cinq (5) premières années à partir du 15 décembre 2004, date de prise d'effet de la Convention d'investissement, AHS Niger a investi 1,8 milliards et près de 2,1 milliards sur la période 2004 à 2010. Ces montants sont attestés par la comptabilité et les comptes certifiés de AHS Niger »*[70].

111.   En ce qui concerne l'obligation de « *créer au moins 83 emplois permanents »*, les Demanderesses soutiennent que « *l'implantation de la société AHS Niger a abouti à la création de 101 emplois soit dix huit (18) postes de plus que l'objectif de 83 agents fixé par la Convention d'Investissement »*[71].

---

[68] Lettre du 6 avril 2011, p. 3.
[69] Pièce C18.
[70] Dem. Mém. mis à jour, §§ 53 et 309, et pièces C10 et C71.
[71] Dem. Mém. mis à jour, §§ 54 et 313.

20

112.    Sur l'obligation de « *fournir au Ministère chargé de l'Industrie, à la fin de chaque exercice, les états financiers* », les Demanderesses ont relevé que :

> « *... quant au respect des obligations comptables, la certification des états financiers de AHS Niger par les services compétents prévus par l'Etat du Niger constitue une présomption irréfragable de la conformité de la comptabilité de AHS Niger au système comptable en vigueur au Niger.* »[72].

Ceci est corroboré par les rapports généraux et spéciaux du commissaire aux comptes que le Tribunal considère suffisants pour justifier ces allégations[73].

113.    Finalement, le Tribunal ne dispose d'aucun élément lui laissant penser qu'AHS Niger aurait manqué à son obligation de « *permettre aux agents du Ministère chargé de l'Industrie et du Ministère chargé des Finances de contrôler le respect des conditions de la présente Convention d'Investissement* » et de « *respecter la réglementation nigérienne en matière sociale.* »

114.    A la lumière de ce qui précède, le Tribunal est d'avis que la dénonciation de la Convention d'Investissement était infondée.

b)  *Procédure*

115.    L'Arrêté 16 dispose que :

> « *L'agrément peut être suspendu ou retiré en cas de non observation des dispositions des articles 9 et 11 de l'Arrêté N° 066/MT/DAC du 30 Décembre 2003 portant Cahier des charges pour l'exercice de l'activité d'assistance en escale.* »[74].

116.    Les articles 9 et 11 de l'Arrêté 66 (le Cahier de Charges) disposent :

> « *Article 9 : SUSPENSION DE L'AGREMENT*
>
> *Si pour des raisons qui lui sont imputables le titulaire de l'agrément ne satisfait plus aux critères définis aux articles 4 et 5, le Ministre en charge de l'Aviation Civile adresse à l'intéressé le cas échéant sur saisine du gestionnaire de l'aéroport ou de l'administration de l'Aviation Civile, une mise en demeure d'apporter les mesures correctives nécessaires aux manquements constatés.*
>
> *En cas de carence persistante à l'expiration d'un délai de deux mois suivant la mise en demeure le Ministre en charge de l'Aviation Civile suspend l'agrément pour une durée maximale de six mois. Préalablement à cette suspension, l'intéressé est mis en demeure de présenter ses observations.*
>
> *L'agrément peut faire l'objet d'une suspension immédiate pour une durée maximale de six mois en cas de risque grave pour la sécurité ou la sûreté des aéronefs, des personnes et des biens.* »

---

[72] Dem. Mém. mis à jour, § 55.
[73] Pièce C10.
[74] Pièce C3, article 5.

*« Article 11 : RETRAIT DE L'AGREMENT*

*L'agrément est retiré par l'autorité l'ayant délivré, si à l'issue de la période de suspension les corrections nécessaires n'ont pas été apportées.*

*L'agrément peut faire également l'objet de retrait dans les cas de figure suivants :*

*- en cas de faillite*

*- en cas de liquidation judiciaire*

*- en cas de condamnation à une peine quelconque pour des faits contraires à la probité commerciale*

*- en cas de cessation d'activité prolongée de plus de six mois*

*- en cas de défaillances répétées du matériel et/ou du personnel*

*L'agrément peut être retiré par le Ministre en charge de l'Aviation civile sans préavis sur rapport motivé de l'administration de l'aviation civile ou du gestionnaire d'aéroport en cas de récidive, de risque grave pour la sécurité ou la sûreté des aéronefs, des personnes et des biens ou de non-paiement des redevances. »*[75].

117.   Le Niger n'a pas rapporté la preuve de ce que la procédure prévue dans le Cahier de Charges ait été suivie. Le Niger n'a même pas identifié (et encore moins, prouvé) des manquements à la Convention d'Investissement ou aux critères définis aux articles 4 et 5 du Cahier de Charges. Par conséquent, le Niger n'était pas en droit de suspendre ou de retirer l'agrément.

118.   En outre, en ce qui concerne la procédure prévue au Cahier de Charges, le Tribunal note que cette question a été abordée par la Cour d'Etat du Niger, Chambre Administrative, dans l'arrêt n°12-054 du 10 Octobre 2012[76], qui a annulé l'Arrêté 106 et la Décision 799. Cet élément ne peut que conforter la position de ce Tribunal arbitral dans sa conclusion que la dénonciation de la Convention d'Investissement n'est pas fondée.

C.    **Conclusion du Tribunal**

119.   Etant donné que la Convention d'Investissement n'était pas encore parvenue à son expiration le 14 décembre 2010 lorsque le Niger a prétendu dénoncer la Convention d'Investissement, et que cette dénonciation était infondée et irrégulière, le Tribunal conclut que le Niger a manqué à ses engagements conformément à ladite Convention.

120.   Cette analyse est confirmée par l'arrêt précité du 10 octobre 2012 par lequel la Chambre Administrative de la Cour d'État du Niger a annulé la dénonciation de la Convention d'Investissement.

---

[75] Pièce C6.
[76] Pièce C77, pp. 5-7.

## V.2    Expropriation

121.    Selon les Demanderesses, le Niger aurait pris plusieurs mesures susceptibles d'être qualifiées d'expropriation en violation de la Convention d'Investissement : la réduction par arrêtés de la durée de l'Arrêté 16 puis son retrait, la dénonciation de la Convention d'Investissement et les mesures de réquisition du matériel et du personnel d'AHS Niger[77].

122.    La Convention d'Investissement dispose que : « *le Gouvernement de la République du Niger garantit à la Société AVIATION HANDLING SERVICES NIGER s.a qu'aucune mesure d'expropriation ou de nationalisation des investissements ne sera prise* »[78]. Le Tribunal note que ceci est conforme au Code des Investissements, qui dispose à son article 7 :

> « *Sauf cas d'utilité publique prévue par loi, la République du Niger garantit aux entreprises installées, ou qui viendraient à s'installer, qu'aucune mesure d'expropriation ou de nationalisation ne serait prise.*
>
> *Les éventuelles mesures d'expropriation ou de nationalisation donnent droit à une indemnisation juste et équitable.* »[79]

123.    Même en cas de dénonciation, la Convention d'Investissement ne permet pas au Niger de réquisitionner le matériel ou le personnel d'AHS Niger :

> « *Le non respect de tout au partie des engagements ci-dessus mentionnes à l'article 4 peut entraîner la dénonciation de la présente Convention par l'Etat du Niger. Dans ce cas, la société remboursera à l'Etat tous les droits, impôts et taxes, normalement exigibles, qui ont été exonérés.* »[80].

124.    Le Tribunal a déjà conclu que la dénonciation de la Convention d'Investissement n'était pas fondée.

125.    En outre, cette dénonciation a été annulée par la Cour d'Etat du Niger. Il n'existe donc en tout état de cause aucune base juridique qui puisse justifier les mesures de réquisitions des actifs, du matériel et du personnel d'AHS Niger. Selon les Demanderesses, ces mesures ont persisté même après l'annulation de la dénonciation.

126.    Le Tribunal s'accorde également avec les Demanderesses sur le fait que les mesures de réquisition des actifs, du matériel et du personnel d'AHS Niger –des faits tous avérés et non contestés par le Niger– ont eu pour effet de priver les Demanderesses du contrôle, de la propriété, de l'usage et de la jouissance de leur investissement et sont

---

[77] Dem. Mém. mis à jour, §§ 333-352.
[78] Pièce C7, article 2.
[79] Pièce C32, article 7 ; voir aussi article 2 (« *La République du Niger assure une protection constante au double point de vue légal et judiciaire a tous les investissements privés participant à la réalisation de ses programmes de développement économique et social.* »).
[80] Pièce C7, article 5.

23

donc constitutives d'une expropriation[81] contraire aux engagements pris par le Niger dans la Convention d'Investissement et le Code des Investissements.

127.    Le Niger doit donc dédommager les Demanderesses.

## VI.    DOMMAGES

128.    Le Tribunal s'accorde avec les Demanderesses et le Professeur Sur sur le fait que le préjudice causé par la violation doit être réparé[82]. Le Tribunal vérifiera donc si les chefs de préjudice allégués par les Demanderesses ont bien été causés par les violations de la Convention d'Investissement.

129.    Les Demanderesses ont allégué dans leur Mémoire au fond en date du 14 novembre 2011 avoir subi un préjudice matériel et moral[83]. Ainsi que noté ci-dessus (§ 70), les Demanderesses indiquent dans leur mémoire du 11 avril 2013 que ce préjudice continue. Elles prétendent ainsi que l'annulation de l'Arrêté 106 et des autres mesures contestées par l'arrêt n° 12-054 n'aurait « *aucun effet sur le montant des dommages-intérêts qui pourraient être octroyés aux Demanderesses dans le cadre de la présente procédure* »[84].

130.    Les Demanderesses ont indiqué que les chefs de préjudice « *ont fait l'objet d'une évaluation provisoire à parfaire* »[85]. Toutefois, ayant eu l'opportunité de compléter leurs écritures, les Demanderesses n'ont pas considéré opportun de réviser le calcul de leur préjudice. Le Tribunal prend donc cette évaluation provisoire comme étant l'évaluation définitive du préjudice des Demanderesses.

### VI.1    Préjudice économique : gain manqué et actif saisis

131.    Selon les Demanderesses, sur la base de l'article 1149 du Code Civil du Niger (« *les dommages-intérêts dus au créancier sont en général de la perte qu'il a fait et du gain dont il a été privé...* »), elles auraient subi deux types de préjudices économiques : (A) un gain manqué, et (B) la perte des biens saisis. Le Tribunal considère que le Code des Investissements, en se référant dans son article 7 à une « *indemnisation juste et équitable* », prévoit la réparation intégrale du préjudice subi par les Demanderesses.

### A.    Sur le gain manqué

132.    Selon les Demanderesses, en dénonçant la Convention d'Investissement le 14 décembre 2010, le Niger a empêché AHS Niger de maintenir son activité

---

[81] V. *Metalclad Corporation v. United Mexican States,* Affaire CIRDI n° ARB(AF)/97/1, Sentence du 30 août 2000, § 103.
[82] Dem. Mém. mis à jour, § 315 ; Avis Juridique du Professeur Sur, § 36.
[83] Dem. Mém. mis à jour, § 316. Voir généralement Dem. Mém. mis à jour, §§ 362-435.
[84] Dem. Mém. mis à jour, § 115.
[85] Dem. Mém. mis à jour, § 360.

24

d'assistance en escale. Sans cette dénonciation, AHS Niger aurait pu continuer cette activité au moins pendant dix ans, en l'occurrence jusqu'en février 2014[86].

133. Selon les Demanderesses, elles auraient réalisé des bénéfices pendant les quatre ans qui restaient à courir jusqu'en 2014 au moment de la dénonciation de la Convention[87]. Toujours selon les Demanderesses, elles auraient le droit de solliciter une indemnisation au titre de ce gain manqué, même si ce gain ne peut pas être établi avec une certitude absolue[88].

134. En effet, le Tribunal se doit d'ordonner la réparation intégrale du préjudice subi et, à ce titre, de mettre les Demanderesses dans l'état où elles se trouveraient si la Convention d'Investissement avait été exécutée jusqu'à son terme.

135. La doctrine et certaines décisions arbitrales invoquées par les Demanderesses confortent le Tribunal dans cette approche.

136. Ainsi, il a été soutenu que « [s]i *les arbitres refusent de réparer le dommage éventuel, ils ne subordonnent toutefois pas l'indemnisation à l'existence d'un dommage absolument certain. Plusieurs obstacles s'opposent en effet à une exigence de certitude absolue [...]. Tout d'abord, pour établir exactement le gain manqué qui se prolonge dans le futur, on se heurte à une 'incertitude irréductible' liée notamment à la difficulté de saisir exactement l'évolution des circonstances externes ayant vocation à intervenir sur le dommage (croissance nationale, déflation, disparition d'un concurrent, découverte de nouveaux débouchés...). Dans l'hypothèse d'une rupture des relations contractuelles, l'arbitre ne peut ainsi jamais être absolument certain qu'un gain aurait pu être réalisé si le contrat avait été normalement exécuté. Trop nombreux sont en effet les aléas qui affectent ce type de dommage [...]. L'analyse prospective exclut par sa nature même l'idée de certitude [...]. Si les arbitres subordonnaient la réparation à la certitude du dommage entendu de façon strict, très souvent, aucune indemnité ne pourrait être allouée pour le gain manqué et le dommage moral. Ce sont donc des considérations théoriques et pratiques qui ont conduit la jurisprudence arbitrale internationale à ne pas appliquer aussi rigoureusement l'exigence de certitude du dommage* »[89].

137. Dans le même sens, dans l'affaire *Maritime International Nominees Establishment (Liechtenstein) c. République de Guinée*[90] le Tribunal a estimé que :

---

[86] Dem. Mém. mis à jour, § 374 (« *terme de la concession prévue jusqu'en février 2014* ») et Pièce C43.

[87] Dem. Mém. mis à jour, § 370.

[88] Dem. Mém. mis à jour, §§ 362-370.

[89] Pièce A17 – J. Ortscheidt, La réparation du dommage dans l'arbitrage commercial international, Dalloz, 2001, p. 37, n°55 à 62 (soulignement ajouté).

[90] Pièce A19 – *Maritime International Nominees Establishment (Liechtenstein) c. République de Guinée*, Aff. CIRDI ARB/84/4, Sentence du 6 janvier 1988, YCA, XIV (1989), n°17, p. 82, extrait traduit par les Demanderesses, original: « *The Tribunal accepts the general principle that MINE is entitled to be compensated*

25

« ... *le principe général selon lequel* [la partie cocontractante] *a le droit d'être indemnisée pour les profits qu'elle aurait réalisés si* [l'Etat d'accueil] *n'avait pas rompu le contrat. Les profits perdus ne doivent pas être prouvés avec entière certitude et la réparation ne devrait pas être refusée simplement parce que le quantum est difficile à déterminer* ».

138.    Ou encore la Sentence CCI de 1990[91] :

« *bien que la charge de la preuve repose sur le demandeur dans une telle situation, le dommage n'a pas besoin d'être établit avec une certitude absolue. Aussi longtemps que des éléments suffisants sont avancés à partir desquels les dommages et intérêts peuvent être évalués de façon approximative, toutes les méthodes raisonnables de calcule sont admissibles* ».

139.    En l'espèce, le Tribunal considère que la preuve apportée par les Demanderesses est suffisante pour établir le manque à gagner subi par les Demanderesses. Pour l'évaluation du gain manqué, les Demanderesses se fondent ainsi sur le rapport de leur expert, Monsieur Willis[92]. L'évaluation de Monsieur Willis est fondée sur une projection des bénéfices nets escomptés pour la période courant du 15 décembre 2010 jusqu'en février 2014, résultant entre autre des projections d'évolution du chiffre d'affaires pour les années 2011 à 2014. Cette évaluation a été chiffrée par Monsieur Willis à 2.634.302.000 F CFA[93], ce qui correspond à 4.015.967,51 euros, montant de la demande formulée par les Demanderesses[94].

## B.    Sur la valeur des biens saisis

140.    Les Demanderesses prétendent également avoir subi une perte du fait des mesures de réquisition des actifs, du matériel et du personnel d'AHS Niger.

141.    Les Demanderesses évaluent ce préjudice à 619.444.433 F CFA, soit 944.336,95 €. Cette somme se décompose en (i) 410.382.837 F CFA pour la valeur nette comptable des actifs, (ii) 209.061.596 F CFA pour les créances, et (iii) 40.758.174 FCFA équivalant aux sommes dues par le personnel d'AHS Niger au titres d'avances et de prêts consentis par AHS Niger[95].

142.    Concernant les créances, les Demanderesses n'expliquent nullement en quoi la dénonciation de la Convention d'Investissement et le retrait de l'agrément empêchent AHS Niger de se retourner vers ses créanciers pour le paiement de ses créances. Elles

---

*for the profits that it would have earned if Guinea had not breached the Convention. The lost profits need not be proven with complete certainty, nor should recovery be denied simply because the amount is difficult to ascertain* ».

[91] Pièce A19 – Affaire CCI n°5946, 1990, YCA, XVI (1991), n°45, p. 97.
[92] Dem. Mém. mis à jour, §§ 373-334.
[93] Rapport Willis, p. 7.
[94] Dem. Mém. mis à jour, §§ 375 et 448.
[95] Dem. Mém. mis à jour, §§ 376-378 et Pièce C72.

26

n'apportent pas la preuve (elles ne font même pas l'allégation) de ce que les créanciers de AHS Niger auraient payé ces montants à l'Etat du Niger. Par conséquent, le Tribunal n'est pas en mesure de prendre en considération ces montants dans le calcul du dommage subi par les Demanderesses.

143. En ce qui concerne les montants correspondants aux sommes dues par le personnel d'AHS Niger au titre d'avances et de prêts consentis par AHS Niger, les Demanderesses ne justifient pas en quoi ces prêts et avances étaient nécessaires à l'exploitation de la concession. Le Tribunal considère que ces prêts et avances établissent une relation juridique entre AHS Niger et ces employés en vertu de laquelle ces employés sont tenus de rembourser ces montants à AHS Niger. AHS Niger n'explique pas en quoi les mesures prises par le Niger sont de nature à l'empêcher de chercher le recouvrement de ces créances auprès de ces employés. Par conséquent, le Tribunal n'est pas en mesure de prendre en considération ces montants dans le calcul du dommage subi par les Demanderesses.

144. Finalement, concernant la valeur des actifs, le Tribunal n'a aucun doute sur le fait que les mesures prises par le Niger ont abouti à la dépossession de AHS Niger de ses actifs. La valeur de ces actifs a été certifiée par le rapport de l'expert M. Willis[96]. Le Tribunal arbitral considère que le Rapport de M. Willis –qui n'a pas été contredit par le Niger, ni son auteur appelé par le Niger pour le contre-interroger– est crédible. Le Tribunal arbitral estime que les montants dégagés dans ce Rapport sont expliqués de manière cohérente et semblent raisonnables. Le Niger doit donc rembourser les Demanderesses pour la valeur de ces actifs, i.e., 625.624,64 euros (410.382.837 F CFA)[97].

145. Par conséquent, à titre de gain manqué et actif saisis, le préjudice économique des Demanderesses est de 4.641.592,15 euros (i.e., 4.015.967,51 plus 625.624,64).

## VI.2  Préjudice moral

146. Selon les Demanderesses, elles auraient subi deux types de préjudice moral : une atteinte à leur image et à leur réputation, et une atteinte à leurs droits de propriété intellectuelle[98] (A). Elles demandent 2.200.000,00 € à titre d'indemnisation globale pour ces deux chefs[99] (B).

---

[96] Rapport Willis, p. 8 et Appendices E et F de ce rapport.
[97] Dem. Mém. mis à jour, § 376.
[98] Dem. Mém. mis à jour, § 380.
[99] Dem. Mém. mis à jour, §§ 434-435.

27

### A.    Préjudice

147.    De manière générale, les Demanderesses invoquent diverses théories de droit au soutien de leur demande de réparation pour préjudice moral. Selon les Demanderesses :

- ce préjudice a été causé par la violation par la Défenderesse de ses obligations[100] ;

- la faute commise par la Défenderesse est « *assimilable à une voie de fait* », étant donne la « *gravité de la faute commise* » et le « *comportement arbitraire* »[101] ; et

- cette réparation est prétendument préconisée par la doctrine française pour « *permet*[tre] *aux juges de dépasser la simple évaluation de la perte matérielle subie* » et « *introduire une dimension punitive dans la réparation* »[102].

148.    Concernant la prétendue atteinte à l'image et à la réputation, les Demanderesses soumettent comme unique preuve des extraits d'articles de la presse nigérienne dans lesquelles la Ministre des Transports aurait prétendument tenu des propos que les Demanderesses caractérisent comme « *dépourvues de tout fondement et revêt*[ant] *un caractère diffamatoire* »[103]. Les Demanderesses n'expliquent pas comment un préjudice causé par ces propos serait relié à, ou résulterait de, la violation de la Convention d'Investissement, et non d'une diffamation à l'égard de laquelle la compétence du Tribunal ferait défaut.

149.    Le Tribunal arbitral considère, en outre, que sur la base de la preuve apportée, il n'est pas en mesure de déterminer la réalité de l'atteinte à l'image et à la réputation des Demanderesses.

150.    S'agissant de la prétendue atteinte aux droits de propriété intellectuelle, les Demanderesses indiquent qu'elles ont obtenu l'enregistrement des noms commerciaux et de marques dans la zone de l'organisation africaine de la propriété intellectuelle (« OAPI »), dont le Niger est membre[104]. Les Demanderesses allèguent que la Cellule d'Assistance en Escale a continué à exploiter l'activité d'assistance en escale en utilisant les uniformes du personnel et les équipements comportant ces noms et sigles[105]. Les Demanderesses reconnaissent que depuis le début de l'année 2011 « *l'ensemble des sigles et noms commerciaux portant le nom AHS* » a été effacé sur le matériel saisi de AHS Niger[106].

151.    Toutefois, l'argument des Demanderesses par rapport à cette utilisation n'est pas suffisant pour établir un droit au dédommagement demandé.

---

[100] Dem. Mém. mis à jour, §§ 353-355, 359.
[101] Dem. Mém. mis à jour, § 382 ; voir aussi §§ 357-358 (citant Rapport Sur, pp. 22-23).
[102] Dem. Mém. mis à jour, § 385 (citant Véronique Wester-Ouisse, pièce A20).
[103] Dem. Mém. mis à jour, §§ 388-397 ; pièces C57 (illisible) et C58.
[104] Dem. Mém. mis à jour, §§ 398-404.
[105] Dem. Mém. mis à jour, §§ 411-418.
[106] Dem. Mém. mis à jour, § 417.

28

152.    D'une part, elles suggèrent –mais ne l'affirment pas explicitement– que cette utilisation serait en violation de l'Accord de Bangui du 2 mars 1977[107]. Les Demanderesses indiquent que le Niger a ratifié cet Accord en 1977[108], mais n'expliquent pas sa pertinence pour le présent arbitrage. Notamment, elles n'expliquent pas comment le présent Tribunal serait compétent pour connaître de ces arguments. A cet égard, le Tribunal remarque que l'article 47 de l'annexe III dudit Accord dispose, s'agissant des « *Juridictions compétentes* », que :

> « *1) Les actions civiles relatives aux marques sont portées devant les tribunaux civils et jugées comme matières sommaires.*
>
> *2) En cas d'action intentée par la voie correctionnelle, si le prévenu soulève pour sa défense des questions relatives à la propriété de la marque, le tribunal compétent statue sur l'exception.* »[109].

153.    D'autre part, elles allèguent que l'utilisation de leurs noms et marques aurait trompé les usagers des services d'assistance en escale, leurs faisant croire que AHS Niger était responsable d'un service ostensiblement dégradé, opéré par la Cellule d'Assistance en Escale. L'implication est qu'en ce faisant, on aurait porté atteinte à leur réputation[110].

154.    Elles s'appuient sur un audit des services réalisé par la société DHL de la Cellule d'Assistance en Escale[111]. Pourtant, elles ne suggèrent pas que cet audit aurait fait état d'une confusion entre la Cellule d'Assistance en Escale et AHS Niger. Au contraire, selon les Demanderesses, cet audit aurait relevé que la « *Cellule Assistance En Escale (CAEE) has assumed the role for ground handling of DHL aircraft at Diori Hamani International Airport (NIM) from Aviation Handling Services (AHS).* »[112]

### B.    Indemnisation

155.    Dans la mesure où le Tribunal n'a pas fait droit aux demandes relatives au préjudice moral, il n'est pas nécessaire d'examiner la quantification du dédommagement demandé à ce titre.

## VII.    INTERETS

156.    Les Demanderesses demandent l'application d'intérêts avec capitalisation sur les montants réclamés, à compter du 14 décembre 2010[113]. Toutefois, elles n'ont pas jugé utile de donner au Tribunal un taux de référence.

---

[107] Dem. Mém. mis à jour, §§ 405-406.
[108] Dem. Mém. mis à jour, § 398.
[109] Pièce C64, article 47 de l'annexe III.
[110] Dem. Mém. mis à jour, §§ 419-430.
[111] Dem. Mém. mis à jour, § 430.
[112] Dem. Mém. mis à jour, § 430.
[113] Dem. Mém. mis à jour, § 448.

157.    Le Tribunal arbitral ayant constaté que les Demanderesses ont droit à la réparation intégrale du préjudice subi, ne peut que constater également son entière liberté pour décider aussi bien du taux que de la date de départ des intérêts. Le Tribunal estime que cette réparation ne serait pas intégrale si les Demanderesses (une fois fixé leur préjudice) ne se voyaient pas octroyer des intérêts jusqu'à la complète satisfaction des condamnations prononcées par ce Tribunal arbitral. Ainsi, le Tribunal considère que des intérêts simples sont dus sur les montants fixés par cette sentence à partir de la date de sa notification et jusqu'à leur paiement complet.

158.    En ce qui concerne le taux d'intérêt, le Tribunal arbitral considère que les intérêts ne doivent pas devenir un moyen d'enrichissement, ni encore moins revêtir un caractère punitif. Pour préserver donc la nature compensatoire de la condamnation aux intérêts qui est prononcée dans cet arbitrage, le Tribunal arbitral considère que le taux approprié doit être un taux qui présente un lien réel avec la monnaie des condamnations les plus importantes, l'Euro, tel que fixé par son autorité monétaire, la Banque Centrale Européenne – BCE. Le Tribunal arbitral considère ainsi que le taux marginal (dit « *Marginal Lending Facility* ») fixé par la Banque Centrale Européenne – BCE est le taux approprié.

## VIII.    FRAIS DE PROCEDURE

159.    Les Demanderesses réclament la condamnation du Niger au paiement des frais de procédure, y compris les honoraires et frais des experts et ceux encourus par les Demanderesses dans la défense de leurs intérêts[114].

160.    A cet égard, conformément aux articles 60(1) et 61(2) de la Convention CIRDI et 28 du Règlement d'arbitrage, le Tribunal arbitral dispose d'une ample liberté dans la détermination des frais d'arbitrage et de défense engagés ou supportés par les Parties et dans la distribution du paiement de ces frais, tout comme des frais fixés par le Secrétaire Général du CIRDI, par les Parties.

161.    Concernant les frais d'arbitrage, y compris les frais et honoraires des membres du Tribunal ainsi que les frais du CIRDI, le Centre notifiera ultérieurement aux Parties le montant exact de cette somme. Ces honoraires, frais et redevances ont été avancés, en leur totalité, contre les versements faits par les Demanderesses exclusivement. Le Niger n'a donné suite à aucune des demandes du CIRDI à cet égard.

162.    Concernant les frais de défense, le Niger n'a communiqué aucun chiffre au Tribunal arbitral. En revanche, les Demanderesses ont apporté des justificatifs démontrant avoir dépensé les montants suivants : Honoraires d'avocat – 141.000 €, Frais – 3.652,57 €, Frais et honoraires de l'expert Prof. Sur – 8.000 €, et Frais et honoraires de l'expert Willis – 4.491,04 £ (i.e., 5.254,51 €) ; pour un total de 157.907,08 €.

---

[114] Dem. Mém. mis à jour, §§ 436 à 439.

30

163. Le Tribunal arbitral estime que ces montants sont raisonnables eu égard au degré de complexité du litige et au travail effectué par les conseils des Demanderesses tout au long de la procédure arbitrale.

164. Pour décider de la distribution des frais d'arbitrage et des frais de défense, le Tribunal arbitral a considéré le sort des demandes présentées par les Parties ainsi que leur comportement pendant l'arbitrage.

165. Le Niger a été débouté de toutes ses objections à la compétence du CIRDI et de ce Tribunal arbitral. Ces objections et le fait que le Niger a fait défaut dans la procédure arbitrale ont alourdi la procédure et ont été source de travail additionnel pour le Tribunal arbitral. Au fond, les Demanderesses obtiennent gain de cause sur la plupart de leurs demandes, mais le dédommagement octroyé par le Tribunal est inférieur à celui qu'elles ont demandé.

166. Par conséquent, le Tribunal arbitral décide que la totalité des frais d'arbitrage (dont le montant sera communiqué aux Parties par le CIRDI dans les 90 jours de la date de cette sentence) doit être mise à la charge de la Défenderesse, et que la Défenderesse doit aussi contribuer à hauteur de 118.000 € (ce qui représente près de 75% du total) aux frais de défense engagés par les Demanderesses.

## IX.    DISPOSITIF

167. Par ces motifs, le Tribunal arbitral :

   1. Déclare que la République du Niger a manqué à ses obligations découlant de la Convention d'Investissement et du Code des Investissements et que, de ce fait, elle a engagé sa responsabilité vis-à-vis de AHS Niger et Menzies Middle East and Africa SA ;

   2. Condamne la République du Niger au paiement de 4.641.592,15 € à titre de dommages-intérêts ;

   3. Condamne la République du Niger au paiement des frais d'arbitrage, y compris les frais et honoraires des membres du Tribunal arbitral ainsi que les frais du CIRDI (qui seront communiqués aux Parties par le CIRDI dans les 90 jours qui suivront la date de cette sentence) ;

   4. Condamne la République du Niger au paiement de 118.000 € au titre des frais de défense encourus par AHS Niger et Menzies Middle East and Africa SA ;

   5. Condamne la République du Niger au paiement d'intérêts simples sur les montants de condamnations prévues aux paragraphes 167.2, 167.3 et 167.4 ci-dessus au taux annuel de prêt marginal (dit « *Marginal Lending Facility* ») tel que fixé par la Banque Centrale Européenne (BCE) et ce, à partir de la date de notification de cette sentence (et à partir de la notification par le CIRDI du montant dû en ce qui concerne les sommes visées au paragraphe 167.3) et jusqu'au complet paiement de ces sommes ; et

   6. Rejette toutes les autres demandes des Parties.

31

Patrick Hubert
Coarbitre
(le 10 juillet 2013)

Gaston Kenfack-Douajni
Coarbitre
(le 8 juillet 2013)

Fernando Mantilla-Serrano
Président
(le 10 juillet 2013)

32

**CENTRE INTERNATIONAL POUR LE RÈGLEMENT DES DIFFÉRENDS RELATIFS AUX INVESTISSEMENTS**
WASHINGTON, D.C.

Dans une procédure entre

**AHS NIGER ET MENZIES MIDDLE EAST AND AFRICA SA**

Demanderesses

et

**LA RÉPUBLIQUE DU NIGER**

Défenderesse

**Affaire CIRDI No. ARB/11/11**

---

# DÉCISION SUR LA COMPÉTENCE

---

*Membres du Tribunal*
Monsieur Fernando Mantilla-Serrano, Président
Monsieur Patrick Hubert, Arbitre
Monsieur Gaston Kenfack-Douajni, Arbitre

*Secrétaire du Tribunal*
Madame Aurélia Antonietti

*Date d'envoi aux Parties: 13 mars 2013*

## REPRÉSENTATION DES PARTIES

Les Demanderesses sont représentées par :

Me Rasseck Bourgi,
10, rue du Chevalier de Saint George
75001 Paris
France

La Défenderesse a été représentée jusqu'au 14 mars 2012 par :

Me. Ibrahim M. Djermakoye
4, rue de la Tapoa, Ancien Plateau
BP 12651 Niamey
Niger

et par

Le Ministre des Transports
et le Directeur des Transports
Immeuble Caisse Nationale de Sécurité Sociale
(Quartier Terminus) Niamey
BP 12.130 Niamey
Niger
et
Le Directeur du Contentieux de l'État
Secrétariat Général du Gouvernement
BP 550 Présidence de la République
Niamey
Niger

Depuis le 13 mars 2012, la Défenderesse fait défaut.

I.    INTRODUCTION ET PARTIES ..................................................................... 1

II.   HISTORIQUE DE LA PROCÉDURE ............................................................. 2

III.  RAPPEL DES FAITS .................................................................................... 6

IV.   RÉSUMÉ DE LA POSITION DES PARTIES ............................................... 12

IV.1  Position des Demanderesses ....................................................................... 13

    A.   Sur la compétence ............................................................................... 13

    B.   Sur le fond .......................................................................................... 14

    C.   Demande des Demanderesses ............................................................. 16

IV.2  Position de la Défenderesse ....................................................................... 17

V.    COMPÉTENCE ............................................................................................ 18

V.1   Dispositions applicables .............................................................................. 18

V.2   Compétence *ratione personae* .................................................................. 19

    A.   Le Niger .............................................................................................. 20

    B.   MMEA ................................................................................................ 20

    C.   AHS Niger ........................................................................................... 20

    **1.   Position des Parties** ........................................................................ **20**

    **2.   Décision du Tribunal** ...................................................................... **23**

        a)   Le statut de AHS Niger .................................................................. 23

        b)   A l'égard du Code des Investissements ........................................... 29

        c)   A l'égard de la Convention CIRDI .................................................. 31

V.3   Compétence *ratione voluntatis* ................................................................. 35

    A.   Analyse des instruments applicables .................................................. 35

    **1.   L'acte d'agrément** .......................................................................... **36**

    **2.   Les modalités de l'arbitrage visées dans l'acte d'agrément** .......... **38**

    **3.   Les parties visées par l'acte d'agrément** ....................................... **41**

    B.   Le Niger .............................................................................................. 42

    C.   AHS Niger ........................................................................................... 43

    D.   MMEA ................................................................................................ 43

V.4   Compétence *rationae materiae* ................................................................ 46

    A.   Le Code des Investissements .............................................................. 46

    B.   La Convention CIRDI ......................................................................... 48

VI.   FRAIS ET DEPENS ..................................................................................... 49

VII.  DISPOSITIF ................................................................................................ 49

GLOSSAIRE

| | |
|---|---|
| AHS | Aviation Handling Services S.A. |
| AHS Niger | Aviation Handling Services Niger S.A. |
| Arrêté 1 | Arrêté n° 000001/MT/AC/DAC du 5 janvier 2010 |
| Arrêté 2 | Arrêté n° 000002/MT/AC/DAC du 5 janvier 2010 |
| Arrêté 15 | Arrêté n° 015/MT/T/DAC du 19 février 2004 |
| Arrêté 16 | Arrêté n° 016/MT/T/DAC du 19 février 2004 |
| Arrêté 66 | Arrêté n° 066/MT/DAC du 30 décembre 2003 |
| Arrêté 103 | Arrêté n° 103/MTT/A/DAC du 14 décembre 2010 |
| Arrêté 104 | Arrêté n° 104/MTT/A/DAC du 14 décembre 2010 |
| Arrêté 105 | Arrêté n° 105/MTT/A/DAC du 14 décembre 2010 |
| Arrêté 106 | Arrêté n° 106/MTT/A/DAC du 14 décembre 2010 |
| Arrêté 108 | Arrêté n° 00108/MTT/A/DRF/M du 29 décembre 2010 |
| Décision 799 | Décision n° 00799/MTT/A/DAC du 14 décembre 2010 |
| C | Pièce Demanderesses |
| CIRDI ou le Centre | Centre international pour le règlement des différends relatifs aux investissements |
| Code des Investissements | Code des Investissements de la République du Niger du 8 décembre 1989, modifié par ordonnance en 1997, 1999 et par loi en 2001 |
| Convention CIRDI ou Convention de Washington | Convention pour le règlement des différends relatifs aux investissements entre États et ressortissants d'autres États du 18 mars 1965 |
| Convention d'Investissement | Convention d'Investissement conclue le 15 décembre 2004 entre AHS Niger et la République du Niger |
| Déf. | Défenderesse |
| Déf. Mém. | Mémoire de la Défenderesse du 6 avril 2011 |
| Dem. | Demanderesses |
| Dem. Mém. | Mémoire des Demanderesses du 14 novembre 2011 |
| MAG | Menzies Aviation Group |
| MMEA | Menzies Middle East and Africa S.A. (dénommée avant le 18 mars 2011 Menzies Afrique S.A.) |
| Règlement d'arbitrage | Règlement de procédure relatif aux instances d'arbitrage du CIRDI |
| Requête | Requête d'arbitrage des Demanderesses du 4 mars 2011 |

iv

## I.    INTRODUCTION ET PARTIES

1.    Cette affaire concerne un différend soumis au Centre international pour le règlement des différends relatifs aux investissements (« CIRDI » ou le « Centre ») sur le fondement d'une Convention d'Investissement conclue en 2004 entre AHS Niger et la République du Niger (« Convention d'Investissement »), le Code des Investissements nigérien de 1989 et sur le fondement de la Convention pour le règlement des différends relatifs aux investissements entre États et ressortissants d'autres États du 18 mars 1965, en vigueur depuis le 14 octobre 1966 (« Convention CIRDI » ou « Convention de Washington »). Le différend porte sur la régularité du retrait par la République du Niger d'un agrément accordé à AHS Niger pour l'assistance en escale à l'aéroport international de Niamey, ainsi que sur la validité de la dénonciation de la Convention d'Investissement conclue entre AHS Niger et la République du Niger.

2.    Les demanderesses sont les sociétés Aviation Handling Services Niger S.A. (« AHS Niger ») et Menzies Middle East and Africa S.A. (dénommée avant le 18 mars 2011 Menzies Afrique S.A.) (« MMEA »), (ci-après conjointement les « Demanderesses »). Le siège social d'AHS Niger est sis Aéroport International de Niamey, BP 10006[1] ; celui de MMEA est sis 127, rue de Mühlenbach, L-2168, Luxembourg[2].

3.    La défenderesse est la République du Niger (ci-après le « Niger » ou la « Défenderesse ») prise en la personne du Ministre des Transports, du Directeur des Transports et du Directeur du Contentieux de l'État.

4.    Les Demanderesses et la Défenderesse seront ci-après collectivement appelées les « Parties ». Les représentants respectifs des Parties et leurs adresses sont mentionnés ci-dessus.

5.    Le Tribunal présentera dans un premier temps un historique de la procédure (II) et un bref rappel des faits (III), avant de rappeler la position des Parties (IV). Le Tribunal examinera ensuite la question de la compétence (V).

---

[1] Pièces C1 et C44.
[2] Pièces C2 et C36.

1

## II.    HISTORIQUE DE LA PROCÉDURE

6.    Le 11 mars 2011, le CIRDI a reçu une requête d'arbitrage en date du 4 mars 2011 des sociétés AHS Niger et Menzies Afrique SA contre la République du Niger, accompagnée des pièces C1 à C30 et des pièces de jurisprudence JP1 à JP10 (la « Requête »).

7.    Par lettres des 16 et 30 mars 2011, le Centre a posé des questions aux Demanderesses dans le cadre de l'examen de la Requête. Les Demanderesses y ont répondu par lettre du 21 mars 2011 avec les pièces C31 à C35 et JP11 et JP12, et par lettre du 5 avril 2011 avec les pièces C36 à C42 et JP13 à JP16.

8.    Le 6 avril 2011, Me Ibrahim M. Djermakoye a soumis pour le compte du Niger un « Mémoire en défense » « *tendant à démontrer l'incompétence du CIRDI à connaître du litige* » accompagné des pièces 1 à 9 (« Déf. Mém. »).

9.    Les Demanderesses y ont répondu par lettres en date des 7 avril (accompagnée des nouvelles pièces C43 à C45) et 18 avril 2011, et le Niger y a répliqué par lettre du 15 avril 2011.

10.    Le 26 avril 2011, le Secrétaire général du Centre a enregistré la Requête conformément à l'article 36(3) de la Convention CIRDI. Les Parties ont été notifiées de cet enregistrement le même jour. Dans sa Notification d'enregistrement, le Secrétaire général a invité les Parties à procéder dès que possible à la constitution du Tribunal arbitral conformément à l'article 7 du Règlement d'introduction des instances.

11.    Les Parties ont convenu, conformément à l'article 37(2)(a) de la Convention CIRDI, que le Tribunal serait composé de trois arbitres, chaque partie nommant un arbitre et le président étant nommé par les co-arbitres. Les Demanderesses ont nommé M. Patrick Hubert, de nationalité française, qui a accepté sa nomination. La Défenderesse a nommé le Dr. Gaston Kenfack-Douajni, de nationalité camerounaise, qui a accepté sa nomination. Messieurs Hubert et Kenfack-Douajni ont nommé M. Fernando Mantilla-Serrano en tant que président du Tribunal. M. Mantilla-Serrano, de nationalité colombienne, a accepté sa nomination.

12. Conformément à l'article 6(1) du Règlement de procédure relatif aux instances d'arbitrage du CIRDI (« Règlement d'arbitrage »), le Secrétaire général a notifié aux Parties le 22 juillet 2011 que les trois arbitres avaient accepté leur nomination et que le Tribunal était réputé constitué et l'instance engagée à cette date. Les Parties ont également été informées de ce que Mme Aurélia Antonietti, Conseiller juridique au CIRDI, était la Secrétaire du Tribunal (la « Secrétaire »).

13. Le 15 septembre 2011, le Tribunal a tenu sa première session avec les Parties. Il était convenu que chaque partie serait représentée lors de la première session mais la veille de la session, le 14 septembre 2011, M. le Directeur du Contentieux de l'État a informé le Centre qu'aucun représentant de la République du Niger ne serait présent à la session, faisant référence à une lettre adressée à AHS Niger S.A. le 13 septembre 2011 et indiquant la volonté de la Défenderesse « *d'entamer des négociations directes avec AHS-NIGER en vue d'un règlement amiable et consensuel du différend qui les oppose et sollicitait par la même occasion une suspension de la procédure d'arbitrage initiée devant le CIRDI pour permettre aux parties de conclure dans les meilleurs délais un accord sauvegardant leurs intérêts respectifs* ». Le conseil des Demanderesses s'est opposé le jour même par courriel à la suspension de la procédure et au report de la session. Le 14 septembre 2011, la Secrétaire a informé les Parties par courriel que le Tribunal avait décidé de maintenir la session du lendemain. Le 15 septembre 2011, le Tribunal a tenu sa première session en présence des représentants des Demanderesses et a discuté des points de l'ordre du jour qui avait été communiqué aux Parties le 2 août 2011. Par courrier du Centre en date du 19 septembre 2011, un projet de procès-verbal de la première session a été adressé aux Parties pour commentaires. Par lettres des 20 et 30 septembre 2011, les Demanderesses ont soumis leurs commentaires et la Défenderesse a fait part de ses commentaires par lettre du 30 septembre 2011. Le procès-verbal définitif de la première session en date du 5 octobre 2011 signé par le Président et la Secrétaire a été adressé aux Parties le 6 octobre 2011.

14. Le procès-verbal de la première session relève que les Parties ont constaté la régularité de la constitution du Tribunal et ont indiqué ne pas avoir d'objections concernant les déclarations de ses membres. Il a été également convenu que le Règlement d'arbitrage

3

applicable serait celui entré en vigueur en janvier 2003, que le lieu de la procédure serait Washington, DC et que la procédure se déroulerait en langue française.

15. Dans la mesure où la Défenderesse n'avait pas encore indiqué si elle entendait soulever officiellement un déclinatoire de compétence, le Tribunal a décidé que le calendrier pour l'échange des écritures serait le suivant :

- Les Demanderesses déposeraient leur Mémoire sur le fond avant le 15 novembre 2011.

- La Défenderesse déposerait son Contre-Mémoire sur le fond et/ou tout déclinatoire de compétence avant le 16 janvier 2012. Elle indiquerait dans sa soumission si elle requérait la bifurcation de la procédure.

- Au plus tard le 30 janvier 2012, les Demanderesses répondraient à toute demande de bifurcation. Le Tribunal déciderait alors rapidement sur la bifurcation.

16. Le 14 novembre 2011, les Demanderesses ont déposé leur Mémoire sur le fond (« Dem. Mém. ») accompagné des pièces C46 à C72, de la jurisprudence A17 à A20, de l'attestation de témoin de M. Pierre Agbogba, de l'attestation de témoin n°2 de M. Rachid Riffi, de l'attestation de témoin de M. Forsyth Black, du rapport de M. John S. Willis et de l'avis juridique de M. le Professeur Serge Sur.

17. Le 15 janvier 2012, la République du Niger n'a pas déposé de soumission. Le 17 janvier 2012, le Centre a reçu une lettre du Secrétaire général du Gouvernement en date du 13 janvier 2012 demandant un délai supplémentaire pour organiser sa défense. Il a alors été demandé au Niger de bien vouloir indiquer au Centre combien de jours lui seraient nécessaires pour présenter ses écritures. Le 25 janvier 2012, le Niger a de nouveau été invité à bien vouloir indiquer dans les plus brefs délais le fondement de sa demande d'extension ainsi que la durée de l'extension demandée.

18. Le 27 janvier 2012, les Demanderesses ont déposé une requête aux fins de constater le défaut de la Défenderesse et de prononcer une sentence par application de l'article 42 du Règlement d'arbitrage. Cette demande a été officiellement notifiée au Niger par lettre du Centre en date du 1er février 2012. Dans la même lettre, la Défenderesse a été invitée à indiquer avant le 6 février 2012 le fondement de sa demande d'extension, le nombre de

jours d'extension requis, et si elle entendait faire valoir ses prétentions dans cette instance. Le Tribunal a indiqué qu'il souhaitait vivement que cette procédure suive son cours en présence de toutes les Parties. Par lettre du Centre en date du 7 février 2012, le Tribunal a constaté l'absence de réaction de la République du Niger dans le délai imparti. Dans ces circonstances, et en application de l'article 42(2) du Règlement d'arbitrage, le Tribunal a fixé un délai jusqu'au 29 février 2012 pour que « [l]a *Défenderesse dépose son Contre-Mémoire sur le fond et/ou tout déclinatoire de compétence et indique aussi si elle requiert la bifurcation de la procédure* », conformément au procès-verbal de la première session du Tribunal arbitral du 15 septembre 2011.

19. Par lettre du 13 mars 2012, le Tribunal a constaté l'absence de dépôt par la Défenderesse de son Contre-Mémoire sur le fond et/ou d'un déclinatoire de compétence. Dans ces circonstances, le Tribunal a indiqué :

   - Faire droit à la requête des Demanderesses en date du 27 janvier 2012 aux fins de constater le défaut de la Défenderesse et de prononcer une sentence en application de l'article 42 du Règlement d'arbitrage.

   - Que si la partie en défaut s'abstient de comparaître ou de faire valoir ses moyens, elle n'est pas pour autant réputée acquiescer aux prétentions de l'autre partie.

   - Qu'aux termes de l'article 42(3) et (4) du Règlement d'arbitrage il allait donc examiner si le différend est ou non de sa compétence et si, dans l'affirmative, les conclusions sont bien fondées en fait et en droit.

   - Qu'il pourrait à tout moment demander aux Demanderesses de déposer des observations, de nouvelles preuves ou de fournir des explications orales.

20. Par lettre du 14 mars 2012, Me Djermakoye, conseil de la Défenderesse, a informé le Tribunal de son déport dans ce dossier.

21. Par lettre du 18 avril 2012, le Centre a informé les Parties que le Tribunal entendait revenir vers les Parties concernant l'état de ses travaux et avec d'éventuelles questions.

22.     Par lettre du 10 août 2012, le Tribunal a posé aux Parties neuf questions auxquelles elles étaient invitées à répondre avant le 3 septembre 2012. Les Demanderesses y ont répondu le 31 août 2012 et ont communiqué les pièces C73 à C76 et A21 à A23.

23.     Par lettre du 25 septembre 2012, et afin de s'assurer que la Défenderesse disposait du dossier complet de cette affaire, le Centre adressait une copie papier de toutes les correspondances échangées dans ce dossier par courrier électronique depuis le début de l'année 2012 au Ministre des Transports et à la Direction du Contentieux de l'État, en copiant l'Ambassade du Niger à Washington, DC, afin que cette dernière transmette le dossier aux services concernés de l'État du Niger. Les conseils des Demanderesses confirmaient par courriers des 5 et 29 novembre 2012 les changements intervenus au sein du Gouvernement.

24.     Par lettre du 23 octobre 2012, les Demanderesses transmettaient au Tribunal une copie de l'arrêt de la Cour d'État du Niger, Chambre Administrative no. 12-054 du 10 octobre 2012 et de sa notification, dont il sera discuté ci-après.

25.     Par lettre du 16 janvier 2013, les Demanderesses réitéraient leur requête afin que le « *Tribunal arbitral statue sur les seuls chefs de conclusions qui lui ont été soumis* » par les Demanderesses dans l'ensemble de leurs écritures.

## III.    RAPPEL DES FAITS

26.     Le Tribunal fera un bref rappel des faits tels qu'ils ressortent des écritures des Demanderesses, du Mémoire de la Défenderesse soumis avant l'enregistrement de la Requête, et des pièces versées aux débats.

27.     En décembre 2003, à la suite du dépôt de bilan en janvier 2002 d'Air Afrique, qui était chargée de l'assistance en escale notamment à l'aéroport de Niamey, l'État du Niger a lancé un appel d'offres international pour l'assistance en escale sur les aéroports du Niger (ci-après « l'Appel d'Offres »)[3].

28.     Par Arrêté n° 066/MT/DAC du 30 décembre 2003 (ci-après, l'« Arrêté 66 ») portant Cahier des Charges pour l'exercice de l'activité d'assistance ou d'auto assistance en escale dans les aéroports du Niger, le Ministre des Transports a défini, entre autres, les

---

[3] Pièce C4.

6

services à fournir et les conditions d'agrément des prestataires pour ces services. La durée prévue pour l'agrément de l'activité d'assistance en escale était de 5 ans et de 3 ans pour l'auto assistance[4].

29. Menzies Aviation Group (MAG) a décidé de participer à cet Appel d'Offres international et a présenté une offre conjointement avec Aviation Handling Services (AHS), son partenaire exclusif en Afrique. D'après les Demanderesses, Menzies Aviation Group, filiale de John Menzies Plc, est un leader dans le domaine de l'assistance en escale dans plusieurs pays africains[5]. Au sein du Menzies Aviation Group, c'est plus particulièrement la société Menzies Afrique SA, aujourd'hui dénommée MMEA, ainsi que son partenaire AHS Dakar, qui étaient chargées de développer les activités d'assistance en escale en Afrique et au Moyen Orient.

30. Par courrier du 29 janvier 2004, le groupement Menzies Aviation Group-AHS a soumis son offre technique et son offre financière[6]. Dans son offre, le groupe s'engageait à :

- investir 1,7 milliards de F CFA ;

- acquérir pour 295 millions de F CF A, le matériel de l'ex Air Afrique ;

- à reprendre les anciens salariés d'Air Afrique nécessaires au fonctionnement de l'activité et non atteints par la limite d'âge ;

- à verser à l'État 5% de son chiffre d'affaires brut au titre de redevance de concession.

31. Par lettre du 26 janvier 2004, Menzies Aviation Group-AHS a demandé que la licence soit de 10 ans, durée d'amortissement des investissements[7].

32. Par lettre du 8 février 2004, le Ministre des Transports a informé le groupe qu'il avait été déclaré adjudicataire[8].

33. Conformément au Dossier d'Appel d'Offres, une société de droit nigérien devait être constituée pour assurer les prestations objet dudit Appel d'Offres. AHS Niger fut ainsi

---

[4] Pièce C6.
[5] Requête, §§ 11-12.
[6] Pièces C8 et C31.
[7] Pièce C46.
[8] Pièce C48, adressée à Monsieur le Président de Aviation Handling Services S.A. (AHS S.A.) à Dakar indiquant que: *"Votre groupe a été déclaré adjudicataire"*.

constituée le 18 février 2004[9]. Son actionnaire principal était à 75% MMEA. Les 25% restants étant détenus par deux actionnaires nigériens, AHS International Limited ne possédant qu'une seule action[10].

34.    Le 19 février 2004, un arrêté n° 015/MT/T/DAC (ci-après, l'« Arrêté 15 ») a été pris pour l'activité d'assistance ou d'auto assistance en escale dans les aéroports du Niger, modifiant le Cahier des Charges de 2003. Cet arrêté indiquait que la validité de l'agrément était de dix ans et limitait le nombre de prestataires agréés à un seul prestataire pour l'assistance en escale à l'aéroport de Niamey[11]. Cet arrêté précisait que « [l]e nombre de prestataires agréés sur cette plate-forme peut être modifié par arrêté ministériel si le nombre de passagers dépassent [sic] cinq cent mille (500 000) par an et sous réserve de l'absence de contraintes particulières en matière d'espace ou de capacité des installations et du respect des contraintes de sécurité et de sûreté de l'aéroport et des passagers ».

35.    Le même jour, l'arrêté n° 016/MT/T/DAC (ci-après, l'« Arrêté 16 ») portant agrément pour une période de 10 ans de la société « Aviation Handling Services Niger S.A. (Menzies Aviation Group Partner) pour l'exercice de l'activité d'assistance en escale sur l'aéroport International Diori Hamani de Niamey » a été pris[12]. Il y était indiqué que l'activité en escale comprenait l'assistance passagers, bagage, fret et poste, opération en piste, nettoyage et service de l'avion, entretien en ligne, opérations aériennes et administration des équipages, transport en vol et service commissariat.

36.    Le 15 décembre 2004, le Gouvernement du Niger et AHS Niger ont conclu une Convention d'Investissement, qui devait prendre effet le même jour[13].

37.    D'après les Demanderesses, sur la période des cinq premières années, à partir du 15 décembre 2004, AHS Niger a investi 2.418.500.792 F CFA, créé 101 emplois et s'est conformée à ses obligations comptables et financières[14].

---

[9] Pièce C1.
[10] Pièce C33.
[11] Pièce C5.
[12] Pièce C3.
[13] Pièce C7.
[14] Requête, § 27.

8

38.  Par arrêté du 5 janvier 2010 n° 000001/MT/AC/DAC (ci-après, l'« Arrêté 1 ») modifiant l'Arrêté 16, la durée de la Convention d'Investissement a été ramenée à 5 ans et toutes les dispositions antérieures contraires ont été abrogées[15]. Un second arrêté du même jour n° 000002/MT/AC/DAC (ci-après, l'« Arrêté 2 ») a modifié et complété l'Arrêté 66 de 2003 en fixant entre autres le nombre des prestataires pour l'aéroport de Niamey à trois (assistance en escale, assistance en escale « Fret et Poste », auto assistance)[16].

39.  Par lettre du 6 janvier 2010 adressée à AHS Niger, le Ministre des Transports, citant *« des contradictions dans les textes régissant l'activité d'assistance et d'auto assistance en escale »* à Niamey, a indiqué que conformément au Cahier des Charges de 2003 le nombre de prestataires était de trois (assistance en escale, assistance en escale « Fret et Poste », auto assistance) et que la durée de la Convention d'Investissement était de 5 ans[17]. Cette même lettre demandait à AHS Niger de prendre les dispositions utiles en vue du renouvellement de son agrément arrivé à terme le 18 février 2009.

40.  AHS Niger s'est opposée à cette mesure par lettre du 25 janvier 2010[18].

41.  AHS Niger a continué, prétendument avec l'accord du Gouvernement, à opérer le service d'assistance en escale et a obtenu le 8 mars 2010 le renouvellement de la licence annuelle d'exploitation pour la période 2010-2011[19].

42.  Selon la Défenderesse, *« [c]ourant décembre 2010, une inspection diligentée par les autorités de la transition concluait à l'irrégularité de l'octroi de l'agrément à AHS Niger s.a., au non respect de ses engagements vis-à-vis de l'État du Niger ainsi qu'au non respect de la législation nigérienne, entre autres manquements relevés »*[20].

43.  Le 14 décembre 2010, le Ministre des Transports du Niger prenait l'arrêté n°106/MTT/A/DAC (ci-après, l'« Arrêté 106 »)[21] abrogeant immédiatement l'Arrêté 16, ainsi qu'une décision n° 00799/MTT/A/DAC (ci-après, la « Décision 799 ») portant

---

[15] Pièce C12.
[16] Pièce C13
[17] Pièce C11.
[18] Pièce C14.
[19] Pièce C43.
[20] Déf. Mém., p. 3.
[21] Pièce C17.

dénonciation de la Convention d'Investissement[22]. D'après les Demanderesses, ces deux documents étaient notifiés à AHS Niger le 15 décembre 2010 en main propre.

44. Etaient également pris:

- l'arrêté n° 103/MTT/A/DAC du 14 décembre 2010 (ci-après, l'« Arrêté 103 ») « *portant création d'une cellule d'assistance en escale à l'Aéroport International DIORI HAMANI de Niamey* ». Il était précisé que cette cellule était chargée d'assurer, sous la direction d'un comité de gestion, la continuité du service public en matière d'assistance aux aéronefs[23] ;

- l'arrêté n° 104/MTT/A/DAC du 14 décembre 2010 (ci-après, l'« Arrêté 104 ») « *portant réquisition du personnel de la société AHS affecté à l'assistance en escale à l'Aéroport International DIORI HAMANI de Niamey* »[24] ;

- l'arrêté n° 105/MTT/A/DAC du 14 décembre 2010 (ci-après, l'« Arrêté 105 ») « *portant réquisition du matériel d'assistance en escale mis à la disposition de la société AHS* »[25] ;

- l'arrêté n° 00108/MTT/A/DRF/M du 29 décembre 2010 (ci-après, l'« Arrêté 108 ») « *portant création et attribution d'un Comité chargé de la gestion financière des ressources de l'exercice de l'assistance en escale à l'Aéroport International DIORI HAMANI de Niamey* »[26].

45. Le 15 décembre 2010, selon les Demanderesses, AHS Niger a été expropriée de son investissement.

46. Les Demanderesses affirment que le Directeur de l'Aviation Civile par Intérim a convoqué le personnel d'AHS Niger lui signifiant qu'il était désormais le nouveau Directeur Général de la Cellule d'Assistance en Escale.

47. Elles prétendent également que le Directeur Général de AHS Niger, M. Rachid Riffi, un ressortissant marocain, a été contraint de quitter son lieu de travail sous la menace et

---

[22] Pièce C18.
[23] Pièce C21.
[24] Pièce C22.
[25] Pièce C23.
[26] Pièce C24.

que, accompagné d'une délégation comprenant l'ancien responsable comptable d'AHS Niger, le Directeur Général de l'ASECNA[27] (membre du comité de gestion de la cellule), deux huissiers, un gendarme et l'avocat d'AHS Niger (arrivé sur les lieux entretemps), il a été contraint de faire le tour des banques dans lesquelles des comptes étaient ouverts au nom de AHS Niger pour disposer des soldes des comptes, des signatures sur les comptes et du droit d'accéder aux comptes ; ce à quoi il s'est opposé. Il a alors été expulsé de son bureau et son véhicule de fonction a été réquisitionné.

48. Selon les Demanderesses, depuis le 15 décembre 2010, « *AHS Niger n'a plus eu accès à son siège et ses équipements, la Cellule d'Assistance en Escale ayant par ailleurs confisqué les documents et pièces comptables d'AHS Niger qui s'est trouvée dans l'impossibilité matérielle de satisfaire à ses obligations fiscales* »[28].

49. Les Demanderesses continuent en affirmant ce qui suit :

> « *92. En outre, la Cellule d'Assistance en Escale pour les besoins de cette expropriation opère avec le matériel et les équipements de AHS Niger.*
>
> *93. C'est d'ailleurs bien vainement que, pour tenter de cacher son forfait, la Cellule d'Assistance en Escale a fait ôter au début de l'année 2011 l'ensemble des logos et marquages portant le nom de AHS sur le matériel de AHS Niger alors qu'elle avait opéré avec le même matériel, portant mention des logos et marquages MENZIES-AHS.*
>
> *94. Toutefois, la Cellule d'Assistance en Escale et l'ensemble du personnel continue à opérer dans les uniformes de AHS Niger avec les insignes du groupe AHS-MENZIES en violation flagrante du droit de propriété de ces dernières leur réservant l'usage exclusif du nom et de l'enseigne du groupe enregistrés et déposés.*
>
> *95. Depuis cette date, aucune mesure n'a été prise par l'État du Niger pour remédier à ces différentes voies de fait* »[29].

50. Le 17 décembre 2010, AHS Niger a introduit deux recours gracieux contre l'Arrêté 106 et la Décision 799[30]. Le 12 janvier 2011, AHS Niger a introduit quatre recours gracieux contre les quatre autres arrêtés mentionnés ci-dessus (v. *supra*, § 44)[31]. Tous ces recours

---

[27] Agence pour la Sécurité de la Navigation Aérienne en Afrique et à Madagascar.
[28] Dem. Mém., § 90.
[29] Dem. Mém., §§ 92-95.
[30] Pièces C19 et C20.
[31] Pièce C25.

étaient adressés à M. le Ministre des Transports, du Tourisme et de l'Artisanat de la République du Niger.

51.    N'ayant reçu aucune réponse du Gouvernement, AHS Niger a saisi en mai 2011, dans le délai imparti de deux mois à la suite du rejet implicite par le Gouvernement des recours gracieux, la Chambre Administrative de la Cour d'État de trois requêtes contentieuses en excès de pouvoir à l'encontre de l'Arrêté 106, de la Décision 799 et des quatre autres arrêtés mentionnés ci-dessus[32].

52.    L'arrêt no. 12-054 du 10 octobre 2012, transmis par les Demanderesses le même jour, indique que les recours en annulation contre l'Arrêté 106, la Décision 799, les Arrêtés 103, 104, 105, et 108 ont été jugés recevables par la Chambre Administrative de la Cour d'État du Niger, et que le recours en annulation contre la décision implicite de rejet du Ministre des Transport a été déclaré irrecevable. Sur le fond, la Cour a annulé l'Arrêté 106 pour avoir été pris « *sans motifs, en violation des articles 4 et 5 de la convention d'investissement et de l'article 9 de l'arrêté no. 066/MTT/A/DAC du 30 décembre 2003* » portant Cahier des Charges. Partant, les Arrêtés 103, 104, 10, 106, 108 et la Décision 799 ont été également annulés et la Cour a mis les dépens à la charge du Trésor public.

53.    A ce jour, le Tribunal Arbitral n'est pas informé des effets de cet arrêt du 10 octobre 2012. Le Tribunal ignore si l'exécution de cet arrêt a remis en état la Convention d'Investissement ou si elle a opéré une restitution, même partielle, des actifs dont les Demanderesses considèrent avoir été expropriées.

## IV.    RÉSUMÉ DE LA POSITION DES PARTIES

54.    Le Tribunal rappellera de manière sommaire la position des Parties et en détaillera certains aspects si nécessaire dans son analyse.

---

[32] Pièces C50 et C52.

12

### IV.1    Position des Demanderesses

#### A.    Sur la compétence

55.    Selon les Demanderesses, elles remplissent les conditions de nationalité prévues par la Convention CIRDI.

56.    MMEA est une société de droit luxembourgeois. Quant à AHS Niger, société de droit local, les parties à la Convention d'Investissement ont consenti à la considérer comme un non-ressortissant dès sa création. L'adjudicataire avait une obligation de se constituer en société de droit nigérien. Il était par ailleurs prévu par le Dossier d'Appel d'Offres que cette société serait majoritairement contrôlée par le partenaire stratégique étranger.

57.    Dès lors, AHS Niger doit être considérée comme un non-national au sens de l'article 25(2)(b) de la Convention CIRDI et de l'article 6(2) du Code des Investissements[33]. Le Niger a donné son accord implicite pour ce faire et entendait traiter AHS Niger comme un non-national, ce qui ressort des stipulations de la Convention d'Investissement et des avantages douaniers et fiscaux dont AHS Niger a bénéficié[34].

58.    MMEA «*doit être considérée comme l'entité effectivement visée par la mention « Menzies Aviation Group Partner » (sic) systématiquement associée à AHS Niger dans le visa et le corps de l'Arrêté d'agrément* »[35].

59.    Pour cette raison, MMEA doit être considérée comme ayant consenti à la Convention d'Investissement et à la clause compromissoire qui y est insérée, et est donc partie à la Convention d'Investissement et à l'acte d'agrément[36]. Les Demanderesses invoquent la jurisprudence arbitrale CCI relative à l'extension de la clause d'arbitrage aux sociétés d'un même groupe.

60.    Le consentement du Niger à l'arbitrage CIRDI en cas de litige avec un non-national se trouve à l'article 6 de la Convention d'Investissement qui vise le Code des Investissements, et constitue le consentement écrit du Niger requis par l'article 25(1) de

---

[33] Dem. Mém., §§109-133.
[34] Dem. Mém., §§ 147-148, §§150-151.
[35] Dem. Mem, § 139.
[36] Dem. Mém., §§ 142 et 144.

la Convention du CIRDI[37]. Pour les Demanderesses, la clause compromissoire insérée à l'article 6 de la Convention d'Investissement opère un renvoi aux dispositions de l'article 6 du Code des Investissements et à la Convention CIRDI[38].

61. L'investissement en cause dans cette affaire est la participation de MMEA dans le capital d'AHS Niger, qui constitue un investissement au sens de l'article 11 du Code des Investissements, ainsi que les biens corporels et incorporels de AHS Niger[39].

62. Le différend entre les parties est d'ordre juridique et est en relation directe avec l'investissement.

### B. Sur le fond

63. Pour les Demanderesses, sont notamment applicables dans ce différend le Code des Investissements, le Règlement d'Appel d'Offres, le Cahier des Charges de 2003, les Arrêtés de 2004, et la Convention d'Investissement.

64. Les Demanderesses considèrent que le Niger a dénoncé la Convention d'Investissement et retiré l'agrément pour l'exercice d'assistance et d'auto assistance en escale de manière irrégulière, infondée et fautive, et a ainsi violé la Convention d'Investissement, la loi applicable et le droit international coutumier[40].

65. Le Niger n'a pas respecté les préalables contractuels et légaux, à savoir mise en demeure préalable et écrite, possibilité de suspension de l'agrément puis retrait, et en tout état de cause recherche d'une solution amiable au différend[41].

66. S'agissant de l'abrogation de l'Arrêté d'agrément, le retrait ne pouvait intervenir qu'après une phase de mise en demeure de remédier aux manquements dans un délai de deux mois et à défaut une suspension temporaire de six mois[42].

67. Par ailleurs, les Demanderesses relèvent l'absence au fond de toute justification à la dénonciation et au retrait mentionnés ci-dessus[43]. Elles considèrent qu'AHS Niger n'a

---

[37] Dem. Mém., § 164 *et seq.*
[38] Dem. Mém., § 166.
[39] Requête, §§ 68-70.
[40] Dem. Mém., § 293.
[41] Dem. Mém., §§ 228-242.
[42] Dem. Mém., §§ 243-264.

14

aucunement méconnu ses obligations au regard de la Convention d'Investissement, du Code des Investissements et du Cahier des Charges.

68.    Le Niger a violé de manière manifeste ses obligations commettant ainsi un excès de pouvoir[44] et a mis ces mesures en application par voie de contrainte, constitutive d'une voie de fait contraire aux articles 2 et 7 du Code des Investissements[45]. Une voie de fait se définit comme « *un comportement constitué lorsque l'autorité administrative prend une décision ou commet une action manifestement insusceptible de se rattacher à un texte législatif ou réglementaire. C'est donc la gravité de l'irrégularité qui dénature l'action de l'administration, au point de la faire sortir du champ administratif* »[46]. Elle est constituée lorsque l'action de l'Administration porte une atteinte grave à la propriété et comporte une irrégularité.

69.    AHS Niger a fait l'objet d'une expropriation que rien ne justifiait[47].

70.    Les Demanderesses soulignent que le Tribunal a compétence pour apprécier les conséquences financières et matérielles nonobstant l'existence d'un recours gracieux[48], lequel a fait l'objet d'un rejet implicite, qui a été annulé, ainsi que la décision contestée par le recours gracieux, par la Cour d'État (v. *supra*, § 52).

71.    Les Demanderesses étaient en droit d'exploiter l'activité d'assistance et d'auto assistance en escale pendant encore quatre ans.

72.    Elles ont droit à la réparation intégrale de leur préjudice matériel et moral, qui se décompose en un préjudice économique (perte de gain manqué et perte de ses biens), un préjudice moral, une atteinte à ses droits de propriété intellectuelle ainsi qu'au remboursement des frais relatifs à l'arbitrage, ce qui inclut les frais de conseils et d'expert[49].

73.    L'évaluation du gain manqué est fondée sur une projection des bénéfices nets escomptés pour la période courant du 15 décembre 2010 jusqu'en février 2014, résultant entre

---

[43] Dem. Mém., §§ 266 *et seq.*
[44] Dem. Mém., § 299.
[45] Dem. Mém., § 300.
[46] Dem. Mém., § 318 citant l'avis juridique du Prof. Sur.
[47] Dem. Mém., §§ 304-312.
[48] Dem. Mém., § 302.
[49] Dem. Mém., § 320.

15

autres des projections d'évolution du chiffre d'affaires pour les années 2011 à 2014, soit un total de 2.634.302.000 F CFA (4.015.967,15 €)[50].

74. S'agissant de l'évaluation du préjudice au titre de l'expropriation des investissements réalisés par les Demanderesses (à savoir 2,1 milliards F CFA sur la période 2004-2010), elle est fondée sur la valeur nette comptable des Actifs et sur les Créances estimés à la somme globale de 944.336,95 £, soit F CFA 619.444.433 se décomposant en 410.382.837 F CFA pour la valeur nette comptable des Actifs et 209.061.596 F CFA pour les Créances[51].

75. Les sommes dues au titre d'avances et de prêts faits au personnel équivalent à 40.758.174 F CFA, soit 62.135,44 €[52].

76. Les Demanderesses demandent également réparation pour atteinte à leur image et à leur réputation commerciale. Elles invoquent, en outre, une atteinte à leurs droits de propriété intellectuelle (sigle et noms commerciaux) dans le cadre de l'exploitation par le Niger des équipements et uniformes sur lesquels les noms et sigles de Menzies et AHS sont apposés. Ce préjudice est estimé à 2.200.000 €[53].

## C.     Demande des Demanderesses

77. Les Demanderesses dans leur Mémoire du 14 novembre 2011 demandent au Tribunal de :

> « *401. Constater la dénonciation irrégulière, infondée et fautive par l'État du Niger de la Convention d'Investissement ;*
>
> *402. Constater le retrait irrégulier, infondé et fautif par l'État du Niger de l'Arrêté d'Agrément;*
>
> *403. Constater que les Demanderesses se sont parfaitement conformées à leurs obligations contractuelles résultant de la Convention d'Investissement ;*
>
> *En conséquence,*
>
> *404. Déclarer que l'État du Niger n'a pas respecté ses obligations contractuelles aux termes de la Convention d'Investissement ;*

---

[50] Dem. Mém., §§ 335-336.
[51] Dem. Mém., § 337.
[52] Dem. Mém., § 339.
[53] Dem. Mém., §§ 359-396.

*405. Déclarer que l'État du Niger a également violé ses obligations légales au titre tant du Code des Investissements, que du Cahier des Charges;*

*406. Déclarer que l'État du Niger a abusivement et sans motif dénoncé la Convention d'Investissement et abrogé l'Arrêté d'agrément;*

*407. Par conséquent, condamner l'État du Niger au paiement des sommes couvrant l'intégralité du préjudice subi par AHS Niger et MMEA :*

- *Quatre millions quinze mille neuf cent soixante sept euros et cinquante et un cents (4.015.967,51 €) en compensation du gain manqué par AHS Niger et MMEA du fait de la résiliation anticipée irrégulière, infondée et fautive de la Convention d'Investissement et de l'arrêt brutal et immédiat des activités d'AHS Niger et MMEA ;*

- *Neuf cent quarante quatre mille trois cent trente six euros et quatre vingt quinze cents (944.336,95 €) en réparation du préjudice subi par AHS Niger et MMEA, réparation consistant au remboursement de la valeur nette comptable des Actifs expropriés et des Créances perdues;*

- *Soixante deux mille cent trente cinq euros et quarante quatre cents (62.135,44€) en indemnisation des sommes dues par le personnel d'AHS Niger réquisitionné par l'Etat du Niger, au titres d'avances et de prêts consentis par AHS Niger;*

- *Deux millions deux cent mille euros (2.200.000 €) en indemnisation du préjudice moral subi par AHS Niger et MMEA au titre de l'atteinte à leur image et à leur réputation sur le continent africain et le proche Orient, ainsi qu'à leurs droits de propriété intellectuelle ;*

- *Les intérêts avec capitalisation sur les montants susvisés et ce, à compter du 14 décembre 2010, date de l'abrogation de l'Arrêté d'agrément;*

- *Tous les frais relatifs à l'arbitrage, incluant les honoraires d'avocats, ainsi que les frais de tout expert, notamment financier et juridique, engagé par AHS Niger et MMEA dans le cadre de la présente procédure »*[54].

## IV.2    Position de la Défenderesse

78.    Dans son Mémoire du 6 avril 2011 soumis avant l'enregistrement de la Requête, le Niger s'est opposé à l'enregistrement par le Centre de la Requête, au motif que le différend excéderait manifestement la compétence du Centre.

79.    Les motifs invoqués par le Niger étaient :

---

[54] Dem. Mém., §§ 404-407.

17

- l'absence de consentement écrit du Niger. Selon le Code des Investissements, le seul document reconnu pour prouver l'acceptation du Niger est l'acte d'agrément, qui ne contient pas de référence à l'arbitrage CIRDI[55] ;

- la nationalité nigérienne d'AHS Niger, que le Niger n'a pas consenti à traiter comme un ressortissant d'un autre État[56] ;

- le fait que MMEA n'est pas partie à la Convention d'Investissement, et partant « *ne saurait agir dans le cadre d'une convention à laquelle elle n'est pas partie* »[57].

## V.   COMPÉTENCE

80.   La Défenderesse ayant fait défaut, il appartient au Tribunal d'examiner si le différend est de la compétence du Centre et de la sienne conformément aux dispositions de l'article 42(4) du Règlement d'arbitrage.

### V.1   Dispositions applicables

81.   L'article 6 de la Convention d'Investissement du 15 décembre 2004 dispose :

> « *Les différends nés de l'interprétation ou de l'application du présent Protocole sont réglés à l'amiable. A défaut d'accord amiable entre les 2 parties, les différends donneront lieu à un règlement par voie d'arbitrage conformément aux dispositions en vigueur au Niger en matière de règlement de différends relatifs aux investissements.* »

82.   L'article 6 du Code des Investissements de 1989 dispose :

> « *Art.6.- Le règlement des différends relatifs à la validité, à l'interprétation ou à l'application de l'acte d'agrément et à la détermination éventuelle de l'indemnité due à la méconnaissance ou à la violation des engagements fera l'objet de l'une des procédures d'arbitrage ci-après à déterminer dans l'acte d'agrément.*
>
> *1)* [arbitrage ad hoc et *ex aequo bono*].
>
> *2) La possibilité pour les non nationaux de recourir au Centre International pour le Règlement des Différends relatifs aux Investissements (CIRDI) créé par*

---

[55] Déf. Mém. 6 avril 2011, p. 5. Pour le Niger, l'acte d'agrément est l'Arrêté 16 (v. *supra*, § 35) ce qui est contesté par les Demanderesses.
[56] Déf. Mém. 6 avril 2011, p. 6.
[57] Déf. Mém. 6 avril 2011, p. 7.

*la convention du 18 mars 1965 de la Banque Internationale pour la Reconstruction et le Développement (BIRD) ».*

83. Les dispositions pertinentes de l'article 25 de la Convention du CIRDI sont les suivantes :

> « *(1) La compétence du Centre s'étend aux différends d'ordre juridique entre un État contractant (ou telle collectivité publique ou tel organisme dépendant de lui qu'il désigne au Centre) et le ressortissant d'un autre État contractant qui sont en relation directe avec un investissement et que les parties ont consenti par écrit à soumettre au Centre. Lorsque les parties ont donné leur consentement, aucune d'elles ne peut le retirer unilatéralement.*
>
> *(2) « Ressortissant d'un autre État contractant » signifie :*
>
> *(a) toute personne physique qui possède la nationalité d'un État contractant autre que l'État partie au différend à la date à laquelle les parties ont consenti à soumettre le différend à la conciliation ou à l'arbitrage ainsi qu'à la date à laquelle la requête a été enregistrée conformément à l'article 28, alinéa (3), ou à l'article 36, alinéa (3), à l'exclusion de toute personne qui, à l'une ou à l'autre de ces dates, possède également la nationalité de l'État contractant partie au différend ;*
>
> *(b) toute personne morale qui possède la nationalité d'un État contractant autre que l'État partie au différend à la date à laquelle les parties ont consenti à soumettre le différend à la conciliation ou à l'arbitrage et toute personne morale qui possède la nationalité de l'État contractant partie au différend à la même date et que les parties sont convenues, aux fins de la présente Convention, de considérer comme ressortissant d'un autre État contractant en raison du contrôle exercé sur elle par des intérêts étrangers. »*

84. Le Tribunal relève que, comme indiqué par les Demanderesses, il n'existe aucun traité bilatéral de protection et de promotion des investissements entre le Niger et le Luxembourg[58].

85. Le Tribunal commencera par examiner sa compétence *ratione personae*, puis *ratione voluntatis*, et enfin *ratione materiae*.

## V.2    Compétence *ratione personae*

86. Le Tribunal doit examiner la condition de nationalité au regard tant du Code des Investissements que de la Convention du CIRDI, cités ci-dessus.

---

[58] Dem. Lettre, 21 mars 2011, p. 5.

## A.    Le Niger

87.    Il ne fait pas de doute que la Défenderesse est un État Contractant au sens de la Convention du CIRDI. La Convention du CIRDI est entrée en vigueur vis-à-vis du Niger le 14 décembre 1966.

## B.    MMEA

88.    Le Code des Investissements s'applique aux personnes physiques ou morales, quelle que soit leur nationalité, dès lors qu'elles exercent une activité dans l'un des secteurs visés par le Code, y compris le secteur aérien[59].

89.    MMEA est une société de droit luxembourgeois. MMEA est bien un non-national au sens de l'article 6(2) du Code des Investissements mentionné ci-dessus.

90.    Le Tribunal ne doute pas non plus, et ce point n'a pas été contesté, qu'il s'agit d'un ressortissant d'un État Contractant autre que le Niger pour les besoins de la Convention de Washington. La Convention du CIRDI est entrée en vigueur vis-à-vis du Luxembourg le 29 août 1970.

## C.    AHS Niger

91.    AHS Niger est une société constituée selon le droit nigérien, dont le siège social est à Niamey, et dont toutes les activités étaient basées au Niger. Les questions qui se posent sont néanmoins celles de savoir si *(i)* pour les besoins du Code des Investissements AHS Niger peut être considérée comme un « *non-national* » ayant accès à un arbitrage CIRDI, et si *(ii)* elle peut être considérée comme un « *ressortissant d'un autre État contractant en raison du contrôle exercé sur elle par des intérêts étrangers* » au sens de l'article 25(2)(b) de la Convention de Washington.

### 1. Position des Parties

92.    Selon les Demanderesses, « *la nationalité réelle d'une société créée pour les nécessités d'une adjudication sous la forme d'une société de droit local ne se détermine*

---

[59] Pièce C32, article 2.

20

*évidemment pas uniquement à la lumière de son siège statuaire et de son lieu d'immatriculation »*[60].

93.    Selon les Demanderesses, en droit nigérien, pour déterminer la nationalité d'une société, *« il y a lieu de tenir compte, au-delà du critère de son siège social statutaire, du faisceau d'indices constitué par les circonstances de sa constitution »*[61]. Elles se fondent sur un jugement de la Cour de cassation française, qui a précisé que le critère du siège statutaire d'une société ne constitue qu'une présomption simple susceptible d'être renversée si le centre de direction effective est situé en un autre lieu[62]. Toujours selon les Demanderesses, cette jurisprudence *« est parfaitement applicable au regard du droit nigérien qui est similaire en la matière au droit français comme en atteste la teneur de l'Acte Uniforme portant sur les sociétés commerciales et le GIE »*[63].

94.    Enfin, selon le Mémoire des Demanderesses, *« [c]ette disposition du Code des Investissements doit être analysée à la lumière des dispositions de l'article 25 (2) (b) de la Convention CIRDI lequel a une autorité supérieure à celle des lois en droit interne nigérien conformément à l'article 171 de la Constitution du Niger du 26 novembre 2010 »*[64] :

95.    Pour les Demanderesses, AHS Niger remplit les conditions de *« non-national »* du Code des Investissements pour les trois raisons suivantes[65] :

96.    Premièrement, la Défenderesse souhaitait s'associer à un opérateur reconnu sur le marché international et de nationalité étrangère. C'est pour cette raison que MMEA a été choisie et AHS Niger n'a été créée que pour les besoins de la procédure d'adjudication et conformément aux articles 3 et 4 de l'Arrêté 66 de 2003, en application duquel la Convention d'Investissement a été conclue. En outre, la Défenderesse associait AHS Niger à MMEA dans l'Arrêté 16 du 19 février 2004[66].

---

[60] Dem. Lettre, 18 avril 2011, p. 1.
[61] Dem. Lettre, 5 avril 2011, p. 5.
[62] Dem. Mém., §§ 130-132.
[63] Dem. Lettre, 5 avril 2011, p. 6 ; Dem. Mém., §§ 130-132.
[64] Dem. Mém., § 104.
[65] Dem. Lettre, 5 avril 2011, pp. 2-9; Dem. Lettre, 7 avril 2011, pp. 5-6; Dem. Mém., §§ 108-133.
[66] Dem. Lettre, 5 avril 2011, pp. 2-4; Dem. Mém., 14 novembre 2011, §§ 109-122.

21

97.    Deuxièmement, le capital de AHS Niger est majoritairement détenu par des non-nationaux, la participation de MMEA dans AHS Niger constituerait un investissement au sens de l'article 11 du Code des Investissements, aucun des administrateurs d'AHS Niger n'est de nationalité nigérienne, et sa direction effective est assurée au Luxembourg[67].

98.    Troisièmement, il y aurait accord implicite de la Défenderesse de traiter AHS Niger comme un non-national. Selon les Demanderesses, ceci s'infère des termes de la Convention d'Investissement, notamment des engagements suivants, qui ne seraient « *pris qu'envers les non-nationaux* » :

- la garantie de l'attribution de devises étrangères en vue d'assurer le paiement des fournisseurs étrangers (article 2) ;

- la protection contre des mesures « *d'expropriation ou de nationalisation* » (article 2), conformément à l'article 7 du Code des Investissements ;

- l'exonération de taxes (article 2) ;

- l'obligation de « *tenir une comptabilité conformément au système comptable en vigueur au Niger* » (article 4) ; et

- l'obligation de respecter la réglementation nigérienne en matière sociale (article 4)[68].

99.    Le Tribunal note que les Demanderesses se fondent également sur ces trois raisons pour prétendre que les Parties sont convenues de traiter AHS Niger comme ressortissant d'un État autre que le Niger au sens de l'article 25(2)(b) de la Convention du CIRDI[69].

100.    Au contraire, selon la Défenderesse, « *la présence de capitaux étrangers et l'exercice de la direction par un ressortissant étranger ne sauraient de par le droit commun nigérien, conférer la nationalité étrangère à AHS Niger ; la nationalité devant nécessairement être appréciée au regard de ses statuts et inscription au Registre du Commerce et du Crédit Mobilier* »[70].

---

[67] Dem. Lettre, 5 avril 2011, pp. 4-6; Dem. Lettre, 7 avril 2011, p. 6; Dem. Mém., §§ 123-127.
[68] Lettre Dem., 5 avril 2011, pp. 6-9; Lettre Dem., 7 avril 2011, p. 6.
[69] Dem. Mém., 14 novembre 2011, §§ 108, 133, 156.
[70] Lettre Déf., 12 avril 2011, p. 2.

101.    D'après la Défenderesse,

> « ... le point II du règlement d'appel d'offres prouve à suffisance que l'État du Niger a expressément entendu exclure de la convention d'investissement toute personne morale de droit étranger (dès l'instant où obligation était faite au candidat de se constituer en société de droit nigérien). »[71]

> « L'article 2 de la Convention d'investissement du 15 décembre 2004 ne saurait non plus être interprété dans le sens de considérer AHS Niger s.a. comme une personne morale de droit étranger puisqu'il n'est qu'une reprise des avantages offerts par le Code des investissements en République du Niger à tout investisseur même national. »[72]

> « ... les privilèges et avantages accordés à AHS Niger ne sauraient être considérés comme un 'accord implicite de l'État de traiter la société de droit local comme un non national' dans la mesure où ceux-ci ne sont pas liés à la nationalité du cocontractant de l'État mais plutôt à la nature de l'activité qu'il exerce ou qu'il désire exercer. »[73]

## 2. Décision du Tribunal

102.    Le Tribunal doit tout d'abord revenir sur les faits de cette affaire dans le but de dégager la volonté des Parties concernant le statut de la société AHS Niger (a), pour ensuite analyser la légitimité de cette dernière à se prévaloir de la qualité de non-national ou de ressortissant étranger tant au regard du Code des Investissements (b) que de la Convention du CIRDI (c).

### a) Le statut de AHS Niger

103.    En ce qui concerne la constitution de la société AHS Niger, le Tribunal constate que AHS Niger a été constituée en tant que société nigérienne pour les besoins du projet et comme condition nécessaire imposée par l'Appel d'Offres lancé par le Ministère des Transports de la République du Niger[74].

104.    Ceci s'explique par le fait que, d'une part, comme il est clairement indiqué sur la page de couverture du Dossier d'Appel d'Offres, il s'agit d'un « Appel d'Offres International » visant à attirer un « partenaire stratégique » « dont le professionnalisme [est] reconnu

---

[71] Déf. Mém., 6 avril 2011, p. 6.

[72] Déf. Mém., 6 avril 2011, p. 6.

[73] Lettre Déf., 12 avril 2011, p. 2.

[74] Règlement d'Appel d'Offres international (Décembre 2003), § II à la p. 2 « Le candidat devra se constituer en société de droit nigérien. Cette société pourra ouvrir son capital à d'autres partenaires » (pièce C4). V. aussi le Mémorandum d'information du Dossier d'Appel d'Offres, pp. 12-13 (pièce C4).

23

*par les compagnies aériennes internationales* »[75]. Donc, l'Appel d'Offres visait nécessairement un partenaire étranger. D'autre part, comme expliqué dans le Mémorandum d'information du Dossier d'Appel d'Offres, il était prévu que ce « *partenaire stratégique* » soit associé (tout en conservant le contrôle) à « *des privés nigériens avec éventuellement une participation symbolique de l'Etat* ». Il fallait donc constituer une société au Niger pour permettre cette participation (minoritaire) de nationaux nigériens et éventuellement celle de l'État du Niger.

105.    En effet, le Dossier d'Appel d'Offres International prévoyait :

«,... *il y a lieu de trouver un <u>repreneur dont le professionnalisme est reconnu par les compagnies aériennes internationales</u> qui puisse donner les garanties suivantes :*

- *renouveler les investissements en matériel techniques indispensables à l'activité ;*

- *souscrire une police internationale d'assurance pour les risques de l'activité (personnel, machine, tiers etc. ...) ;*

- *former et maintenir la qualification sur tous les types d'aéronefs du personnel    technique appelé à exercer le handling ;*

- *Recruter tout ou parties du personnel de l'ancienne Air Afrique.* » (Souligné dans le texte)

« *3.3.2.3.  Lancement d'un avis d'appel d'offre pour le choix d'un partenaire stratégique*

<u>Une société de droit nigérien sera créée</u> à cet effet avec la <u>participation majoritaire du partenaire stratégique.</u>

*Les autres actionnaires seront des privés nigériens avec éventuellement une participation symbolique de l'État.*

- *Les soumissionnaires doivent notamment remplir les conditions suivantes :*

- *une situation financière saine ;*

- *une capacité technique reconnue au niveau international ;*

- *une capacité à souscrire à une police d'assurance couvrant les risques sur le plan international ;*

- *un engagement à réaliser à court terme des investissements prioritaires minima ;*

- *un engagement à fournir des prestations conformes aux normes internationales ;*

---

[75] Pièce C4.

24

- *un engagement à respecter l'environnement ;*
- *un engagement à respecter la législation sociale en vigueur au Niger ;*
- *un engagement à payer une redevance de concession. »*[76] (souligné dans le texte)

106.     Le Cahier des Charges annexé au Dossier d'Appel d'Offres International prévoyait quant à lui que :

« *L'exercice de l'activité d'assistance ou d'auto assistance en escale par un prestataire ou un transporteur aérien est subordonné à l'obtention d'un agrément délivré par le Ministre charge de l'Aviation Civile.* »[77]

« *Toute personne physique ou morale souhaitant être agréée pour l'assistance ou l'auto assistance en escale doit satisfaire les critères suivants :*

*- être dûment constituée en société de droit nigérien ».*[78]

107.     La nécessité d'un partenaire étranger et le rôle de celui-ci, tant lors de l'Appel d'Offres que dans la gestion de AHS Niger, ressortent également des attestations de témoins versées aux débats.

108.     Ainsi, M. Pierre Agbogba, Président du Conseil d'administration de AHS Niger depuis 2004, a indiqué :

« *Dans le cadre des négociations entre notre groupe et l'État du Niger, il était évident que la société d'exploitation de droit nigérien que nous devions constituer serait considérée et traitée, en ce qui concerne la réglementation des investissements internationaux, comme un ressortissant étranger dans la mesure où notre groupe était évidemment accueilli comme un investisseur étranger, ce qui résulte de toute la démarche de l'appel d'offre.*

*C'est pour cette raison que l'État du Niger avait précisé et a insisté pour que la société de droit nigérien devant exploiter le marché soit majoritairement détenue par l'adjudicataire étranger.*

*Les représentants de l'État du Niger me l'ont d'ailleurs confirmé car ils voulaient s'assurer que la société de droit nigérien détenue par notre groupe dispose de la surface financière lui permettant d'effectuer les importants investissements rendus indispensables du fait de la vétusté du matériel et des équipements techniques nécessaires à l'exercice de l'activité d'assistance en escale.* »[79] (soulignement ajouté).

---

[76] Pièce C4, p. 12.
[77] Pièces C4 et C6, article 3.
[78] Pièces C4 et C6, article 4.
[79] Attestation de M. Agbogba du 18 octobre 2011, § 29.

25

109.   De plus, M. Forsyth Rutherford Black, Senior Vice President Africa and Middle-East de Menzies Aviation PLC, a déclaré :

> « *Dans le cadre des négociations entre notre groupe et l'État du Niger, il était évident que la société d'exploitation de droit nigérien que nous devions constituer serait considérée et traitée, en ce qui concerne la réglementation des investissements internationaux, comme un ressortissant étranger.*
>
> *C'est pour cette raison que l'État du Niger avait précisé et a insisté pour que la société de droit nigérien soit majoritairement détenue par l'adjudicataire. Il était donc évident qu'il incomberait à l'adjudicataire d'assurer à ce titre la gouvernance et le contrôle des activités de la filiale de droit nigérien.*
>
> *La préoccupation de l'État du Niger était de s'assurer que la société de droit nigérien puisse effectuer les importants investissements rendus indispensables du fait de la vétusté du matériel techniques nécessitant l'exercice de l'activité de l'assistance et dispose de la surface financière du groupe.* »[80] (soulignement ajouté).
>
> « *... pour MENZIES AVIATION GROUP-AHS, il a donc toujours été clair que l'État du Niger a entendu traiter en réalité avec nous et non avec la société de droit nigérien qui, selon les termes même de l'appel d'offres international, devait être placée sous contrôle étranger* »[81] (soulignement ajouté).

110.   Aux yeux du Tribunal Arbitral, ces témoignages ne sont pas contredits par les autres éléments de preuve apportés qui, à plusieurs égards, les confirment[82]. En outre, le Niger n'a pas considéré nécessaire de contester les témoignages de MM. Agbogba, Riff et Black ni de demander leur interrogatoire en audience.

111.   Le Tribunal est donc convaincu que l'Appel d'Offres visait un partenariat stratégique avec une société étrangère reconnue mondialement dans le milieu des services aéroportuaires.

112.   En l'espèce, une société étrangère a répondu à cet Appel d'Offres et s'est vue octroyer le marché. En effet, la réponse à l'Appel d'Offres est libellée « *Offre de services de Menzies Aviation Group – AHS* »[83]. Comme expliqué dans cette offre, Menzies Aviation

---

[80] Attestation de M. Black du 13 octobre 2011, § 17. Le Tribunal remarque que suite à une erreur de mise en forme (qui n'affecte pas le contenu de la déclaration), la numérotation des paragraphes n'est pas identique dans les versions française et anglaise de la déclaration. Le Tribunal prendra comme référence la version française de la déclaration de M. Black.

[81] *Idem*, § 20.

[82] V. notamment les pièces C1, C4, C6, C8, C34, C35, C38, C39, C40 et C41.

[83] Pièce C8.

Group (MAG) « *opère en Afrique de l'Ouest , en Afrique Centrale et en Afrique du Nord à travers Aviation Handling Services SA ('AHS')* »[84]. Ceci a été confirmé par les Demanderesses dans leur réponse aux questions posées par le Tribunal, lorsqu'elles ont clarifié que AHS[85] est, depuis 2003, le partenaire exclusif de Menzies Aviation Group en Afrique et Moyen Orient et fait partie du réseau mondial Menzies Aviation Group[86].

113. Il n'y a donc aucun doute que c'est cette offre de Menzies Aviation Group – AHS qui a été retenue[87]. Ceci est confirmé par la lettre du 8 février 2004 adressée par M. le Ministre des Transports du Niger à M. le Président de Aviation Handling Services à Dakar l'informant que « *votre groupe a été déclaré adjudicataire* »[88].

114. Conformément à ses engagements et en stricte application des conditions fixées par l'Appel d'Offres, Menzies Aviation Group-AHS a choisi ses affiliées Menzies Afrique SA, société de droit luxembourgeois (aujourd'hui, Menzies Middle East and Africa SA - MMEA) et AHS International Ltd pour constituer, le 18 février 2004, la société de droit nigérien Aviation Handling Services Niger – AHS Niger[89].

115. Lors de sa constitution, le 18 février 2004, AHS Niger était donc sous contrôle majoritaire luxembourgeois[90]. La déclaration de souscription et de versement du capital de AHS Niger montre que MMEA (sous son ancienne dénomination, Menzies Afrique S.A.[91]) détenait 75% des actions de AHS Niger[92]. Le contrôle en février 2004 apparaît direct et majoritaire - la part de 75% de MMEA permet à cette société d'atteindre seule le quorum aux assemblées ordinaires et extraordinaires[93] et d'emporter les décisions[94]. Dans ses écritures, le Niger confirme d'ailleurs que « *le collectif MENZIES AVIATION*

---

[84] *Idem*, p.3 de l'Offre Financière.
[85] Le siège social de AHS se trouve à Dakar (Sénégal), v. pièces C48, C61 et C62.
[86] V. Lettre des demanderesses du 31 août 2012, pp. 8-9.
[87] V. Rapport d'évaluation des offres du 2 février 2004 (pièce C47).
[88] Pièce C48.
[89] Pièces C1 et C33.
[90] Pièce C33.
[91] V. Procès-verbal de l'assemblée générale extraordinaire du 18 mars 2011 (pièce C36).
[92] *Idem*.
[93] Pièce C1, articles 27(2)-(3) et 28(2).
[94] Pièce C1, articles 27(4) et 28(3).

*GROUP/AHS fut déclaré adjudicataire* » et confirme également le contrôle de AHS Niger[95].

116. Le Tribunal relève que les administrateurs de AHS Niger nommés à sa création étaient tous non-nigériens[96]. De même, le Directeur Général a toujours été de nationalité non-nigérienne depuis 2004[97]. Le Directeur Général d'AHS Niger à sa création, M. Willem Debeurme, était le représentant de Menzies Afrique SA[98].

117. Selon M. Black, Menzies Afrique SA, désormais MMEA, « *avait été choisie pour être l'actionnaire majoritaire, mais également pour assurer la direction et le contrôle effectif de la société de droit nigérien que l'adjudicataire avait l'obligation de constituer* »[99].

118. Il ressort de l'attestation de M. Rachid Riffi, Directeur Général de AHS Niger entre le 15 août 2010 et la fin 2010, que toutes les décisions majeures, et qui ne relèvent pas de la gestion courante, « *sont toujours validé[e]s ou autorisé[e]s avant leur mise en œuvre par Menzies Afrique SA et ses administrateurs. Par ailleurs, des reporting opérationnels et financiers hebdomadaires sont envoyés aux sièges de Menzies Afrique et Menzies Aviation* »[100].

119. De même, selon M. Riffi, « *tous les investissements ayant permis l'acquisition des actifs d'AHS Niger nécessaires à l'exercice de ses activités d'assistance en escale ont été financés par concours bancaires garantis par Menzies Afrique SA et par injection de capitaux de cet actionnaire majoritaire d'AHS Niger* »[101].

120. Le 19 février 2004, soit 24 heures à peine après la constitution de AHS Niger, le Ministre des Transports et du Tourisme (à l'époque, M. Souleymane Kane) a pris l'Arrêté 16 portant agrément pour les services visés dans l'Appel d'Offres[102]. Cet arrêté était déjà envisagé dans le Cahier des Charges de l'Appel d'Offres[103].

---

[95] V. Déf. Mém. 6 avril 2011, p. 2.
[96] V. Résolution du Conseil d'Administration du 19 février 2004 (pièce C39). V. aussi, attestation de M. Rachid Riffi du 4 avril 2011 (pièce C42).
[97] Attestation de M. Rachid Riffi du 4 avril 2011.
[98] Attestation de M. Agbogba, précitée, § 28.
[99] Attestation de M. Black, précitée, § 15.
[100] Attestation de M. Riffi, 4 avril 2011.
[101] *Idem.*
[102] Pièce C3.
[103] Pièce C4, Arrêté No. 66 MT7DAC du 30 décembre 2003, article 6.

121.    Le Tribunal Arbitral constate que l'Arrêté 16 fait référence au Cahier des Charges visé dans le Dossier d'Appel d'Offres et, à plusieurs reprises, identifie la société « *AVIATION HANDLING SERVICES NIGER S.A. (MENZIES AVIATION GROUP PARTNER)* » comme étant l'entité agréée pour l'exercice des activités visées dans l'Appel d'Offres.

122.    Pour le Tribunal il n'existe aucun doute que l'Arrêté 16 visait le groupement Menzies Aviation Group-AHS à travers la mention Aviation Handling Services Niger S.A. (Menzies Aviation Group Partner). Le Tribunal estime, à la lumière des éléments de preuve apportés, que la référence (entre parenthèses) au Menzies Aviation Group montre clairement que l'État du Niger, par la voix de son Ministère des Transports, comprenait, acceptait et reconnaissait que son partenaire et prestataire agréé était en fait des sociétés appartenant au « *Menzies Aviation Group* » (en particulier, MMEA en tant qu'actionnaire majoritaire de la toute récente société AHS Niger), de nationalité autre que nigérienne, et que, suivant les instructions de l'État, ces sociétés venaient de constituer une société nigérienne jusqu'alors inexistante. De ce fait, l'État du Niger comprenait, acceptait et reconnaissait que la société AHS Niger était, de facto, en ce qui concerne le traitement de son investissement, ressortissante d'un autre pays que le Niger.

123.    C'est dans ces contexte et circonstances que, dix mois plus tard, le Niger (de nouveau sous la signature de M. Soulaymane Kane[104], Ministre des Transports, et les signatures des Ministres de Commerce et de l'Economie et Finances), va conclure la Convention d'Investissement du 15 décembre 2004, qui est au cœur du présent différend[105].

### b) A l'égard du Code des Investissements

124.    Le Dossier d'Appel d'Offres vise le Code des Investissements comme l'un des éléments fondamentaux de l'environnement législatif et réglementaire dont bénéficierait l'adjudicataire[106]. Comme déjà indiqué, le Code des Investissements s'applique aux personnes physiques ou morales, quelle que soit leur nationalité, dès lors qu'elles exercent des activités dans l'un des secteurs visés par le Code, y compris le secteur aérien[107]. Le Code des Investissements contient cependant une disposition spécifique aux

---

[104] M. Kane était aussi le Ministre lorsque l'Arrêté 16 a été pris (v. *supra*, ¶ 120).
[105] Pièce C7.
[106] Pièce C4, pp. 6-7.
[107] Pièce C32, article 2.

non-nationaux en son article 6, en matière de règlement de litiges, d'où le Tribunal déduit que ce texte reconnait la notion de non-national, même s'il ne la définit pas. L'unique spécificité que cette disposition reconnaît aux non-nationaux est la possibilité de recourir à un arbitrage CIRDI, ce qui conduit le Tribunal à considérer que la définition du non-national au sens du Code des Investissements, soit est identique à la définition donnée par la Convention CIRDI, soit doit être interprétée comme prenant en compte les critères dégagés par rapport à la Convention CIRDI.

125. D'autres considérations doivent aussi être prises en compte et le Tribunal tient à rappeler que l'Appel d'Offres visait en particulier un partenariat stratégique avec une société étrangère reconnue mondialement dans le milieu de services aéroportuaires[108].

126. En l'espèce, Menzies Aviation Group – AHS a demandé à bénéficier du Régime B du Code des Investissements[109] mais semble avoir finalement bénéficié du Régime C[110], dit aussi régime conventionnel, accordé « *aux grandes entreprises présentant une importance exceptionnelle pour l'exécution des programme nationaux de développement économique et social* »[111]. Il faut remarquer que le régime C est accordé par une convention passée entre l'entreprise bénéficiaire et l'État[112]. D'après l'article 36(f) du Code des Investissements, cette convention définit, notamment, « *la procédure d'arbitrage qui sera mise en œuvre en cas de litige entre les parties* ».

127. Bien que le régime C ne soit pas lié à une condition de nationalité, le Tribunal considère que le contenu de la Convention d'Investissement permet d'éclairer la position de l'État du Niger vis-à-vis de la nationalité de l'investisseur, au sens du Code des Investissements. Le Tribunal constate ainsi que certains des avantages dont a bénéficié AHS Niger dans la Convention d'Investissement sont par nature réservés à des investisseurs étrangers. Ceci est notamment le cas des exonérations fiscales, surtout lorsque celles-ci sont presque totales et pour une période significative, ainsi que de

---

[108] V. *supra*, ¶¶ 104 *et seq.*
[109] V. Réponse à l'Appel d'Offres, p. 9 (pièce C8).
[110] V. pièce jointe à la lettre réf. 421 du 19 septembre 2011 du Ministère des Transports (pièce C-55) : « *La société AHS Niger SA, pour bien mener ses activité techniques, a sollicité et obtenu auprès du gouvernement <u>le bénéfice du régime C du code des investissements</u>. Ce bénéfice est matérialisé par la signature d'une convention qui engage les deux parties.* » (souligné dans le texte).
[111] Code des Investissements, article 30 (pièce C32).
[112] *Idem*, article 31.

l'accès aux devises étrangères et, plus important, de l'interdiction de toute mesure d'expropriation ou de nationalisation (v. art. 2 de la Convention d'Investissement).[113]

128.    Au vu, d'une part, de ces éléments factuels, qui s'ajoutent aux considérations développées au point (a) ci-dessus, et, d'autre part, de la position présentée ci-après au sujet de la notion de non-national au sens de la Convention CIRDI, le Tribunal conclut que l'intention des Parties de considérer AHS Niger comme étant d'une nationalité autre que la nationalité nigérienne[114] permet de considérer AHS Niger comme un « *non-national* » au sens du Code des Investissements.

129.    Au regard du Code des Investissements, le caractère de « *non-national* » acquiert de l'importance seulement en matière de règlements de litiges. En effet, tel que cela ressort de son article 6, seuls les non-nationaux ont la possibilité de recourir à l'arbitrage CIRDI.

130.    Il faut maintenant examiner si les conditions de nationalité exigées par la Convention du CIRDI sont remplies.

c) A l'égard de la Convention CIRDI

131.    La question qui se pose dans cette sous-section est celle de savoir si AHS Niger, société de droit nigérien, peut être une partie demanderesse en application de la deuxième partie de l'article 25(2)(b) de la Convention CIRDI qui dispose :

> « *Ressortissant d'un autre État contractant* » *signifie* […]
>
> *toute personne morale qui possède la nationalité de l'État contractant partie au différend à la même date* [date à laquelle les parties ont consenti à soumettre le différend à l'arbitrage] *et que les parties sont convenues, aux fins de la présente Convention, de considérer comme ressortissant d'un autre État contractant en raison du contrôle exercé sur elle par des intérêts étrangers* » (soulignement ajouté).

132.    Un accord des Parties pour traiter AHS Niger comme un national d'un autre État Contractant en raison du contrôle étranger à la date du consentement à l'arbitrage doit donc être établi.

---

[113] Le Tribunal remarque à cet égard que le Code des Investissements (applicable à tous les investisseurs sans considération de leur nationalité) offre une protection moindre et permet l'expropriation ou la nationalisation en cas d'utilité publique prévue par la loi (v. art. 7 du Code des Investissements).

[114] V. *supra*, § 122.

31

133. La date de la Convention d'Investissement qui, selon les Demanderesses, contiendrait le consentement à l'arbitrage est le 15 décembre 2004. Le Tribunal prendra donc cette date comme date de référence du consentement pour déterminer si la condition objective de contrôle étranger exercé sur AHS Niger est remplie.

134. Il découle de l'examen de l'actionnariat de AHS Niger au moment de sa constitution (v. *supra*, §§ 115 *et seq.*), que le contrôle exercé sur AHS Niger provenait d'une société ressortissante d'un État contractant de la Convention du CIRDI.

135. En réponse à une question posée par le Tribunal, les Demanderesses ont confirmé que ce contrôle n'avait pas changé au 15 décembre 2004[115]. La déclaration de M. Riffi le confirme également[116].

136. Le Tribunal constate donc qu'au 15 décembre 2004, date de la Convention d'Investissement, AHS était sous contrôle étranger et, plus particulièrement, d'un ressortissant d'un État contractant de la Convention CIRDI. Le Tribunal doit maintenant examiner si les parties à la Convention d'Investissement sont convenues de traiter AHS Niger comme un ressortissant d'un autre État en raison de ce contrôle.

137. Le Tribunal relève que ce type d'accord se trouve généralement dans l'instrument qui contient le consentement à l'arbitrage ou peut être donné par acte séparé. Cependant, plusieurs décisions ont reconnu qu'un tel accord peut être implicite[117]. La présence d'une clause CIRDI, par exemple, a été reconnue comme un élément indicatif d'un tel accord[118]. Un tel accord a été également déduit du fait que des avantages réservés aux investisseurs étrangers ont été accordés à la société de droit local[119].

138. Par ailleurs, le Tribunal note que le tribunal dans l'affaire *LETCO c. Libéria* a retenu que « [...] *unless circumstances clearly indicate otherwise, it must be presumed that where*

---

[115] V. Lettre des Demanderesses au CIRDI du 31 août 2012, p. 10.
[116] Pièce C42.
[117] Schreuer, Article 25, §§ 775-794.
[118] *Klöckner Industrie-Anlagen GmbH et autres c. République du Cameroun et Société camerounaise des Engrais*, Aff. CIRDI No. ARB/81/2, Sentence, 21 octobre 1983, 2 ICSID Report 16 ; *LETCO c. Libéria*, Aff. No. CIRDI ARB/83/2, Décision sur la compétence, 24 octobre 1984, 2 ICSID Report 349, p. 352, JP 15.
[119] *CableTelevision of Nevis, Ltd. and CableTelevision of Nevis Holdings, Ltd c. Fédération de St Kitts et Nevis*, Aff. CIRDI No. ARB/95/2, Sentence, 13 janvier 1997, §§ 5.17-5.18, JP 16.

32

*there exists foreign control, the agreement to treat the company in question as a foreign national is 'because' of this foreign control* »[120].

139.    Le Tribunal considère que la décision LETCO (qui a aussi inspiré le tribunal dans l'affaire *Millicom c. Sénégal*[121]) est particulièrement intéressante dans la mesure où le tribunal a considéré que l'obligation de constituer une société de droit local renforçait la présomption d'un accord de l'État de traiter cette dernière comme non-ressortissante tirée de la présence d'une clause compromissoire CIRDI dans la convention en cause[122].

140.    Dans la présente affaire, il n'y a pas, à proprement parler, de « clause compromissoire CIRDI » dans la Convention d'Investissement. Toutefois, cette dernière renvoie au Code des Investissements qui vise la possibilité de recourir à l'arbitrage du CIRDI pour les « *non-nationaux* » et le Tribunal Arbitral est déjà parvenu à la conclusion que le Niger a considéré AHS Niger comme étant d'une nationalité autre que la nationalité nigérienne[123].

141.    Dans son Mémoire en Défense du 6 avril 2011, la Défenderesse prétend que le Tribunal constate que la nationalité (nigérienne) de AHS Niger est de nature à priver le Tribunal de compétence à son égard et soutient à ce propos qu'en exigeant la constitution d'une société de droit du Niger, l'État « *a expressément entendu exclure de la convention d'investissement toute personne morale du droit étranger* »[124].

142.    Le Tribunal Arbitral considère que le raisonnement du Niger ne peut pas être suivi.

143.    Premièrement, comme le Tribunal l'a déjà remarqué[125], le comportement des Parties, et particulièrement du Niger, constitue une reconnaissance au moins implicite de la qualité de non-national de AHS Niger.

144.    Deuxièmement, de l'opinion du Tribunal, le comportement des Parties dénote également une croyance légitime de la part de AHS Niger, et de ses actionnaires majoritaires, que

---

[120] *Liberian Eastern Timber Corporation (LETCO) c. Libéria*, Sentence du 31 mars 1986, JP15, p. 5.
[121] *Millicom International Operations B.V. & Sentel GSM S.A. c. République du Sénégal*, Aff. CIRDI No. ARB/08/20, Décision sur la compétence, 16 juillet 2010.
[122] *LETCO c. Libéria*, p. 6.
[123] V. *supra*, §§ 122 et 128.
[124] V. Déf. Mém. 6 avril 2011, p. 6.
[125] V. *supra*, §§ 103 *et seq.*

33

AHS Niger serait considérée comme un ressortissant étranger et jouirait de tous les bénéfices inhérents à cette condition en ce qui concerne ses investissements au Niger.

145.    Troisièmement, le Tribunal n'est pas convaincu que l'exigence qu'une société de droit nigérien soit constituée ait été motivée par le souci du Niger de refuser à AHS Niger les bénéfices propres à un investisseur non-national, y compris la possibilité de recourir à l'arbitrage du CIRDI conformément à l'article 6(2) du Code des Investissements. Au contraire, le Tribunal considère que cette exigence s'explique pleinement et suffisamment par l'intérêt exprimé par l'État que des actionnaires privés nigériens et l'État du Niger prennent des participations minoritaires dans la société adjudicataire[126].

146.    Finalement, comme l'a très bien souligné le Tribunal dans l'affaire *Millicom c. Sénégal*, « [c]*'est au contraire en raison d'exigences de cette nature, relativement courantes en pratique, que, sous l'angle de la nationalité, la notion de l'investisseur protégé a été étendue par l'article 25(2)(b) in fine* »[127].

147.    Enfin, le Tribunal note que le Niger dans ses écritures devant la Cour d'État du Niger a excipé de la saisine du CIRDI pour soutenir que le recours pour excès de pouvoir n'était pas disponible dans la mesure où AHS dispose du recours de plein contentieux devant le CIRDI pour faire valoir ses droits[128]. C'est donc que le Niger reconnaît que la saisine du CIRDI par AHS est valable.

148.    Au vu de ce qui précède et des éléments de preuve déjà analysés précédemment, le Tribunal considère que le Niger a implicitement accepté de considérer AHS Niger comme un non-ressortissant au sens de l'article 25(2)(b) de la Convention du CIRDI en raison de son actionnariat luxembourgeois et du contrôle effectif exercé sur elle par MMEA.

---

[126] V. *supra*, § 104.

[127] *Millicom International Operations B.V. & Sentel GSM S.A. c. République du Sénégal*, Aff. CIRDI n° ARB/08/20, Décision sur la compétence, 16 juillet 2010, § 114, disponible sur le site internet du CIRDI.

[128] Arrêt no. 12-054 de la Chambre Administrative de la Cour d'État du Niger du 10 octobre 2012, communiqué par les Demanderesses le 10 octobre 2012.

### V.3    Compétence *ratione voluntatis*

149.    Le Tribunal arbitral doit examiner si toutes les Parties ont consenti par écrit à soumettre le différend au CIRDI et à la compétence du Tribunal.

### A.    Analyse des instruments applicables

150.    A défaut d'accord amiable, la Convention d'Investissement qui est invoquée dans cette affaire renvoie à l'arbitrage. Il existe, à l'article 6 de la Convention d'Investissement, une volonté claire et expresse de voir les litiges y afférents tranchés par voie arbitrale : « *les différends donneront lieu à un règlement par voie d'arbitrage* ».

151.    Concernant les modalités de cet arbitrage, ledit article 6 ajoute : « *conformément aux dispositions en vigueur au Niger en matière de règlement de différends relatifs aux investissements* ».

152.    Le Dossier d'Appel d'Offres définit l'environnement législatif et réglementaire du projet comme comprenant les droits de douane, la fiscalité, le Code des Investissements de 1989 et le droit du travail[129]. Le Tribunal constate que le Code des Investissements de 1989 représente et fait partie de la législation en vigueur en matière de règlement des différends relatifs à un investissement visée dans la Convention d'Investissement.

153.    Dans le Code des Investissements, tel que modifié en dernier lieu en 2001, le Niger a accepté en son article 6 que « *le règlement des différends relatifs à la validité, à l'interprétation ou à l'application de l'acte d'agrément et à la détermination éventuelle de l'indemnité due à la méconnaissance ou à la violation des engagements fera l'objet de l'une des procédures d'arbitrage ci-après à déterminer dans l'acte d'agrément* » (soulignement ajouté). Ces procédures ne sont autres que l'arbitrage *ad hoc* en équité ou l'arbitrage CIRDI.

154.    Il convient donc d'identifier « *l'acte d'agrément* » (1) pour, ensuite, déterminer le type d'arbitrage auquel les Parties ont consenti (2). Le Tribunal abordera après la question de savoir qui sont les parties qui ont consenti et sont bénéficiaires de « l'acte d'agrément » (3).

---

[129] Pièce C4, pp. 5-6.

### 1. L'acte d'agrément

155. Pour les Demanderesses, « *l'acte d'agrément* » au sens du Code des Investissements ne peut être que la Convention d'Investissement [130].

156. Pour le Niger, « *l'acte d'agrément* » est l'Arrêté 16 du 19 février 2004 « *portant agrément de l'activité d'assistance en escale sur l'Aéroport international Diori Hamani de Niamey* ». L'Arrêté 16 ne comportant aucune disposition concernant le règlement de litiges, la Défenderesse conclut qu'aucun choix n'a été opéré par les Parties et que, donc, il n'y a pas de recours possible à l'arbitrage CIRDI.

157. Il est évident des pièces apportées et des allégations faites par les Parties que l'expression « agrément » peut prêter à équivoque. Ainsi, pour le Tribunal, il convient de distinguer entre, d'une part, « l'agrément à l'investissement », c'est-à-dire, l'acte qui autorise l'investissement, fixe les conditions de celui-ci et, de ce fait, lui confère l'aptitude à être couvert, sous certaines conditions, par le Code des Investissements et par l'un des régimes privilégiés prévus par ce Code et, d'autre part, « l'agrément pour l'exercice de l'activité », c'est-à-dire, la décision administrative qui autorise l'exercice d'une activité, en l'espèce, l'assistance en escale, qui concerne les biens de l'État ou affecte l'intérêt publique.

158. À la lecture du Dossier d'Appel d'Offres International[131], et plus concrètement du Mémorandum d'information, le Tribunal constate que, sous le titre « *Evolution juridique de l'activité* » (qui est une section distincte de celle consacrée à l'« *Environnement législatif et règlementaire* », faisant mention du Code des Investissements), il est indiqué qu' « [u]*n agrément et une licence d'exploitation sont prévus pour officialiser la concession de l'activité à la structure retenue* »[132].

159. A son tour, l'Arrêté 66 du 30 décembre 2003, portant Cahiers des Charges, qui fait partie du Dossier d'Appel d'Offres, prévoit à son article 3, sous « *CONDITIONS D'EXERCICE* », que l'exercice de l'activité d'assistance ou d'auto assistance en escale « *est subordonnée à l'obtention d'un agrément délivré par le Ministre chargé de*

---

[130] Dem. Mém., § 200.
[131] Pièce C4.
[132] Mémorandum d'information, p. 12, § 3.3.2.2 (pièce C4).

*l'Aviation Civile* » (qui n'est autre que le Ministre des Transports) et confirme, à son article 6, que l'agrément prend la forme d'un arrêté ministériel : « *L'agrément pour l'exercice de l'activité d'assistance en escale est délivré par arrêté du Ministre chargé des transports* ».

160. Le Tribunal considère que l'Arrêté 16 constitue l'acte d'agrément pour l'exercice de l'activité, permettant à AHS Niger d'exercer une activité réglementée qui se déroule sur le domaine public de l'aéroport de Niamey, sous le contrôle de l'État nigérien. Le Tribunal note que AHS Niger a, en outre, obtenu une licence annuelle d'exploitation délivrée par la Direction Générale de l'Aviation Civile en échange du paiement d'une redevance d'exploitation.

161. L'Arrêté 16 est, bien évidemment, un acte important et nécessaire à l'investissement. Il s'agit d'un acte préparatoire et nécessaire pour aboutir à l'agrément de l'investissement, toutefois, à lui seul, il ne suffit pas pour conférer les bénéfices prévus dans le Code des Investissements et, à ce titre, il ne peut être considéré comme étant l'acte d'agrément prévu à l'article 6 du Code des Investissements.

162. Pour le Tribunal Arbitral, la notion d'acte d'agrément de cet article 6 doit être analysée dans le contexte même du Code des Investissements. En effet, de la lecture du Code, on peut conclure que ses avantages particuliers (énoncés comme l'un des atouts du cadre juridique nigérien dans le Dossier d'Appel d'Offres) sont octroyés, suivant le régime accordé, par arrêté ou décret (v. article 17) et, dans le cas du régime C (applicable à AHS Niger, v. *supra*, § 126), par convention signée avec l'État. Dans ce dernier cas, comme expressément indiqué dans le Code (v. art. 36(f)), la Convention définit la procédure d'arbitrage à suivre pour le règlement des litiges.

163. Deux éléments principaux ressortent de la lecture de l'article 6 du Code des Investissements et sont essentiels pour guider le Tribunal arbitral dans sa démarche menant à l'identification de « *l'acte d'agrément* ».

164. Premièrement, d'après ce Code, l'arbitrage prévu dans l'acte d'agrément règle tout litige relatif à la validité, l'interprétation ou l'application de l'acte d'agrément. Ainsi, l'acte d'agrément est l'objet même de la compétence arbitrale. Ceci s'entend sans difficulté de la Convention d'Investissement qui, comme son nom l'indique, est une convention

37

juridique qui règle les relations entre les parties en matière d'investissement. En revanche, l'Arrêté 16 est un acte réglementaire de l'État et, en tant que tel –comme il a été justement relevé par les juridictions du Niger (v. *supra*, §§ 52 et 147) –, sa validité et sa légalité sont de la compétence exclusive des juridictions nigériennes, ce qui met en échec la position soutenue par le Niger dans cet arbitrage tendant à voir reconnu l'Arrêté 16 comme étant « *l'acte d'agrément* » visé par le Code des Investissements.

165. Deuxièmement, toujours d'après l'article 6 du Code, l'acte d'agrément doit comporter des engagements dont la violation fera l'objet de la procédure arbitrale. L'Arrêté 16 ne comporte pas d'engagements à proprement parler. Cet Arrêté n'est que l'autorisation administrative donnée à l'opérateur et lui posant les conditions pour l'exercice de son activité. En revanche, la Convention d'Investissement, signée par l'État et par l'investisseur, contient des engagements aussi bien à la charge de l'investisseur qu'à la charge de l'État.

166. Par conséquent, le Tribunal conclut que « *l'acte d'agrément* », auquel fait référence l'article 6 du Code des Investissements, ne peut être que la Convention d'Investissement en date du 15 décembre 2004.

## 2. Les modalités de l'arbitrage visées dans l'acte d'agrément

167. Les parties à la Convention d'Investissement ont consenti par écrit à ce que les différends nés de l'interprétation ou de l'application de la Convention d'Investissement, à défaut d'être réglés à l'amiable, soient réglés par voie d'arbitrage conformément aux « *dispositions en vigueur au Niger en matière de règlement de différends relatifs aux investissements* ».

168. Comme précédemment indiqué, les « *dispositions en vigueur* » visées dans le second paragraphe de l'article 6 de la Convention d'Investissement sont celles du Code des Investissements. Or, le Code des Investissements, tout en imposant le recours à l'arbitrage, offre le choix entre une procédure *ad hoc* et une procédure CIRDI « *à déterminer dans l'acte d'agrément* », c'est-à-dire, comme on vient de le constater, dans la Convention d'Investissement.

169.   Dans un premier temps, la question qui se pose est celle de savoir si, nonobstant la volonté exprimée à l'article 6 de la Convention d'Investissement de recourir à l'arbitrage, le fait que « *l'acte d'agrément* » ne fasse pas de choix exprès entre les deux procédures offertes par le Code prive de tout effet l'article 6 (intitulé « *Règlement des différends* ») de ladite Convention. Dans un deuxième temps, s'il doit produire des effets, il faut déterminer la procédure d'arbitrage à laquelle les parties peuvent recourir.

170.   Les Parties ne se sont pas prononcées dans leurs écritures sur les critères d'interprétation que devait suivre le Tribunal Arbitral. Ce n'est qu'en réponse aux questions posées par le Tribunal que les Demanderesses ont fait référence aux dispositions du Code Civil du Niger en matière d'interprétation des conventions[133]. S'agissant de l'interprétation d'une convention d'arbitrage et constatant que les parties n'ont soumis cette convention à aucun droit particulier, le Tribunal appréhendera son interprétation sur la base de la volonté commune des parties telle qu'elle ressort de la Convention d'Investissement, de son exécution et des documents produits par les Parties, notamment le Dossier d'Appel d'Offres.

171.   Le Tribunal part d'un constat fondamental : le Code des Investissements, de façon générale (v. arts. 6 et 36(f)), et la Convention d'Investissement, de façon particulière (v. art. 6), soumettent à l'arbitrage les litiges relatifs à l'acte d'agrément (i.e. la Convention d'Investissement). Il existe ainsi une volonté expresse, exprimée dans l'article 6 de la Convention d'Investissement, de recourir à l'arbitrage.

172.   Dans ces circonstances, le Tribunal ne peut accepter, comme le soutient le Niger, que puisque la Convention d'Investissement ne fait pas de choix entre les deux modes d'arbitrage prévus dans le Code, il n'y aurait tout simplement pas de consentement à un arbitrage CIRDI, et donc recours nécessaire à l'autre branche de l'alternative, l'arbitrage *ad hoc*. En effet, si l'absence de référence expresse à l'arbitrage CIRDI signifie absence de consentement, il devrait en aller de même pour l'arbitrage *ad hoc*, pour lequel il n'y aurait pas davantage de consentement.

---

[133] V. Lettre des Demanderesses au CIRDI du 31 août 2012, p.15 et la référence générale aux articles 1156 à 1164 du Code Civil du Niger.

173. Ceci mènerait à un résultat absurde et contraire non seulement à la volonté des parties de voir leur litige tranché par voie arbitrale mais aussi à l'objet et au but de l'article 6 de la Convention d'Investissement et du Code, qui est de régler par voie arbitrale tout litige découlant de cet investissement.

174. Le Tribunal constate donc, dans un premier temps, que l'article 6 de la Convention d'Investissement constitue un convention d'arbitrage qui exprime de façon claire la volonté des parties de recourir à l'arbitrage.

175. Il n'en demeure pas moins que cette convention d'arbitrage n'opère pas de choix entre l'arbitrage *ad hoc* et l'arbitrage CIRDI. A la lumière des textes invoqués par les Parties, et inspiré par la recherche de l'effet utile qui doit guider l'interprète, le Tribunal constate que la Convention d'Investissement exprime une volonté commune de ne pas choisir entre l'arbitrage *ad hoc* et l'arbitrage CIRDI.

176. Cette décision de ne pas choisir entre les deux types d'arbitrage proposés par le Code des Investissements, on vient de le constater, ne peut être interprétée comme exprimant une volonté de ne pas se soumettre à l'arbitrage ou de ne pas se soumettre à l'arbitrage du CIRDI. Pour le Tribunal, la rédaction de l'article 6 de la Convention d'Investissement laisse le choix ouvert pour qu'il soit effectué par la partie demanderesse au moment de la matérialisation du litige. L'autre partie étant considérée comme ayant consenti à ce choix par avance au moment où la Convention d'Investissement a été conclue.

177. Dès lors, les parties à la Convention d'Investissement ont accepté un arbitrage *ad hoc* ou un arbitrage CIRDI, sans qu'il n'existe de hiérarchie entre les deux possibilités. Le choix appartient à la partie demanderesse à l'arbitrage, étant entendu que l'arbitrage CIRDI est disponible à la seule condition de posséder la qualité de « *non-national* ». Cette dernière condition est remplie en l'espèce, le Tribunal ayant déterminé (v. *supra* § 128) que le Niger a accepté de considérer AHS Niger comme « *non-national* » au sens du Code des Investissements et MMEA étant une société luxembourgeoise. Par conséquent, les conditions de « nationalité » requises pour la mise en œuvre d'un arbitrage CIRDI sont remplies en l'espèce.

### 3. Les parties visées par l'acte d'agrément

178.    Les Demanderesses ont allégué[134] :

> « 138. A cet égard, depuis la création de AHS Niger, c'est MMEA, actionnaire majoritaire fondateur, qui en assure le contrôle capitalistique mais également la direction effective d'AHS Niger puisque le Directeur General a toujours été un représentant de MMEA de nationalité non nigérienne.
>
> 139. MMEA doit donc être considérée comme l'entité effectivement visée par la mention « MENZIES AVIATION CROUP PARTNER » (sic) systématiquement associée à AHS Niger dans le visa et le corps de l'Arrêté d'agrément.
>
> 140. Comme les Demanderesses se sont attachées à le démontrer ci-dessus, les Parties à la Convention d'Investissement dont l'Etat du Niger, se sont implicitement accordées pour considérer AHS Niger comme un non national.
>
> 141. Le « partenaire stratégique » étranger de l'Etat du Niger qui a d'ailleurs procédé au financement des investissements et souscrit la police internationale d'assurance est bien MMEA l'actionnaire majoritaire fondateur d'AHS Niger.
>
> 142. Ainsi, MMEA en tant que société mère fondatrice d'AHS Niger assurant tant le contrôle que la direction effective de sa filiale doit être considérée comme ayant consenti à la Convention d'Investissement et à la clause compromissoire qui y est insérée. » (Citations omises).

179.    A cet égard, le Tribunal se réfère à l'historique de la relation entre les parties et aux actes préparatoires qui ont culminé avec la signature de la Convention d'Investissement, tels qu'ils ont été rappelés plus haut aux paragraphes 111 à 123 de cette décision.

180.    Le Tribunal partage la position des Demanderesses. Il considère que le groupe qui est visé par l'Arrêté 16 est celui-là même qui a été retenu à l'issue de l'Appel d'Offres. Cet Arrêté se trouve à l'origine et constitue le fondement de la Convention d'Investissement ou « acte d'agrément »[135].

181.    En particulier, le Tribunal est arrivé à la conclusion que, tout au long de la procédure qui a mené à la signature de la Convention d'Investissement, le Niger comprenait, acceptait et reconnaissait que son partenaire et prestataire agréé était Menzies Aviation Group – AHS, et particulièrement la société MMEA, qui a toujours contrôlé et financé la société

---

[134] Dem. Mém., p. 29.
[135] V. supra, § 161.

41

AHS Niger, constituée en tant que société nigérienne à la demande de l'État et pour les besoins exclusifs de la prestation des services qui constitue l'objet du présent arbitrage[136].

182. Par conséquent, le Tribunal arbitral considère que MMEA est « partie bénéficiaire » de l'agrément donné en vertu de l'Arrêté 16 et de la Convention d'Investissement, comme il sera décrit ci-dessous. À ce titre, MMEA a toute légitimité à recevoir la protection et à jouir des avantages qu'en tant qu'investisseur le Niger lui a offerts, y compris le droit à avoir recours à l'arbitrage visé dans la Convention d'Investissement et dans le Code des Investissements.

### B. Le Niger

183. Selon les Demanderesses, le consentement du Niger a été donné à l'article 6 de la Convention d'Investissement, qui a été signée par l'État du Niger, et par le Code des Investissement du Niger[137] qui renvoie à la Convention CIRDI.

184. Le Tribunal tient à faire deux remarques préliminaires: premièrement, contrairement à ce que les Demanderesses laissent entendre[138], il est un principe établi en matière d'arbitrage que le simple fait de participer à la constitution du tribunal ne saurait emporter consentement à sa compétence et renonciation à soulever des objections à cet égard[139]. Deuxièmement, contrairement à ce qu'affirment les Demanderesses, le simple fait qu'un État soit partie à la Convention CIRDI n'emporte pas consentement à l'arbitrage du CIRDI[140].

185. En ce qui concerne le consentement du Niger à l'arbitrage CIRDI, le Tribunal se réfère à l'analyse développée dans les paragraphes précédents. Pour le Tribunal, le Niger a accepté la compétence du CIRDI, et du Tribunal qui serait constitué sous son égide, lorsqu'il a conclu la Convention d'Investissement le 15 décembre 2004. Ce jour-là, en

---

[136] V. *supra*, §§ 115 à 123 et 126. V. aussi pièces C37 et C41.

[137] Requête, 4 mars 2011, §§ 73 et 79-81; Dem. Mém., 14 novembre 2011, §§ 161-162, 169.

[138] Dem. Mém., § 171.

[139] Voir notamment l'article 16(2) de la Loi Type CNUDCI pour le droit commercial international ainsi que l'article 23(2) du Règlement d'arbitrage CNUDCI qui disposent que « [l]e *fait pour une partie d'avoir désigné un arbitre ou d'avoir participé à sa désignation ne la prive pas du droit de soulever* [l'exception d'incompétence] ». Cette disposition a été reprise, peu ou prou verbatim, par de nombreux états (par exemple l'article 31 de l'Arbitration Act de 1996 du Royaume-Uni ou encore l'article 1297.162 du Code de Procédure civile canadien).

[140] V. Préambule de la Convention CIRDI.

42

vertu de l'article 6 de la Convention d'Investissement et du renvoi qu'elle opère à la législation du Niger « *en matière de règlement de différends relatifs aux investissements* » (i.e., le Code des Investissements qui prévoit l'arbitrage CIRDI), le Niger a donné son consentement à un arbitrage CIRDI, si tel était le choix de la partie demanderesse à l'arbitrage.

186.    Le Tribunal tient à rappeler qu'à aucun moment le Niger n'a manifesté sa volonté de saisir une autre juridiction (y compris le tribunal arbitral *ad hoc* mentionné à l'article 6 du Code des Investissements). Au contraire, comme il a été déjà indiqué (v. *supra*, § 147), le Niger s'est même prévalu de l'existence de la procédure arbitrale CIRDI devant les juridictions nigériennes.

### C.    AHS Niger

187.    AHS Niger a aussi consenti à l'arbitrage le 15 décembre 2004 dans la Convention d'Investissement. Elle a procédé au choix de l'arbitrage CIRDI, comme elle en avait le droit, dans la Requête, le 4 mars 2011.

### D.    MMEA

188.    MMEA n'est pas signataire de la Convention d'Investissement du 15 décembre 2004.

189.    Dans leur Mémoire, les Demanderesses considèrent que MMEA est la société visée par l'acte d'agrément du 19 février 2004[141]. Elles allèguent, de plus, que MMEA a donné son consentement dans la Convention d'Investissement, qui doit lui être étendue conformément à la jurisprudence CCI, notamment la jurisprudence *Dow Chemical Company*[142], et que MMEA est un non-national au sens de l'article 6(2) du Code des Investissements et un ressortissant étranger au sens de la Convention CIRDI.

190.    D'après les Demanderesses, la date du consentement de MMEA à l'arbitrage serait donc le 15 décembre 2004[143].

---

[141] Dem. Mém., § 139.
[142] Voir Lettre Dem. 21 mars 2011, p. 6.
[143] Lettre Dem. 21 mars 2011, p. 7.

191. Il ne fait pas de doute, comme indiqué plus haut, que MMEA est un non-national. La question est de savoir si MMEA a donné son consentement.

192. Les Demanderesses se sont référées à l'arbitrage CCI dans leurs écritures pour justifier de l'extension d'une clause compromissoire CIRDI à une société qui appartient au même groupe ou à la maison mère.

193. En effet, l'ordonnance de procédure rendue le 23 septembre 1982 par le tribunal CCI dans l'affaire *Isover-Saint-Gobain c. Dow Chemical*[144] établissait que « [...] *the arbitration clause expressly accepted by certain of the companies of the group should bind the other companies which, by virtue of their role in the conclusion, performance, or termination of the contracts containing said clauses, and in accordance with the mutual intention of all parties to the proceedings, appear to have been veritable parties to these contracts or to have been principally concerned by them and the disputes to which they may give rise* »[145].

194. Cette décision fut entérinée par la Cour d'appel de Paris le 21 octobre 1983, dans le cadre d'une requête en annulation de la sentence arbitrale, la Cour insistant sur l'importance de l'intention réelle des parties qui, à elle seule, suffisait à étendre le bénéfice de la clause compromissoire aux autres sociétés du groupe Dow Chemical, nonobstant le fait que ces dernières n'aient pas été signataires du contrat[146].

195. Cette jurisprudence a été confirmée à maintes reprises depuis lors, au travers notamment des arrêts *Sponsor c. Lestrade*[147], *Korsnas Marma c. Sté Duranz-Auzias*[148], *Kis France c. Société générale*[149] ou encore *V 2000 (Jaguar) c. Renault*[150].

---

[144] Affaire CCI No.4131.

[145] Fouchard, Gaillard, Goldman on International Commercial Arbitration (éd. Kluwer Law International), p. 287, § 503.

[146] CA Paris, 21 octobre 1983, *Isover-Saint-Gobain c. Dow Chemical France*, 1984 *Rev. Arb.* 98.

[147] CA Pau, 26 nov. 1986.

[148] CA Paris, 30 novembre 1988 : « [...] *La clause d'arbitrage insérée dans un contrat international a une validité et une efficacité propres qui commandent d'en étendre les effets aux parties directement impliquées dans l'exécution du contrat, dès lors que leur situation et leurs activités font présumer qu'elles avaient connaissance de l'existence et de la portée de cette clause, stipulée conformément aux usages du commerce international* ».

[149] CA Paris, 31 octobre 1989.

[150] CA Paris, 7 décembre 1994 : « [...] *in international arbitration law, the effects of the arbitration clause extend to parties directly involved in the performance of the contract, provided that their respective situations and activities raise the presumption that they were aware of the existence and scope of the arbitration clause, so that the*

44

196. La position communément adoptée en matière d'arbitrage international sur cette question de l'étendue du champ d'application de la clause compromissoire se retrouve par ailleurs synthétisée dans la sentence rendue à Genève en 1990 par un tribunal CCI selon les termes suivants : « [...] *l'appartenance de deux sociétés à un même groupe ou la domination d'un actionnaire ne sont jamais, à elles seules, des raisons suffisantes justifiant de plein droit la levée du voile social. Cependant, lorsqu'une société ou une personne individuelle apparaît comme étant le pivot des rapports contractuels intervenus dans une affaire particulière, il convient d'examiner avec soin si l'indépendance juridique des parties ne doit pas, exceptionnellement être écartée au profit d'un jugement global. On acceptera une telle exception lorsque apparaît une confusion entretenue par le groupe ou l'actionnaire majoritaire* »[151].

197. Le Tribunal trouve également amples illustrations dans la jurisprudence CIRDI.

198. Dans l'affaire *Holiday Inns c. le Maroc*, la question de l'extension d'une clause à des parties non signataires, en l'occurrence la maison mère, s'est posée. Le tribunal a accepté que la clause lui soit étendue en raison du rôle joué par la maison mère dans l'exécution du contrat[152]. Dans l'affaire *AMCO c. l'Indonésie*, le tribunal a aussi accepté une telle extension car l'investisseur étranger était la société mère, la filiale de droit local n'étant que l'instrument par lequel l'investissement était réalisé et le but de la clause CIRDI était de protéger l'investisseur[153].

199. Comme relevé par Schreuer :

« *These cases show that the tribunals take a realistic attitude when identifying the party on the investor's side. They look for the actual foreign investor and are unimpressed by the fact that the consent agreement only names a subsidiary. The operation of ICSID clauses will not be frustrated through a narrow interprétation of the investor's identity. What matters is that the parent company acts in the preparation and possibly the implementation of the investment operation and that the ICSID clause is designed to work for its* 

---

*arbitrator can consider all economic and legal aspects of the dispute* » (citation sous Fouchard, Gaillard, Goldman, *op.cit.* p. 282, § 499) et Cass. Civ. 1ère, 21 mai 1997.

[151] Affaire CCI No. 5721, voir *Bull. CCI*, vol 2, n° 2 (1991), p. 20.

[152] Voir Schreuer, §§ 322-323.

[153] Schreuer, § 324. Voir également, E. Gaillard, Jurisprudence du CIRDI (éd. Pédone), Vol. I, p. 54.

*benefit. This may work to the investor's advantage and detriment. Where companies other than those named in the consent agreement are not necessarily parties but are merely economically associated with the investment or the investor, they will not be given standing in ICSID proceedings. But the parties before the tribunal may be given the right to represent their interests and to claim on their behalf. »[154]*

200.    Selon le Tribunal (v. *supra*, §§ 103 à 123), il ressort des faits du dossier que le Niger a considéré MMEA, qui a participé à l'Appel d'Offres, à la constitution de AHS Niger et à l'exécution des services fournis, comme partie à la Convention d'Investissement. Cette participation active de MMEA fait d'elle une véritable partie à la Convention d'Investissement et l'État du Niger l'a considérée ainsi (v. *supra*, §§ 179 à 182).

201.    Au vu de ce qui précède et du rôle joué par MMEA dans l'historique et le développement du projet, le Tribunal considère que MMEA est partie à la Convention d'Investissement et a consenti à la convention d'arbitrage contenue à son article 6.

## V.4    Compétence *rationae materiae*

202.    Enfin, le Tribunal doit examiner s'il est en présence *(i)* d'un différend et d'un investissement qui entrent dans le champ d'application de l'article 6 du Code des Investissements et *(ii)* d'un différend d'ordre juridique en relation directe avec un investissement au sens de la Convention CIRDI.

### A.    Le Code des Investissements

203.    L'article 6(2) vise « *le règlement des différends relatifs à la validité, à l'interprétation ou à l'application de l'acte d'agrément et à la détermination éventuelle de l'indemnité due à la méconnaissance ou à la violation des engagements* ».

204.    Il ne fait pas de doute que le litige, tel que décrit ci-dessus, qui oppose les Demanderesses au Niger, a trait à la validité, à l'interprétation ou à l'application de l'acte d'agrément,

---

[154] Schreuer, The ICSID Convention, 2010, Article 25, § 329.

i.e., la Convention d'Investissement, et à la détermination éventuelle de l'indemnité due par le Niger pour les manquements allégués aux engagements pris dans ladite convention.

205. Aux termes de l'article 11 du Code des Investissements (qui est applicable aux « *activités* » exercées dans le « *secteur* » du transport aérien[155]), est considéré comme un investissement :

> « *- les apports au Niger de capitaux de toute nature et le réinvestissement des fonds provenant d'investissements effectués antérieurement si ceux-ci sont destinés à la création d'entreprises nouvelles, à l'extension, à la diversification, à la reconversion ou à la modernisation d'unités existantes ;*
>
> *- les apports en nature à une société nouvellement créée ou à l'occasion d'extension, de diversification, de reconversion ou de modernisation d'une société déjà existante ;*
>
> *- les participations consistant en un apport de capitaux ou de biens à toute entreprise établie au Niger en échange de l'octroi de titres sociaux ou de parts donnant droit à une participation aux bénéfices et au produit de la liquidation;*
>
> *- les prêts assimilables à des participations, c'est à dire les prêts consentis à toute personne autre que l'État, régulièrement établie au Niger lorsque ces prêts, d'une durée minimum de dix (10) ans, sont venus compléter les fonds propres et ont permis d'obtenir les crédits bancaires nécessaires au financement de l'investissement envisagé. Ces prêts ne sauraient toutefois représenter plus de la moitié des fonds propres.* »

206. S'agissant de AHS Niger, cette société devait, aux termes de la Convention d'Investissement, réaliser un programme d'investissement pendant les cinq premières années, avec un engagement minimum de 7.767.232.157 F CFA et une création d'emplois minimum, qui répondent aux critères mentionnés ci-dessus. Les Demanderesses allèguent, sans être démenties, qu'elles ont réalisé cet investissement.

207. S'agissant de MMEA, sa contribution au capital de AHS Niger représente son investissement et répond également aux critères ci-dessus.

208. La participation de MMEA dans le capital d'AHS Niger et les activités de AHS Niger, constituent donc un investissement au sens de l'article 11 du Code des Investissements.

---

[155] V. Art. 9(g), pièce C32.

### B.    La Convention CIRDI

209.    Par ailleurs, il ne fait pas de doute que le différend soumis au Tribunal est d'ordre juridique, les Parties étant en conflit tant sur l'existence d'un droit que sur l'étendue de la réparation.

210.    Le Tribunal est également d'avis que la condition relative à l'existence d'un investissement, au sens de l'article 25(1) de la Convention CIRDI, est remplie. La Convention CIRDI ne définit pas la notion d'investissement. Toutefois, comme plusieurs décisions de tribunaux sous l'égide du CIRDI et du règlement UNCITRAL l'ont constaté, le terme « investissement » à un sens ordinaire et inhérent qui suppose la présence d'apports, sur une certaine durée et une participation aux risques de l'opération[156].

211.    Le Tribunal est donc satisfait que le terme « investissement » doit être pris dans son sens ordinaire et inhérent[157]. En l'espèce, le Tribunal n'a aucun doute, en ce qui concerne les activités de Demandeurs au Niger, qu'il est en présence d'un apport substantiel d'une durée originelle de dix ans et qui comportait un risque tel que décrit ci-dessus.

***

212.    En conclusion, le Tribunal Arbitral considère que AHS Niger, Menzies Afrique SA (aujourd'hui, MMEA) et la République du Niger sont parties et ont consenti à être liées par la convention d'arbitrage incluse à l'article 6 de la Convention d'Investissement[158], qui offre l'alternative, aux non-nationaux, d'avoir recours à l'arbitrage du CIRDI[159]. En vertu de leur nationalité (effective ou reconnue par le Niger), les Demanderesses ont pu, de façon légitime, faire ce choix[160] et ont ainsi soumis à l'arbitrage du CIRDI un différend d'ordre juridique qui porte sur un investissement couvert par la Convention CIRDI, la Convention d'Investissement et par le Code des Investissements[161].

---

[156] V. *Mr. Saba Fakes c. République turque*, Aff. CIRDI No. ARB/07/20, Sentence du 12 juillet 2010, et *Romak S.A. c. République d'Ouzbékistan*, Aff. CPA No. AA280, Sentence du 26 novembre 2009, §§ 197-205. V., aussi, Schreuer, §§ 152-174.

[157] Schreuer, §§ 152-174. V. aussi, *Romak S.A. c. Ouzbékistan,* Sentence du 26 novembre 2009, §§ 197-205.

[158] V. *supra*, §§ 109, 111-114, 121-123, 178 *et seq.*, §§ 185-186, 187, et 200-201.

[159] V, *supra*, §§ 150 *et seq.*, et §§ 167 *et seq.*

[160] V. *supra*, §§ 102 *et seq.*, et §§ 176-177.

[161] V, *supra*, §§ 202 *et seq.*

213. Dans ces conditions, le Tribunal décide qu'il est compétent pour connaître du litige opposant les Demanderesses à la République du Niger.

## VI.    FRAIS ET DEPENS

214. Le Tribunal observe que les Demanderesses se sont acquittées entièrement de la somme de 150.000 dollars américains demandée le 27 juillet 2011 comme premier acompte pour cette affaire et de la somme de 300.000 dollars américains demandée le 13 mars 2012 comme second acompte dans cette affaire.

215. Le Tribunal a pris note de la demande des Demanderesses relatives aux frais de l'arbitrage[162]. Le Tribunal statuera sur la question des frais au terme de la procédure sur le fond.

## VII.    DISPOSITIF

216. Par ces motifs, le Tribunal décide ce qui suit :

1. Le Tribunal est compétent pour connaître des demandes des Demanderesses à l'encontre de la République du Niger ;

2. Les frais de l'arbitrage feront l'objet d'une décision du Tribunal au terme de cette procédure ;

3. L'organisation de la prochaine phase de la procédure fera l'objet d'une ordonnance de procédure du Tribunal.

---

[162] Dem. Mém., §§ 397 à 399.

49

Patrick Hubert

Gaston Kenfack-Douajni

Fernando Mantilla-Serrano