# EXHIBIT 2



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW | WASHINGTON, DC 20433| USA        TEL.
+1 (202) 458 1534 | FAX +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

## <u>C E R T I F I C A T E</u>

# AHS NIGER AND MENZIES MIDDLE EAST AND AFRICA S.A.

v.

# REPUBLIC OF NIGER

(ICSID CASE No. ARB/11/11)

I certify that the attached document is a true copy of the original Award issued on July 15, 2013, by the Arbitral Tribunal.

[Illegible Signature]    [ICSID STAMP]

Meg Kinnear
Secretary General

Washington, D.C., October 2, 2023

**INTERNATIONAL CENTRE FOR THE SETTLEMENT OF
INVESTMENT DISPUTES**
Washington, D.C.


In proceedings between


**AHS NIGER AND MENZIES MIDDLE EAST AND AFRICA SA**

Claimants


and


**THE REPUBLIC OF NIGER**

Respondent


**ICSID Case No. ARB/11/11**

---

# AWARD

---


*Tribunal members*
Mr. Fernando Mantilla-Serrano, Chairman
Mr. Patrick Hubert
Mr. Gaston Kenfack-Douajni


*Tribunal Secretary*
Mrs. Aurélia Antonietti


*Date sent to Parties: July 15, 2013*

**PARTY REPRESENTATION**

The Claimants are represented by:

Me Rasseck Bourgi,
10, rue du Chevalier de Saint George
75001 Paris
France

The Respondent was represented until March 14, 2012, by:

Me. Ibrahim M. Djermakoye
4, rue de la Tapoa, Ancien Plateau
BP 12651 Niamey
Niger

and by

The Minister of Transport
and the Director of Transport
Immeuble Caisse Nationale de Sécurité Sociale
(Quartier Terminus) Niamey
BP 12.130 Niamey
Niger
and
The Director of State Litigation
Government General Secretariat BP
550 Présidence de la République
Niamey
Niger

Since March 13, 2012, the Respondent has been in default.

| | | |
|---|---|---|
| I. | INTRODUCTION AND PARTIES | 1 |
| II. | HISTORY OF THE PROCEDURE | 2 |
| III. | FACTS | 6 |
| | III.1 AHS Niger Approval and Investment Agreement | 6 |
| | III.2 Withdrawal of approval and termination of the Investment Agreement | 6 |
| | III.3 Recourse in Niger | 7 |
| IV. | SUMMARY OF THE PARTIES' POSITION | 7 |
| | IV.1 Claimants' position | 7 |
| | IV.2 Claimants' claims | 7 |
| | IV.3 Respondent's position | 7 |
| V. | ARBITRAL TRIBUNAL ANALYSIS | 7 |
| | V.1 Termination of the Investment Agreement | 8 |
| | A. Duration of the Investment Agreement | 8 |
| | B. Termination of the Investment Agreement | 9 |
| | C. Tribunal's conclusion | 10 |
| | V.2 Expropriation | 10 |
| VI. | DAMAGES | 11 |
| | VI.1 Economic loss: lost earnings and seized assets | 12 |
| | A. On the loss of earnings | 12 |
| | B. On the value of the seized assets | 14 |
| | VI.2 Non-material damage | 15 |
| | A. Damage | 15 |
| | B. Compensation | 17 |
| VII. | INTEREST | 17 |
| VIII. | COSTS OF THE PROCEEDINGS | 18 |
| IX. | OPERATIVE PART OF THE AWARD | 19 |

# GLOSSARY

| | |
|---|---|
| AHS | Aviation Handling Services S.A. |
| AHS Niger | Aviation Handling Services Niger S.A. |
| Decree 1 | Decree no. 000001/MT/AC/DAC of January 5, 2010 |
| Decree 2 | Decree no. 000002/MT/AC/DAC of January 5, 2010 |
| Decree 15 | Decree no. 015/MT/T/DAC of February 19, 2004 |
| Decree 16 | Decree no. 016/MT/T/DAC of February 19, 2004 |
| Decree 66 or Specifications | Decree no. 066 MT/DAC of December 30, 2003 "*containing Specifications for the conducting of assistance or self-assistance ground handling activities in airports in Niger*". |
| Decree 103 | Decree no. 103/MTT/A/DAC of December 14, 2010 |
| Decree 104 | Decree no. l04/MTT/A/DAC of December 14, 2010 |
| Decree 105 | Decree no. l05/MTT/A/DAC of December 14, 2010 |
| Decree 106 | Decree no. 106/MTT/A/DAC of December 14, 2010 |
| Decree 108 | Decree no. 00108/MTT/A/DRF/M of December 29, 2010 |
| C | Claimants' Exhibit |
| ICSID or the Center | International Center for Settlement of Investment Disputes |
| Investment Code | Investment Code of the Republic of Niger of December 8, 1989, amended by decrees in 1997, 1999 and by a law in 2001 |
| ICSID Convention or Washington Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States of March 18, 1965 |
| Investment Agreement | Investment Agreement signed on December 15, 2004, between AHS Niger and the Republic of Niger |
| Decision on Jurisdiction | Decision on Jurisdiction in ICSID Case no. ARB/11/11, sent to the Parties on March 13, 2013 |
| Decision 799 | Decision no. 00799/MTT/A/DAC of December 14, 2010 |
| Respondent | Niger |
| Def. Memorial | Respondent's Memorial of April 6, 2011 |
| Claimants | AHS Niger and Menzies Middle East and Africa S.A., jointly |
| Plaint. Mem. | Claimants' Memorial of November 14, 2011 |
| Claim. Mem., updated | Claimants' Memorial of April 11, 2013 |
| MAG | Menzies Aviation Group |
| MMEA | Menzies Middle East and Africa S.A. (entitled Menzies Afrique S.A. before March 18, 2011) |
| Niger | Republic of Niger |
| R | Respondent's exhibit |
| Arbitration rules | Rules of procedure for ICSID arbitration proceedings |
| Request | Claimants' request for arbitration dated March 4, 2011 |

## I. INTRODUCTION AND PARTIES

1. This case concerns a dispute submitted to the International Center for Settlement of Investment Disputes ("ICSID") on the basis of the Investment Agreement concluded in 2004 between AHS Niger and the Republic of Niger ("Investment Agreement"), the Investment Code of the Republic of Niger of December 8, 1989, amended by decrees in 1997, 1999 and by a law in 2001 ("Investment Code") and on the basis of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States of March 18, 1965, in force since October 14, 1966 (the "ICSID Convention"). The dispute concerns the legality of the withdrawal by the Republic of Niger of a license granted to AHS Niger to provide ground handling services at Niamey international airport, and the validity of the termination of the Investment Agreement.

2. The Claimants are Aviation Handling Services Niger S.A. ("AHS Niger") and Menzies Middle East and Africa S.A. (named Menzies Afrique S.A. before March 18, 2011) ("MMEA") (hereinafter jointly referred to as the "Claimants"). The registered office of AHS Niger is at Aéroport International de Niamey, BP 10006[1]; MMEA's registered office is at 127, rue de Mühlenbach, L-2168, Luxembourg[2].

3. The Respondent is the Republic of Niger (hereinafter "Niger" or the "Respondent") in the person of the Minister of Transport, the Director of Transport and the Director of State Litigation.

4. The Claimants and the Respondent will hereinafter be collectively referred to as the "Parties". The respective representatives of the Parties and their addresses are mentioned above.

5. The Tribunal has read and analyzed all the allegations and evidence submitted by the Parties and will confine its award to such facts, allegations and evidence which it considers most relevant to explain its conclusions and reasoning.

6. The Tribunal will first present a background to the proceedings (II) and a review of the facts (III). The Tribunal will then present its analysis of the parties' arguments on the merits (IV), and on damages (VI), interest (VII) and costs (VIII).

---

[1] Exhibits C1 and C44.
[2] Exhibits C2 and C36

## II.     HISTORY OF THE PROCEEDINGS

7.    On March 11, 2011, ICSID received a request for arbitration dated March 4, 2011, from AHS Niger and Menzies Afrique SA against the Republic of Niger, accompanied by exhibits C1 to C30 and exhibits JP1 to JP10 (the "Request").

8.    By means of letters dated March 16 and 30, 2011, the Center put questions to the Claimants in connection with the examination of the Request. The Claimants replied by letter dated March 21, 2011, with exhibits C31 to C35 and JP11 and JP12, and by letter dated April 5, 2011, with exhibits C36 to C42 and JP13 to JP16.

9.    On April 6, 2011, Mr. Ibrahim M. Djermakoye submitted on behalf of Niger a "Defense Memorial" "*seeking to demonstrate the lack of jurisdiction of the CIRDI to hear the dispute* " accompanied by exhibits 1 to 9 ("Respondent's Memorial").

10.    The Claimants replied through letters dated April 7 (accompanied by new exhibits C43 to C45) and April 18, 2011, and Niger replied by letter dated April 15, 2011.

11.    On April 26, 2011, the Secretary-General of the Center registered the Request in accordance with Article 36(3) of the ICSID Convention. The Parties were notified of this registration on the same day. In the Notification of Registration, the Secretary-General invited the Parties to proceed as soon as possible with the constitution of the Arbitral Tribunal in accordance with Article 7 of the Institution Rules.

12.    The Parties agreed, in accordance with Article 37(2)(a) of the ICSID Convention, that the Tribunal would be composed of three arbitrators, with each Party appointing one arbitrator and the Chairman being appointed by the co-arbitrators. The Claimants appointed Mr. Patrick Hubert, of French nationality, who accepted his appointment. The Respondent nominated Dr. Gaston Kenfack-Douajni, of Cameroonian nationality, who accepted the nomination. Mr. Hubert and Mr. Kenfack-Douajni appointed Mr. Fernando Mantilla-Serrano as Chairman of the Tribunal. Mr. Mantilla-Serrano, of Colombian nationality, accepted his appointment.

13.    In accordance with Article 6(1) of the Rules of Procedure for ICSID Arbitration Proceedings ("Arbitration Rules"), the Secretary-General notified the Parties on July 22, 2011, that the three arbitrators had accepted their appointment, and that the Tribunal was deemed to be constituted and the proceedings commenced on that date. The Parties were also informed that Ms. Aurélia Antonietti, Legal Counsel at ICSID, was the Secretary of the Tribunal (the "Secretary").

14. On September 15, 2011, the Tribunal held its first session with the Parties. It was agreed that each party would be represented at the first session, but on the eve of the session, September 14, 2011, the Director of State Litigation informed the Center that no representative of the Republic of Niger would be present at the session, referring to a letter addressed to AHS Niger S.A. on September 13, 2011, indicating the Respondent's willingness "*to enter into direct negotiations with AHS-NIGER with a view to an amicable and consensual settlement of the dispute between them, and at the same time requesting a suspension of the arbitration p r o c e e d i n g s  initiated before ICSID to enable the parties to conclude as soon as possible an agreement safeguarding their respective interests*". Counsel for the Claimants objected by e-mail on the same day to the suspension of the proceedings and the postponement of the session. On September 14, 2011, the Secretary informed the Parties by e-mail that the Tribunal had decided to maintain the session for the following day. On September 15, 2011, the Tribunal held its first session in the presence of the Claimants' representatives and discussed the items on the agenda that had been communicated to the Parties on August 2, 2011. In a letter from the Center dated September 19, 2011, draft minutes of the first session were sent to the Parties for comment. By means of letters dated September 20 and 30, 2011, the Claimants submitted their comments, and the Respondent submitted its comments by a letter dated September 30, 2011. The final minutes of the first session dated October 5, 2011, signed by the Chairman and the Secretary were sent to the Parties on October 6, 2011.

15. The minutes of the first session state that the Parties noted that the Tribunal had been properly constituted and that they had no objections to the declarations of its members. It was also agreed that the applicable Rules of Arbitration would be those that came into force in January 2003, that the place of proceedings would be Washington, DC, and that the proceedings would be conducted in French.

16. Insofar as the Respondent had not yet indicated whether it intended to formally raise an objection to jurisdiction, the Tribunal decided that the timetable for the exchange of pleadings would be as follows:

   - The Claimants would file their Memorial on the merits before November 15, 2011.
   - The Respondent would file its Counter-Memorial on the merits and/or any objection to jurisdiction before January 16, 2012. It would indicate in its Memorial whether it requested bifurcation of the proceedings.
   - No later than January 30, 2012, the Claimants would respond to any request for bifurcation. The Tribunal would then promptly decide on bifurcation.

17. On November 14, 2011, the Claimants filed their Memorial on the Merits ("Claimants' Memorial") together with exhibits C46 to C72, case law A17 to A20, the witness statement of Mr. Pierre Agbogba, the witness statement of Mr. Rachid Riffi, the witness statement of Mr. Forsyth Black, the report of Mr. John S. Willis and the legal opinion

of Prof. Serge Sur.

18. On January 15, 2012, the Republic of Niger did not make a submission. On January 17, 2012, the Center received a letter from the Secretary-General of the Government dated January 13, 2012, requesting additional time to organize its defense. Niger was then asked to kindly inform the Center how many days it would need to present its written submissions. On January 25, 2012, Niger was again asked to indicate as soon as possible the basis for its extension request and the duration of the requested extension.

19. On January 27, 2012, the Claimants filed a request for a declaration of default by the Respondent and for the issuance of a ruling pursuant to Article 42 of the Arbitration Rules. This request was officially notified to Niger by letter from the Center dated February 1 2012. In the same letter, the Respondent was invited to indicate by February 6, 2012, the basis for its extension request, the number of extension days required, and whether it intended to assert its claims in these proceedings. The Tribunal indicated that it was anxious for this procedure to proceed in the presence of all the parties. By letter from the Center dated February 7, 2012, the Tribunal noted the absence of any reaction from the Republic of Niger within the time limit set. In these circumstances, and pursuant to Article 42(2) of the Arbitration Rules, the Tribunal set a deadline of February 29, 2012 for "[t]*he Respondent to file its Counter-Memorial on the merits and/or any rejection of jurisdiction and also to indicate whether it requires the proceedings to be bifurcated*", in accordance with the minutes of the first session of the Arbitral Tribunal of September 15, 2011.

20. By letter dated March 13, 2012, the Tribunal noted the Respondent's failure to file its Counter-Memorial on the merits and/or a rejection of jurisdiction. In these circumstances, the Tribunal indicated:

- that it would grant the Claimants' request dated January 27, 2012, to declare the Respondent in default and issue a ruling pursuant to Article 42 of the Arbitration Rules;
- that if the party in default fails to appear or present its case, it will not be deemed to have acquiesced to the other Party's claims;
- under the terms of Article 42(3) and (4) of the Arbitration Rules, it would therefore examine whether or not the dispute fell within its jurisdiction and, if so, whether the conclusions were well-founded in fact and in law; and
- that it could, at any time, ask the Claimants to submit observations, new evidence or oral explanations.

21. By letter dated March 14, 2012, Mr. Djermakoye, counsel for the Respondent, informed the Tribunal of his withdrawal from the case on March 8, 2012.

22. By letter dated April 18, 2012, the Centre informed the Parties that the Tribunal intended to get back to the Parties regarding the status of its work and with any questions.

23. By letter dated August 10, 2012, the Tribunal asked the Parties nine questions to which they were invited to reply by September 3, 2012. The Claimants replied on August 31, 2012, and submitted exhibits C73 to C76 and A21 to A23.

24. By letter dated September 25, 2012, and in order to ensure that the Respondents had the complete file on this case, the Centre sent a hard copy of all correspondence exchanged in this file by e-mail since the beginning of 2012 to the Minister of Transport and the State Litigations Department, copying in the Niger Embassy in Washington, DC, so that the latter could forward the file to the relevant departments of the State of Niger. In letters dated November 5 and 29, 2012, counsel for the Claimants confirmed the changes in the Government.

25. By letter dated October 23, 2012, the Claimants sent the Tribunal a copy of the ruling of the Niger State Court, Administrative Chamber no. 12-054 of October 10, 2012, and its notification, which will be discussed below.

26. In a letter dated January 16, 2013, the Claimants reiterated their request that the "*Arbitral Tribunal should rule only on the heads of claim submitted to it*" by the Claimants in all their pleadings.

27. The Decision on Jurisdiction (see *supra*, § 88) was sent to the Parties by ICSID's letter of March 13, 2013, by which ICSID requested that the Parties set forth their observations by March 28, 2013, on the organization of further proceedings and indicate whether they wished to make further submissions and be heard orally.

28. By letter dated March 15, 2013, the Claimants replied, stating that they did not intend to make any further submissions and that they were at the Tribunal's disposal should it deem it necessary to hear the Parties, asking the Tribunal to rule on the merits as soon as possible.

29. The Respondent did not react to ICSID's letter of March 13, 2013.

30. By letter dated April 1, 2013, addressed to the Parties, the Arbitral Tribunal invited the Claimants to discuss and elaborate on the effects of Ruling No. 12-054 of October 10, 2012, of the Niger State Court, Administrative Chamber, and gave them until April 16, 2013, to do so. The Tribunal indicated that the Respondent would then have an equivalent period, i.e., until 1 May 2013, to respond.

31. On April 11, 2013, the Claimants submitted their updated Memorial on the Merits in which they referred to and elaborated on the effects of Ruling No. 12-054, accompanied by new exhibits C77 to C82.

32. The Respondent, duly notified of this Memorial, did not reply.

33. By letter dated May 3, 2013, addressed to the Parties, ICSID, on behalf of the Tribunal, once again took note of the Respondent's default.

34. By letter dated May 6, 2013, the Claimants again asked the Tribunal to apply the provisions of Article 42 of the Arbitration Rules by ruling only on the heads of claim submitted by the Claimants in their pleadings entered in the debate.

35. By letter dated May 16, 2013, the Claimants submitted a copy of ruling no. 13-028 of the Niger State Court, Administrative Chamber (Exhibit C83). By letter dated June 4, 2013, the Claimants submitted a copy of the notification of this ruling by the Chief Registrar of the Court of State, Administrative Chamber (Exhibit C84).

36. By letter dated June 24, 2013, the Parties were invited, in accordance with Article 28(2) of the Arbitration Rules, within a time limit expiring on July 8, 2013, to communicate to the Arbitral Tribunal a statement of the expenses they had incurred or borne in the course of the proceedings. The Claimants filed a Memorial and an Additional Memorial on Arbitration Costs and Fees, with supporting documents, on June 25 and 28, 2013. Niger has not communicated anything to the Arbitral Tribunal concerning the costs and expenses incurred by Niger.

37. By letter dated July 8, 2013, the Parties were informed, in accordance with Article 38 of the Arbitration Rules of the closure of the proceedings.

## III. FACTS

### III.1 AHS Niger Approval and Investment Agreement

38. The Tribunal will review the facts as they emerge from the Claimants' pleadings, the Respondent's Memorial submitted prior to the filing of the Request and the exhibits submitted.

39. In December 2003, following the bankruptcy filing in January 2002 of Air Afrique, which was in charge of ground handling, notably at Niamey airport, the State of Niger

launched an international tender invitation for ground handling services at Niger's airports (hereinafter the "Tender Invitation").[3]

40. By Decree no. 066/MT/DAC of December 30, 2003 (hereinafter referred to as "Decree 66"), establishing the Specifications for the provision of ground handling or self-handling services at Niger airports, the Minister of Transport defined, inter alia, the services to be provided and the conditions for approval of service providers. The approval period for ground handling services was set for 5 years, and 3 years for self-handling services[4].

41. In a letter dated January 29, 2004, the Menzies Aviation Group-AHS consortium submitted its technical and financial bids.[5] In its bid, the group undertook to:
   - invest 1.7 billion CFA francs;
   - purchase the equipment of the former Air Afrique for 295 million CFA francs;
   - take on former Air Afrique employees needed to run the business and who have not reached the age limit; and
   - pay the State 5% of its gross sales as a concession fee.

42. In a letter dated January 26, 2004, Menzies Aviation Group-AHS requested that the license be for a period of 10 years, the length of time required for the amortization of the investment.[6]

43. In a letter dated February 8, 2004, the Minister of Transport informed the Group that it had been declared the successful bidder.[7]

44. In accordance with the tender documents, a company incorporated under Nigerien law was to be set up to provide the services covered by the tender. AHS Niger was thus incorporated on February 18, 2004.[8] Its main shareholder was MMEA (75%). The remaining 25% was held by two Nigerien shareholders, with AHS International Limited owning just one share.[9]

45. On February 19, 2004, Decree No. 015/MT/T/DAC (hereinafter "Decree 15") was issued for ground handling and self-handling services at Niger airports, amending the 2003 specifications. This decree stipulated that approval would be valid for ten years and limited the number of approved service providers to a single service provider for ground handling at Niamey airport.[10] This decree specified that "[t]he *number of*

---

[3] Exhibit C4.
[4] Exhibit C6.
[5] Exhibits C8 and C31.
[6] Exhibit C46.
[7] Exhibit C48, addressed to the President of Aviation Handling Services S.A. (AHS S.A.) in Dakar, stating that: "*Your group has been awarded the contract*".
[8] Exhibit C1.
[9] Exhibit C33.
[10] Exhibit C5.

*approved service providers on this platform may be modified by ministerial decree if the number of passengers exceeds* [sic] *five hundred thousand (500,000) per year and subject to the absence of particular constraints in terms of space or facility capacity and compliance with airport and passenger safety and security constraints.*"

46. On the same day, Decree No. 016/MT/T/DAC (hereinafter "Decree 16") approving a 10-year approval to "*Aviation Handling Services Niger S.A. (Menzies Aviation Group Partner) to provide ground handling services at Niamey's Diori Hamani international airport*" was issued.[11] It stated that the ground handling activity included passenger, baggage, freight and mail handling, ramp operations, aircraft cleaning and servicing, line maintenance, flight operations and crew administration, air transport, and catering. This decree stipulated that "the *period of validity of the approval is ten (10) years, renewable.*"[12]

47. On December 15, 2004, the Government of the Republic of Niger and AHS Niger signed an Investment Agreement, the purpose of which was "*... to define the conditions under which AVIATION HANDLING SERVICES NIGER S.A. will carry out its activities, as well as the commitments of the two contracting parties* (sic), *namely the Government of the Republic of Niger and AVIATION HANDLING SERVICES NIGER S.A.*"[13]

48. According to the Claimants, in accordance with the terms of the Specifications,[14] AHS Niger applied for and obtained an operating license for the ground handling business.[15]

49. Under the Investment Agreement, AHS Niger has undertaken to:
   "*invest a minimum amount of one billion, seven hundred sixty-seven million, two hundred thirty-two thousand, one hundred fifty-seven (1,767,232,157) CFA francs excluding taxes and working capital;*
   *- create at least 83 permanent jobs;*
   *- provide the Ministry of Industry with financial statements at the end of each financial year;*
   *- enable officials from the Ministry of Industry and the Ministry of Finance to monitor compliance with the terms and conditions of this Investment Agreement;*

---

[11] Exhibit C3.
[12] Exhibit C3, section 4.
[13] Exhibit C7, section 1.
[14] Exhibit C6, sections 3 and 13-18.
[15] Claim. Mem., updated, § 52.

*- comply with Niger's social regulations."*[16]

50. According to the Claimants, over the first five years, from December 15, 2004, AHS Niger invested 2,418,500,792 CFA francs, created 101 jobs and complied with its accounting and financial obligations.[17]

51. According to the Claimants, AHS Niger has "perfectly" fulfilled its obligations.[18] The Claimants also emphasize the benefits to Niger of AHS Niger's activities, namely the injection of more than 7.6 billion CFA francs into the country's economy as salaries, license fees and taxes, among other things.[19]

52. According to the Claimants, AHS Niger has not been accused of any breach of its obligations[20] and no formal notice has been served on AHS Niger.[21]

53. Consequently, according to the Claimants, AHS Niger's license was renewed every year since 2005.[22] The last renewal took place on March 8, 2010.[23]

### III.2 Withdrawal of approval and termination of the Investment Agreement

54. By means of Decree No. 000001/MT/AC/DAC of January 5, 2010 (hereinafter "Decree 1") amending Decree 16, the duration of the Investment Agreement was reduced to 5 years and all previous provisions to the contrary were repealed.[24] A second decree of the same date, No. 000002/MT/AC/DAC (hereinafter referred to as "Decree 2"), amended and supplemented Decree 66 of 2003, by setting, inter alia, the number of service providers at Niamey airport at three (ground handling, freight and post handling, and self-handling).[25]

55. In a letter dated January 6, 2010, addressed to AHS Niger, the Minister of Transport, citing "*...contradictions in the texts governing the ground handling and self-handling activities*" in Niamey, indicated that, in accordance with the 2003 Specifications, the number of service providers was three (ground handling, freight and post handling, and self-handling) and that the duration of the Investment Agreement was 5 years....[26]. The same letter asked AHS Niger to take the necessary steps to renew its approval, which expired on February 18, 2009.

---

[16] Exhibit C, section 4.
[17] Request, § 27.
[18] Claim. Mem., updated, §§ 53-64.
[19] Claim. Mem., updated, §§ 63-64.
[20] Claim. Mem., updated, § 59.
[21] Claim. Mem., updated, § 62.
[22] Claim. Mem., updated, § 60. With the exception of the 2010 license (Exhibit C43), the other licenses have not been submitted.
[23] Exhibit C43.
[24] Exhibit C12.
[25] Exhibit C13.
[26] Exhibit C11.

56.     AHS Niger objected to this measure in a letter dated January 25, 2010.[27]

57.     AHS Niger continued to operate the ground handling service, allegedly with the agreement of the Government, and on March 8, 2010, obtained a renewal of the annual operating license for the 2010-2011 period.[28]

58.     According to the Respondent, "[i]*n December 2010, an inspection carried out by the transitional authorities concluded that the granting of approval to AHS Niger S.A. was irregular, that its commitments to the State of Niger had not been honored and that Nigerien legislation had not been respected, among other deficiencies identified.*"[29]

59.     On December 14, 2010, Niger's Minister of Transport issued Decree No. 106/MTT/A/DAC (hereinafter referred to as "Decree 106")[30] immediately repealing Decree 16, as well as decision No. 00799/MTT/A/DAC (hereinafter "Decision 799") terminating the Investment Agreement.[31] According to the Claimants, these two documents were notified to AHS Niger by hand delivery on December 15, 2010.

60.     The following decrees have also been issued:

- Decree No. 103/MTT/A/DAC of December 14, 2010 (hereinafter "Decree 103") "*creating a ground handling unit at Niamey's DIORI HAMANI International Airport* [the Cellule d'Assistance en Escale]." It was specified that this unit would be responsible for ensuring, under the direction of a management committee, the continuity of public services in terms of aircraft assistance;[32]
- Decree No. 104/MTT/A/DAC of December 14, 2010 (hereinafter "Decree 104") "*requisitioning the personnel from the company AHS dedicated to providing ground handling assistance at Niamey's DIORI HAMANI International Airport;* "[33]
- Decree No. l05/MTT/A/DAC of December 14, 2010 (hereinafter "Decree 105") "*requisitioning the ground handling equipment made available to AHS;*"[34]
- Decree No. 00108/MTT/A/DRF/M of December 29, 2010 (hereinafter "Decree 108") "*establishing and assigning a committee responsible for the financial management of ground handling resources at Niamey's DIORI HAMANI International Airport.*"[35]

---

[27] Exhibit C14.
[28] Exhibit C43.
[29] Claim. Mem., p.3.
[30] Exhibit C17.
[31] Exhibit C18.
[32] Exhibit C21.
[33] Exhibit C22.
[34] Exhibit C23.
[35] Exhibit C24.

61. On December 15, 2010, according to the Claimants, they were expropriated from their investment.

62. The Claimants state that, on that date, the Acting Director of Civil Aviation called a meeting of the staff of AHS Niger, informing them that he was now the new General Manager of the Ground Handling Unit.

63. They also claim that, on the same day, the Managing Director of AHS Niger, Mr. Rachid Riffi, a Moroccan national, was threatened and forced to leave his workplace and, that, accompanied by a delegation including the former head accountant of AHS Niger, the Managing Director of ASECNA[36] (a member of the cell's management committee), two bailiffs, a gendarme, and AHS Niger's lawyer (who had arrived on the scene in the meantime), he was forced to visit the banks in which accounts had been opened in the name of AHS Niger in order to obtain account balances, signatures on the accounts and the right of access to the accounts. This, he refused to do. He was then expelled from his office and his company vehicle was seized.

64. According to the Claimants, since December 15, 2010, "*AHS Niger has no longer had access to its headquarters and equipment, and the Cellule d'Assistance en Escale has confiscated AHS Niger's accounting documents and records, making it physically impossible for AHS Niger to meet its tax obligations.*"[37]

65. The Claimants go on to assert the following:

> "*92. In addition, for the purposes of this expropriation, the Cellule d'Assistance en Escale is making use of AHS Niger materials and equipment.*
>
> *93. In a vain attempt to conceal its activities, the Cellule d'Assistance en Escale had all AHS logos and markings removed from AHS Niger equipment in early 2011, even though it had been operating the same equipment with MENZIES-AHS logos and markings.*
>
> *94. However, the Cellule d' Assistance en Escale and all staff continue to operate in AHS Niger uniforms with AHS-MENZIES group insignia, in flagrant violation of the latter's property rights which reserve them exclusive use of the group's registered name and sign.*
>
> *95. Since that date, no measures have been taken by the State of Niger to remedy these various infringements.*"[38]

---

[36] Agency for Air Navigation Safety in Africa and Madagascar.
[37] Claim. Mem., updated, § 116.
[38] Claim. Mem., updated, §§ 118-121.

## III.3 Recourse in Niger

66. On December 17, 2010, AHS Niger filed two requests for review against Decree 106 and Decision 799.[39] On January 12, 2011, AHS Niger filed four requests for review against the other four decrees mentioned above (see § 60 above).[40] All these appeals were addressed to the Minister of Transport, Tourism and Crafts of the Republic of Niger.

67. Having received no response from the Government, in May 2011 AHS Niger filed three requests with the Administrative Chamber of the State Court, within the two-month time limit following the Government's implicit rejection of the appeals, for abuse of power against Decree 106, Decision 799 and the four other decrees mentioned above.[41]

68. Ruling no. 12-054 of October 10, 2012, sent by the Claimants on the same day, states that the appeals for annulment against Decree 106, Decision 799, Decrees 103, 104, 105, and 108 were deemed admissible by the Administrative Chamber of the Niger State Court, and that the appeal for annulment against the implied rejection by the Minister of Transport was declared inadmissible. On the merits, the Court annulled Decree 106 for having been issued "*without grounds, in violation of Articles 4 and 5 of the investment agreement and Article 9 of Decree No. 066/MTT/A/DAC of December 30, 2003*" relating to the Specifications. Accordingly, Decrees 103, 104, 105, 106, 108, and Decision 799 were also annulled by the Court, which also ordered the Treasury to pay the costs.

69. On November 6, 2012, Niger filed an appeal to set aside this ruling.[42] On May 8, 2013, by Ruling No. 13-028, the Niger State Court, Administrative Chamber, dismissed this appeal.[43]

70. The Claimants stated in their Memorial of April 11, 2013, that "*since December 2010, the Cellule d'Assistance en Escale set up by the Respondent has continued to operate the equipment and use the personnel of the said Claimants to continue the ground handling activity at Niamey's Diori Hamani International Airport*"[44] and that "*for more than two years, the State of Niger has also been using the expertise of the Claimants, which is internationally recognized in this field, to collect fees from airlines.*"[45] Niger does not contest these allegations. As a result, to date, there has been no reinstatement of the Investment Agreement, nor any return, even partial, of the assets which the Claimants consider expropriated.

---

[39] Exhibits C19 and C20.
[40] Exhibit C25.
[41] Exhibits C50 and C52.
[42] Exhibit C79.
[43] Exhibit C83.
[44] Claim. Mem., updated, § 328; Exhibit C82.
[45] Claim. Mem., updated, § 329.

## IV.    SUMMARY OF THE PARTIES' POSITION

### IV.I    **Position of the Claimants**

71.    As far as the Claimants are concerned, the Investment Code, Tender Regulations, 2003 Specifications, 2004 Decrees, and the Investment Agreement are particularly applicable in this dispute.

72.    The Claimants consider that Niger has reneged on the Investment Agreement and withdrawn the approval for the exercising of ground-handling and self-handling activities in an irregular, unfounded and wrongful manner, thus violating the Investment Agreement, applicable law and customary international law.[46]

73.    Niger has failed to comply with the contractual and legal prerequisites, i.e., prior written notice, the possibility of suspending approval and then withdrawing it, and, in any event, seeking an amicable resolution to the dispute.[47]

74.    Withdrawal of the approval order should only take place after two months' formal notice to remedy deficiencies, followed (if necessary) by a six-month temporary suspension.[48]

75.    Furthermore, the Claimants note the absence of any justification on the merits for the above-mentioned reneging and withdrawal.[49] They believe that AHS Niger has not breached any of its obligations under the Investment Agreement, Investment Code and Specifications.

76.    Niger has manifestly violated its obligations, thereby committing an abuse of power[50] and has implemented these measures by means of coercion, in violation of Articles 2 and 7 of the Investment Code.[51] A "voie de fait" is an unlawful administrative act defined as "*conduct perpetrated when the administrative authority takes a decision or commits an action that is manifestly unlikely to be linked to a legislative or regulatory text. It is therefore the seriousness of the irregularity that distorts the administration's action, to the point of taking it outside the scope of the administrative field.*"[52] It occurs when the Administration's action causes serious damage to property and involves an irregularity.

---

[46] Claim. Mem. updated, § 321.
[47] Claim. Mem. updated, §§ 256-270.
[48] Claim. Mem. updated, §§ 271-292.
[49] Claim. Mem. updated, §§ 294 *et seq*.
[50] Claim. Mem. updated, § 338.
[51] Claim. Mem. updated, § 339.
[52] Claim. Mem., updated, § 357 citing the legal opinion of Prof. Sur.

77. AHS Niger was expropriated for no good reason.[53]

78. The Claimants emphasize that the Tribunal has jurisdiction to assess the financial and material consequences notwithstanding the existence of a request for review,[54] which was implicitly rejected and annulled, along with the contested decision, by the Niger State Court (see § 68 above).

79. The Plaintiffs were entitled to operate the ground handling and self-handling business for another four years.

80. They are entitled to full compensation for their material and non-material loss, which can be broken down into economic loss (loss of earnings and loss of property), non-material loss, infringement of their intellectual property rights, and reimbursement of costs related to the arbitration, including counsel and expert fees.[55]

81. The valuation of the loss of earnings is based on a projection of expected net profits for the period from December 15, 2010, to February 2014, resulting, inter alia, from turnover growth projections for the years 2011 to 2014, i.e., a total of 2,634,302,000 CFA francs (€4,015,967.51).[56]

82. The valuation of the loss due to the expropriation of the investments made by the Claimants (i.e., 2.1 billion CFA francs over the period 2004-2010) is based on the net book value of the Assets and on the Receivables estimated at the overall sum of €944,336.95, i.e. 619,444,433 CFA francs, broken down into 410,382,837 CFA francs for the net book value of the Assets and 209,061,596 CFA francs for the Receivables.[57]

83. Amounts due in respect of advances and loans to employees are equivalent to 40,758,174 CFA francs, or €62,135.44.[58]

84. The Claimants also claim compensation for damage to their image and commercial reputation. They also claim infringement of their intellectual property rights (acronyms and trade names) in connection with the exploitation by Niger of equipment and uniforms bearing the names and initials of Menzies and AHS. This loss is estimated at €2,200,000.[59]

---

[53] Claim. Mem., updated, § 343-351.
[54] Claim. Mem., updated, § 341.
[55] Claim. Mem., updated, § 359.
[56] Claim. Mem. updated, §§ 374-375.
[57] Claim. Mem. updated, §§ 376.
[58] Claim. Mem. updated, §§ 378.
[59] Claim. Mem., updated, §§ 398-435.

### IV.2 Claimants' claims

85. The Claimants in their Memorial of April 11, 2013, ask the Tribunal to:

> *"441. Find the Respondent in default, in accordance with Articles 45 of the ICSID Convention and 42 of the ICSID Arbitration Rules, and, consequently, rule only on the heads of claim submitted to it by the Claimants in their Memorial on the merits dated November 14, 2011, as updated in this Memorial as well as in all of their pleadings which preceded the said Memorial;*
>
> *442. Acknowledge the irregular, unfounded and wrongful reneging on the Investment Agreement by the State of Niger;*
>
> *443. Acknowledge the irregular, unfounded and wrongful withdrawal of the Approval Decree by the State of Niger;*
>
> *444. Find that the Claimants have fully complied with their contractual obligations under the Investment Agreement;*
>
> *As a result,*
>
> *445. Declare that the State of Niger has failed to comply with its contractual obligations under the Investment Agreement;*
>
> *446. Declare that the State of Niger has also violated its legal obligations under both the Investment Code and the Specifications;*
>
> *447. Declare that the State of Niger has improperly and without cause reneged on the Investment Agreement and revoked the Approval Decree;*
>
> *448. Consequently, order the State of Niger to pay the sums covering all the damages suffered by AHS Niger and MMEA:*
>
> - *Four million, fifteen thousand, nine hundred sixty-seven euros and fifty-one cents (€4,015,967.51) as compensation for the loss of earnings suffered by AHS Niger and MMEA as a result of the irregular, unfounded and wrongful early termination of the Investment Agreement and the sudden and immediate cessation of AHS Niger's and MMEA's activities;*
>
> - *Nine hundred forty-four thousand, three hundred thirty-six euros and ninety-five cents (€944,336.95) as compensation for the loss suffered by AHS Niger and MMEA, consisting of the repayment of the net book value of the expropriated Assets and the lost Receivables;*
>
> - *Sixty-two thousand one hundred thirty-five euros and forty-four cents (€62,135.44) as compensation for sums owed by AHS Niger staff requisitioned by the State of Niger, in respect of advances and loans granted by AHS Niger;*
>
> - *Two million two hundred thousand euros (€2,200,000) as compensation for the moral prejudice suffered by AHS Niger and MMEA as a result of the damage to their image and reputation on the African continent and in the Middle East, as well as to their intellectual property rights;*
>
> - *Interest with capitalization on the aforementioned amounts from December 14, 2010, the date of repeal of the Approval Decree;*
>
> - *All costs related to the arbitration, including lawyers' fees, as well as the costs*

*of any expert, in particular financial and legal experts, engaged by AHS Niger and MMEA in connection with the present proceedings."*

IV.3  **Respondent's position**

86.  In its Memorial of April 6, 2011, submitted prior to the registration of the Request, Niger objected to the Center's registration of the Request, on the grounds that the dispute manifestly exceeded the Center's jurisdiction.

87.  As noted by the Arbitral Tribunal on several occasions, Niger has been in default since March 13, 2012. The Tribunal must therefore make an award in accordance with Article 42 of the Arbitration Rules.

## V.  ANALYSIS OF THE ARBITRAL TRIBUNAL

88.  The Tribunal recalls that, by virtue of its Decision on Jurisdiction, which forms an integral part of this award, it decided that:

1.  the Tribunal has jurisdiction over the claims of the Claimants against the Republic of Niger;

2.  the costs of the arbitration will be decided by the Tribunal at the end of this procedure; and

3.  the organization of the next phase of the proceedings will be the subject of a procedural order from the Tribunal.

89.  The jurisdiction of the Arbitral Tribunal is based, in particular, on article 6 of the Investment Agreement and the Investment Code.

90.  Article 6 of the Investment Agreement of December 15, 2004, states:

"Disputes arising from the interpretation or application of this Protocol shall be settled amicably. Failing amicable agreement between the 2 parties, disputes shall be settled by arbitration in accordance with the provisions in force in Niger concerning the settlement of investment disputes".

91.  Article 6 of the 1989 Investment Code states:

> *"**Art. 6** – The settlement of disputes relating to the validity, interpretation or application of the act of approval and to the determination of a possible indemnity due to the breach or non-observance of the undertakings will be subject to one of the following arbitration procedures to be determined in the act of approval.*
>
> *1)* [ad hoc and *ex aequo bono* arbitration].
>
> *2) The possibility for non-nationals to have recourse to the International Center for Settlement of Investment Disputes (ICSID) created by the International Bank for Reconstruction and Development (IBRD) convention of March 18, 1965"*.

92. The Tribunal must therefore determine whether there has been a breach of the Investment Agreement and, where applicable, of the Investment Code, and if so, the consequences of such breaches.

### V.1 Termination of the Investment Agreement

### A. Duration of the Investment Agreement

93. With regard to its duration, the Investment Agreement stipulates in Article 2:

> "a). During the investments phase:
>
> - total exemption from the charges and taxes collected by the State excluding the statistical tax including Value-Added Tax (VAT) for the materials, tools and production equipment and contributing directly to the approved program;
>
> - exemption from the charges and taxes collected by the State, including VAT, for the services, work and tasks contributing directly to the execution of the approved investment program.
>
> However, if equivalent, locally made products should be unavailable, the importing of materials, tools and equipment will not give rise to an exemption.
>
> The investments phase is set as five (5) years.
>
> b). During the operating phase, total exemption for five (5) years:
>
> - from the "patente" [license to carry out a business activity];
>
> - from property tax;
>
> - from the tax on industrial and commercial profits (BIC);
>
> - from the minimum lump-sum tax (IMF)"[60] (emphasis added).

94. According to the Claimants, this provision should be interpreted as an acknowledgement that the term of the Investment Agreement is ten years:

> "In this regard, we wish to remind you that, on top of the provisions in the Investment Agreement concluded on December 15, 2004, between AHS NIGER and the State of

---

[60] Exhibit C7, section 3.

Niger, the agreed term of which is set as ten (10) years, the two investment and operating phases are each set as five years."[61][61].

95. The duration of the Investment Agreement is also determined by the regulatory context (see §§ 45 to 46 above). At the time of the call for tenders, Menzies-AHS had requested that the duration of the agreement be extended to ten years, given the scale of the investments to be made. With Decree 15, Niger amended articles 7 and 19 of the Specifications (Decree 66). The duration of the approval was extended to ten years. This is confirmed by Decree 16, which stipulates that "*the period of validity of the approval is ten (10) years, renewable*". It should be recalled that, in its Decision on Jurisdiction (§ 166), the Tribunal concluded "*that the 'act of approval' referred to in article 6 of the Investment Code can only be the Investment Agreement*".

96. Thus, the Tribunal finds that Niger has undertaken, through the Investment Agreement, to grant to AHS Niger the rights covered by this agreement for at least ten years, i.e., until December 15, 2014.

97. According to the Respondent, "on January 05, 2010, owing to the contradictions observed in the texts governing the ground handling and self-handling activities in the Airports of Niger, the Minister of Transport introduced Decree no. 001/MT/ACIDAC through which the approval validity duration was switched to five (05) years"[62]. The Respondent thus seems to suggest that Decrees 15 and/or 16 are affected by certain irregularities.

98. However, the Respondent does not provide any evidence of such irregularities. Nor does the Respondent put forward any reasons justifying the suspension or withdrawal of the approval through Decree 16.

99. Consequently, the Investment Agreement had not yet expired on December 14, 2010, when the Minister of Transport issued Decree 106 and Decision 799 terminating the Investment Agreement.

100. As the Investment Agreement did not expire on December 14, 2010, it is for the Tribunal to determine whether it was validly terminated.

---

[61] Claim. Mem. updated, § 69.
[62] Letter of 6 April 2011, p. 2.

### B. Termination of the Investment Agreement

#### 1. Investment Agreement, Article 5

101. The Claimants consider that the termination of the Investment Agreement was unfounded[63]. Moreover, such termination would not have satisfied the procedure set forth in the Specifications (Decree 66)[64].

102. The Tribunal will therefore consider the substantive and procedural aspects of this issue in turn.

a) *Background*

103. The "[c]*onditions for reneging from*" the Investment Agreement are set forth in Article 5:

*"Non-compliance with all or part of the above commitments mentioned in Article 4 may result in the termination of this agreement by the State of Niger. In this case, the company will reimburse the State for all duties, taxes and levies, normally due, which have been exempted."*[65]

104. In turn, Article 4 of the Investment Agreement stipulates that AHS Niger undertakes to:

*"invest a minimum amount of one billion seven hundred sixty-seven million two hundred thirty-two thousand one hundred fifty-seven (1,767,232,157) CFA francs, excluding taxes and working capital;*

*- create at least 83 permanent jobs;*

*- provide the Ministry of Industry with financial statements at the end of each financial year;*

*- enable officials from the Ministry of Industry and the Ministry of Finance to monitor compliance with the terms and conditions of this Investment Agreement;*

*- comply with Niger's social regulations."*[66]

105. According to the Claimants, AHS Niger has "*perfectly*" fulfilled its obligations.[67]

106. In this arbitration, the Respondent merely asserted that:

*"In December 2010, an inspection carried out by the transitional authorities concluded that a license had been wrongly granted to AHS NIGER S.A.,*

---

[63] Claim. Mem., updated, §§ 306-321.
[64] Claim. Mem., updated, §§ 256-270.

[65] Exhibit C7, section 5.
[66] Exhibit C7, section 4.
[67] Claim. Mem., updated, §§ 53-64.

*owing to its failure to meet its commitments to the State of Niger and failure to comply with Nigerien legislation, among other deficiencies.*

*In compliance with the recommendations of the inspection mission and in application of Article 5 of the Investment Agreement of December 15, 2004, the Minister of Tourism reneged from the said agreement."*[68]

107.  This allegation reproduces language similar to that expressed in Decision 799:

*"[...] it has come to my attention, in light of the various inspections of which you have been the subject, that AHS has not fulfilled any of its commitments, as defined in Article 4 of the said Agreement.*

*Furthermore, I would remind you of the terms of Article 5 of the same text, which stipulates that failure to comply with all or part of the above-mentioned commitments may result in the termination of this Investment Agreement by the State of Niger [...].*

*The Government of the Republic of Niger, through me, hereby denounces the Investment Agreement signed with AHS and considers said Agreement null and void."*[69][69]

108.  Niger has not provided the slightest proof of these inspections actually having been conducted or of any breach by AHS Niger of its obligations under the Investment Agreement.

109.  On the contrary, the Claimants have demonstrated to the satisfaction of the Arbitral Tribunal that AHS Niger has complied with the Investment Agreement.

110.  Thus, with regard to the obligation to "*invest a minimum amount of one billion seven hundred sixty-seven million two hundred thirty-two thousand one hundred fifty-seven (1,767,232,157) CFA francs excluding taxes and working capital,*" the Claimants have provided evidence that "*over the first five (5) years from December 15, 2004, the effective date of the Investment Agreement, AHS Niger invested 1.8 billion and nearly 2.1 billion over the period 2004 to 2010. These amounts are evidenced by AHS Niger's certified accounts.*[70]

111.  With regard to the obligation to "*create at least 83 permanent jobs,*" the Claimants maintain that "*the establishment of AHS Niger has resulted in the creation of 101 jobs, i.e., eighteen (18) positions more than the objective of 83 agents set by the Investment Agreement.*"[71]

[68] Letter of April 6, 2011, p. 3.
[69] Exhibit C18.
[70] Claim. Mem., updated, §§ 53 and 309, and exhibits C10 and C71.
[71] Claim. Mem., updated, §§ 54 and 313.

112. With regard to the obligation to "*provide the Ministry of Industry with financial statements at the end of each financial year,*" the Claimants noted that:

> "*... with regard to compliance with accounting obligations, the certification of AHS Niger's financial statements by the competent departments established by the State of Niger constitutes irrefutable evidence of the compliance of AHS Niger's accounting with the accounting system in force in Niger.*"[72]

This is corroborated by the auditor's general and special reports, which the Tribunal considers sufficient to substantiate these claims.[73]

113. Lastly, the Tribunal has no evidence to suggest that AHS Niger failed in its obligation to "*allow officials of the Ministry of Industry and the Ministry of Finance to monitor compliance with the terms of this Investment Agreement*" and to "*comply with Niger's social regulations.*"

114. In light of the foregoing, the Tribunal is of the opinion that the termination of the Investment Agreement was unfounded.

b) *Procedure*

115. Decree 16 stipulates that:

> "*Approval may be suspended or withdrawn in the event of non-compliance with the provisions of Articles 9 and 11 of Decree No. 066/MT/DAC of December 30, 2003, containing Specifications for the exercising of the ground handling activity.*"[74]

116. Articles 9 and 11 of Decree 66 (the Specifications) stipulate:

> "*Article 9: SUSPENSION OF APPROVAL*
>
> *If, for reasons attributable to it, the holder of the approval no longer meets the criteria defined in Articles 4 and 5, the Minister of Civil Aviation will send to the interested party, if necessary, at the request of the airport manager or the Civil Aviation Authority, formal notice to take the necessary corrective measures to remedy the deficiencies observed.*
>
> *In the event of persistent failure to comply within two months of formal notice, the Minister of Civil Aviation shall suspend approval for a maximum period of six months. Prior to such a suspension, the interested party will be given formal notice to present its observations.*
>
> *Approval may be suspended immediately for a maximum of six months in the event of a serious risk to the safety or security of aircraft, persons or property.*

---

[72] Claim. Mem., updated, § 55.
[73] Exhibit C10.
[74] Exhibit C3, Section 5.

*"Article 11: WITHDRAWAL OF APPROVAL*

*Approval shall be withdrawn by the issuing authority if the necessary corrections have not been made by the end of the suspension period.*

*Approval may also be withdrawn in the following cases:*

*- in the event of bankruptcy*

*- in the event of judicial liquidation*

*- in the event of conviction for any penalty whatsoever for acts that run contrary to commercial integrity*

*- in the event of cease of trading operations for more than six months*

*- in the event of repeated equipment and/or personnel failures*

*Approval may be withdrawn by the Minister of Civil Aviation without prior notice on the basis of a reasoned report from the civil aviation authority or airport manager in the event of a repeat offence, a serious risk to the safety or security of aircraft, persons or property, or non-payment of fees."*[75]

117. Niger has not provided any evidence that the procedure set forth in the Specifications was followed. Niger did not even identify (let alone prove) any breaches of the Investment Agreement or of the criteria set forth in Articles 4 and 5 of the Specifications. Consequently, Niger was not entitled to suspend or withdraw approval.

118. In addition, with regard to the procedure set forth in the Specifications, the Tribunal notes that this issue was addressed by the Niger State Court, Administrative Chamber, in ruling no. 12-054 of October 10, 2012[76], which annulled Decree 106 and Decision 799. This element can only support the position of this Arbitral Tribunal in its conclusion that the termination of the Investment Agreement is unfounded.

## C. The Tribunal's Conclusion

119. Given that the Investment Agreement had not yet expired on December 14, 2010, when Niger claims to have terminated the Investment Agreement, and that such termination was unfounded and irregular, the Tribunal concludes that Niger has breached its undertakings under the said Agreement.

120. This analysis is confirmed by the aforementioned ruling of October 10, 2012, whereby the Administrative Chamber of the Niger State Court annulled the termination of the Investment Agreement.

---

[75] Exhibit C6.
[76] Exhibit C77, pp. 5-7.

### V.2 Expropriation

121. According to the Claimants, Niger has taken several measures that could be qualified as expropriation in violation of the Investment Agreement: the reduction by decree of the duration of Decree 16 and its subsequent withdrawal, the termination of the Investment Agreement and requisition measures for AHS Niger equipment and personnel[7777].

122. The Investment Agreement stipulates that: "the Government of the Republic of Niger guarantees to the company AVIATION HANDLING SERVICES NIGER s.a. that no expropriation or nationalization measure will be adopted against its investments"[78]. The Tribunal notes that this is consistent with the Investment Code, which states in article 7:

    *"Except in cases of public utility provided for by law, the Republic of Niger guarantees that no expropriation or nationalization measures will be taken in respect of companies that have already set up operations or that may do so in the future.*

    *Any expropriation or nationalization measures shall give rise to the right to fair and equitable compensation[79].*

123. Even in the event of termination, the Investment Agreement does not allow Niger to requisition AHS Niger's equipment or personnel:

    *"Failure to comply with any or all of the undertakings set forth in Article 4 above may result in the termination of this Agreement by the State of Niger. In this case, the company will reimburse the State for all duties, taxes and levies, normally due, which have been exempted."*[80]

124. The Tribunal has already concluded that the termination of the Investment Agreement was unfounded.

125. Moreover, such termination has been annulled by the Niger State Court. In any event, therefore, there is no legal basis for the requisition of AHS Niger's assets, equipment and personnel. According to the Claimants, these measures persisted even after the annulment of the termination.

126. The Tribunal also agrees with the Claimants that the requisitioning of AHS Niger's assets, equipment and personnel – all of which have been proven and are not contested by Niger – had the effect of depriving the Claimants of the control, ownership, use and

---

[77] Claim. Mem., updated, §§ 333-352.
[78] Exhibit C7, Section 2.
[79] Exhibit C32, Article 7; see also Article 2 ("*The Republic of Niger ensures constant protection from both a legal and judicial standpoint to all private investments participating in the realization of its economic and social development programs*").
[80] Exhibit C7, Section 5.

enjoyment of their investment and therefore constitute an expropriation[81] contrary to the undertakings given by Niger in the Investment Agreement and the Investment Code.

127. Niger must therefore compensate the Claimants.

## VI. DAMAGES

128. The Tribunal agrees with the Claimants and [the Claimants' legal expert] that the damage caused by the breach must be made good[82]. The Tribunal will therefore verify whether the heads of damage alleged by the Claimants were indeed caused by breaches of the Investment Agreement.

129. In their Memorial on the merits dated November 14, 2011, the Claimants alleged that they had suffered material and non-material damage[83]. As noted above (§ 66), the Claimants indicate in their Memorial of April 11, 2013, that this prejudice is ongoing. They thus claim that the annulment of Decree 106 and the other measures challenged by Ruling no. 12-054 would have "no effect on the amount of damages and interest that may be granted to the Claimants in these proceedings"[84].

130. The Claimants have indicated that the heads of damage "have been the object of a provisional evaluation that will be fine-tuned"[85]. However, having had the opportunity to supplement their written submissions, the Claimants did not consider it appropriate to revise the calculation of their damages. The Tribunal therefore takes this provisional assessment as the definitive assessment of the Claimants' loss.

### VI.1 Economic Loss: Lost Earnings and Seized Assets

131. According to the Claimants, on the basis of Article 1149 of the Niger Civil Code ("*the damages due to the creditor are in general the loss it has suffered and the earnings of which it has been deprived...*"), they suffered two types of economic loss: (A) lost earnings, and (B) the loss of seized property. The Tribunal considers that the Investment Code, by referring in Article 7 to "*fair and equitable compensation*", provides for full reparation of the loss suffered by the Claimants.

### A. On the lost earnings

132. According to the Claimants, by terminating the Investment Agreement on December 14, 2010, Niger prevented AHS Niger from continuing with its ground handling activities. Without this termination, AHS Niger would have been able to

---

[81] See *Metalclad Corporation v. United Mexican States,* ICSID Case No. ARB(AF)/97/1, Award of August 30, 2000, § 103.
[82] Plaint. Mem., updated, § 315; Legal Opinion of Prof. Sur, § 36.
[83] Plaint. Mem., updated, § 316. See generally Plaint. Memorial update, §§ 362-435.
[84] Plaint. Mem., updated, § 115.
[85] Plaint. Mem., updated, § 360.

continue this activity for at least ten years, until February 2014[86].

133. According to the Claimants, they would have made profits during the four years remaining until 2014 when the Agreement was terminated[87]. Also, according to the Claimants, they are entitled to claim compensation for this lost profit, even if it cannot be established with absolute certainty[88].

134. In fact, the Tribunal must order full compensation for the loss suffered and, as such, put the Claimants in the position they would have been in had the Investment Agreement been executed to its full term.

135. Legal doctrine and certain arbitration decisions cited by the Claimants support the Tribunal in this approach.

136. Thus, it has been argued that "[w]*hile arbitrators refuse to compensate for possible damage, they do not make compensation conditional on the existence of absolutely certain damage. Several obstacles stand in the way of a requirement of absolute certainty [...]. First of all, in order to establish exactly the lost profit that extends into the future, we come up against an 'irreducible uncertainty' linked in particular to the difficulty of exactly grasping the evolution of external circumstances likely to have an impact on the damage (national growth, deflation, disappearance of a competitor, discovery of new outlets, etc.). In the event of a breach of contract, the arbitrator can never be absolutely certain that a profit might have been earned if the contract had been performed normally. There are too many uncertainties affecting this type of damage [...]. By its very nature, prospective analysis excludes the idea of certainty [...]. If arbitrators were to make compensation conditional on the certainty of the damage in the strictest sense of the term, it would very often be impossible to award compensation for lost profit and non-material damage. Theoretical and practical considerations have therefore led international arbitration case law not to apply the requirement of certainty of damage so rigorously*"[89].

137. Similarly, in *Maritime International Nominees Establishment (Liechtenstein) v. Republic of Guinea*[90] the Tribunal held that:

> "*... the general principle that* [the contracting party] *is entitled t o compensation for the profits it would have made if* [the host state] *had not*

---

[86] Plaint. Mem., updated, § 374 ("term of the license envisaged until February 2014") and Exhibit C43.

[87] Plaint. Mem., updated, § 370.

[88] Plaint. Mem., updated, §§ 362-370.

[89] Exhibit A17 – J. Ortscheidt, The awarding of damages in 'international commercial arbitration, Dalloz, 2001, p. 37, nos. 55 to 62 (emphasis added).

[90] Exhibit A19 – *Maritime International Nominees Establishment (Liechtenstein) v. Republic of Guinea*, ICSID Case ICSID ARB/84/4, Award of January 6, 1988, YCA, XIV (1989), no. 17, p. 82, extract translated by the Claimants, original: "*The Tribunal accepts the general principle that MINE is entitled to be compensated for the profits that it would have earned if Guinea had not breached the Convention. The lost profits need not be proven with complete certainty, nor should recovery be denied simply because the amount is difficult to ascertain*".

*breached the contract. Lost profits need not be proved with complete certainty, and compensation should not be refused simply because the quantum is difficult to determine*".

138.  Or the 1990 ICC Award[91]:

*although the burden of proof rests on the claimant in such a situation, the damage does not need to be established with absolute certainty. As long as sufficient elements are put forward from which damages can be roughly assessed, all reasonable methods of calculation are admissible*".

139.  In the present case, the Tribunal considers that the evidence provided by the Claimants is sufficient to establish the loss of profit suffered by the Claimants. For the assessment of lost profits, the Claimants rely on the report of their expert, Mr. Willis[92]. Mr. Willis' valuation is based on a projection of expected net profits for the period from December 15, 2010, to February 2014, resulting, inter alia, from sales growth projections for the years 2011 to 2014. This valuation was calculated by Mr. Willis as 2,634,302,000 F CFA[93] which corresponds to 4,015,967.51 euros, the amount requested by the Claimants[94].

## B.  On the value of seized goods

140.  The Claimants also claim to have suffered a loss as a result of the requisition of AHS Niger's assets, equipment and personnel.

141.  The Claimants estimate this loss as 619,444,433 F CFA, or 944,336.95 €. This sum can be broken down into (i) 410,382,837 F CFA for the net book value of assets, (ii) 209,061,596 F CFA for receivables, and (iii) 40,758,174 FCFA equivalent to sums owed by AHS Niger staff in respect of advances and loans granted by AHS Niger[95].

142.  With regard to the claims, the Claimants do not explain how the termination of the Investment Agreement and the withdrawal of approval prevent AHS Niger from turning to its creditors for payment of its claims. They do not provide any proof (nor even allege) that AHS Niger's creditors have paid these amounts to the State of Niger. Consequently, the Tribunal is not in a position to take these amounts into account in calculating the damages suffered by the Claimants.

---

[91] Exhibit A19 – ICC Case no. 5946, 1990, YCA, XVI (1991), no. 45, p. 97.
[92] Plaint. Mem., updated, §§ 373-334.
[93] Willis Report, p. 7.
[94] Plaint. Mem., updated, §§ 375 and 448.
[95] Plaint. Mem., updated, §§ 376-378 and Exhibit C72.

143. As regards the amounts corresponding to the sums owed by AHS Niger employees in respect of advances and loans granted by AHS Niger, the Claimants do not justify how these loans and advances were necessary for the operation of the concession. The Tribunal considers that these loans and advances establish a legal relationship between AHS Niger and these employees, by virtue of which these employees are obliged to repay these amounts to AHS Niger. AHS Niger does not explain how the measures taken by Niger are such as to prevent it from seeking recovery of these debts from these employees. Consequently, the Tribunal is not in a position to take these amounts into account in calculating the damage suffered by the Claimants.

144. Finally, concerning the value of the assets, the Tribunal has no doubt that the measures taken by Niger resulted in the dispossession of AHS Niger's assets. The value of these assets was certified by the expert, Mr. Willis', report[96]. The Arbitral Tribunal considers Mr. Willis' Report – which was not disputed by Niger, nor was its author summoned by Niger for cross-examination – to be credible. The Arbitral Tribunal considers that the amounts set forth in the Report are explained in a coherent manner and appear reasonable. Niger must therefore reimburse the Claimants for the value of these assets, i.e., 625,624.64 euros (410,382.837 F CFA)[97].

145. Consequently, in terms of lost profits and seized assets, the economic loss suffered by the Claimants is 4,641,592.15 euros (i.e., 4,015,967.51 plus 625,624.64).

## VI.2 **Moral Prejudice**

146. According to the Claimants, they have suffered two types of non-material damage: damage to image and reputation, and damage to intellectual property rights[98] (A). They are claiming €2,200,000.00 in global compensation for these two counts[99] (B).

---

[96] Willis Report, p. 8 and Appendices E and F of this report.
[97] Plaint. Mem., updated, § 376.
[98] Plaint. Mem., updated, § 380.
[99] Plaint. Mem., updated, §§ 434-435.

### A. Damages

147. Generally speaking, the Claimants invoke various legal theories in support of their claim for compensation for non-material damage. According to the Claimants:

   - this damage was caused by the Respondent's breach of its obligations[100];

   - the fault committed by the Respondent is *"equivalent to the administrative offence of 'voie de fait'"* in view of *"the gravity of the offence committed"* and *"the arbitrary conduct'"*[101]and

   - this compensation is supposedly advocated by French legal doctrine to *"enable courts to go beyond merely evaluating the material loss suffered"* and *"introduce a punitive element into the compensation"*[102].

148. With regard to the alleged damage to image and reputation, the Claimants submit as their sole evidence extracts from articles in the Nigerien press in which the Minister of Transport is alleged to have made statements that the Claimants characterize as *"baseless and characterized as defamatory"*[103]. The Claimants do not explain how any prejudice caused by these remarks are related to, or result from, violation of the Investment Agreement, rather than defamation in respect of which the Tribunal would lack jurisdiction.

149. The Arbitral Tribunal also considers that, on the basis of the evidence provided, it is unable to determine the actual damage to the image and reputation of the Claimants.

150. With regard to the alleged infringement of intellectual property rights, the Claimants state that they have obtained registration of trade names and trademarks in the area of the African Intellectual Property Organization ("OAPI"), of which Niger is a member[104]. The Claimants allege that the 'Ground Handling Cell continued to operate the ground handling business using staff uniforms and equipment bearing these names and acronyms[105]. The Claimants acknowledge that, since the beginning of 2011, *"All acronyms and trade names bearing the AHS name* have been removed from the equipment seized from AHS Niger[106].

151. However, the Claimants' argument in relation to this use is not sufficient to establish a right to the compensation claimed.

---

[100] Plaint. Mem., updated, §§ 353-355, 359.
[101] Plaint. Mem., updated, § 382; see also §§ 357-358 (citing Sur Report, pp. 22-23).
[102] Plaint. Mem., updated, § 385 (citing Véronique Wester-Ouisse, Exhibit A20).
[103] Plaint. Mem., updated, §§ 388-397; Exhibits C57 (illegible) and C58.
[104] Plaint. Mem., updated, §§ 398-404.
[105] Plaint. Mem., updated, §§ 411-418.
[106] Plaint. Mem., updated, § 417.

152. On the one hand, they suggest – but do not explicitly state – that such use would be in violation of the Bangui Agreement of March 2, 1977[107]. The Claimants state that Niger ratified this Agreement in 1977[108] but fail to explain its relevance to these arbitration proceedings. In particular, they do not explain how this Tribunal would have jurisdiction to hear these arguments. In this respect, the Tribunal notes that Article 47 of Annex III of the said Agreement stipulates, with regard to "*Competent Jurisdictions*", that:

> "(*1*) *Civil actions relating to trademarks shall be brought before the civil courts and judged as summary matters.*
>
> (2) *In the case of proceedings instituted by way of criminal proceedings, if the accused raises in its defense questions relating to the ownership of the trademark, the competent court shall rule on the objection.*"[109]

153. Secondly, they allege that the use of their names and brands misled users of ground handling services, leading them to believe that AHS Niger was responsible for an ostensibly degraded service operated by the Ground Handling Cell. The implication is that doing so would have damaged their reputation[110].

154. They rely on an audit of services carried out by the DHL company of the 'Ground Handling Cell[111]. However, they do not suggest that this audit revealed any confusion between the 'Ground Handling Cell and AHS Niger. On the contrary, according to the Claimants, the audit revealed that "*Cellule Assistance en Escale (CAEE) has assumed the role for ground handling of DHL aircraft at Diori Hamani International Airport (NIM) from Aviation Handling Services (AHS)*."[112]

### B. Compensation

155. Insofar as the Tribunal did not grant the claims relating to non-material damage, it is not necessary to examine the quantification of the compensation claimed in this respect.

## VII. INTEREST

156. The Claimants requested the request of interest with capitalization on the amounts claimed, as from December 14, 2010[113]. However, they did not consider it useful to provide the Tribunal with a reference rate.

---

[107] Plaint. Mem., updated, §§ 405-406.
[108] Plaint. Mem., updated, § 398.
[109] Exhibit C64, Article 47 of Appendix III.
[110] Plaint. Mem., updated, §§ 419-430.
[111] Plaint. Mem., updated, § 430.
[112] Plaint. Mem., updated, § 430.
[113] Plaint. Mem., updated, § 448.

157. Having found that the Claimants are entitled to full reparation for the loss suffered, the Arbitral Tribunal can only note that it is entirely free to decide both the rate and the starting date of interest. The Tribunal considers that this compensation would not be complete if the Claimants (once their loss has been determined) were not awarded interest until the awards made by the Arbitral Tribunal have been fully satisfied. Accordingly, the Tribunal considers that simple interest is due on the amounts fixed by this award from the date of its notification until their full payment.

158. As far as the interest rate is concerned, the Arbitral Tribunal considers that interest must not become a means of enrichment, much less be punitive in nature. In order to preserve the compensatory nature of the interest awards made in this arbitration, the Arbitral Tribunal considers that the appropriate rate should be one that has a real link with the currency of the largest awards, the Euro, as set by its monetary authority, the European Central Bank – ECB. The Arbitral Tribunal therefore considers that the marginal lending facility set by the ECB is the appropriate rate.

## VIII. COST OF PROCEEDINGS

159. The Claimants claim that Niger should be ordered to pay the costs of the proceedings, including the fees and expenses of the experts and those incurred by the Claimants in defending their interests[114].

160. In this respect, in accordance with Articles 60(1) and 61(2) of the ICSID Convention and Article 28 of the ICSID Arbitration Rules, the Arbitral Tribunal has broad discretion in determining the costs of arbitration and defense incurred or borne by the Parties and in apportioning the payment of such costs, as well as the costs fixed by the Secretary General of ICSID, by the Parties.

161. The Center will notify the Parties of the exact amount of the arbitration costs, including the costs and fees of the members of the Tribunal and the ICSID fees, at a later date. These fees, expenses and charges have been advanced, in their entirety, against payments made by the Claimants exclusively. Niger has not responded to any of ICSID's requests in this respect.

162. With regard to defense costs, Niger has not provided the Arbitral Tribunal with any figures. On the other hand, the Claimants have provided supporting documents showing that they have spent the following amounts: Attorney's fees - €141,000, Expenses - €3,652.57, Prof. Sur's fees and expenses - €8,000, and Mr. Willis' fees and expenses - £4,491.04 (i.e., €5,254.51); for a total of €157,907.08.

---

[114] Plaint. Mem., updated, §§ 436 to 439.

163. The Arbitral Tribunal considers that these amounts are reasonable in view of the complexity of the dispute and the work carried out by the Claimants' counsel throughout the arbitration proceedings.

164. In deciding on the distribution of arbitration and defense costs, the Arbitral Tribunal considered the outcome of the claims presented by the Parties as well as their conduct during the arbitration.

165. Niger's objections to the jurisdiction of ICSID and this Arbitral Tribunal were rejected. These objections, and the fact that Niger had defaulted in the arbitration proceedings, have made the proceedings more cumbersome and have been a source of additional work for the Arbitral Tribunal. On balance, the Claimants were successful on most of their claims, but the compensation awarded by the Tribunal was less than they had asked for.

166. Consequently, the Arbitral Tribunal decides that the entire arbitration costs (the amount of which will be communicated to the Parties by ICSID within 90 days of the date of this award) must be borne by the Respondent, and that the Respondent must also contribute €118,000 (representing nearly 75% of the total) to the defense costs incurred by the Claimants.


## IX.    OPERATIVE PART OF THE AWARD

167.    For these reasons, the Arbitral Tribunal:

1. Declares that the Republic of Niger has failed to fulfil its obligations under the Investment Agreement and the Investment Code and that, as a result, it is liable vis-à-vis AHS Niger and Menzies Middle East and Africa SA;

2. Decrees the Republic of Niger to pay damages in the amount of €4,641,592.15;

3. Decrees the Republic of Niger to pay the costs of the arbitration, including the costs and fees of the members of the Arbitral Tribunal and the ICSID costs (which will be communicated to the Parties by ICSID within 90 days of the date of this award);

4. Decrees the Republic of Niger to pay €118,000 in defense costs incurred by AHS Niger and Menzies Middle East and Africa SA;

5. Decrees the Republic of Niger to pay simple interest on the amounts of the awards provided for in paragraphs 167.2, 167.3 and 167.4 above at the annual marginal lending rate as set by the European Central Bank (ECB) from the date of notification of this award (and from the date of notification by ICSID of the amount due in respect of the sums referred to in paragraph 167.3) until such sums are paid in full; and

6. Rejects all other claims of the Parties.

[signed]

_____

Patrick Hubert
Arbitrator
(HW: July 10, 2013)

[signed]

_____

Gaston Kenfack-Douajni
Arbitrator
(HW: July 8, 2013)

[signed]

_____

Fernando Mantilla-Serrano
Chairman
(HW: July 10, 2013)

# INTERNATIONAL CENTRE FOR THE SETTLEMENT OF INVESTMENT DISPUTES
WASHINGTON, D.C.


In proceedings between


**AHS NIGER ET MENZIES MIDDLE EAST AND AFRICA SA**

Claimants


and


**THE REPUBLIC OF NIGER**

Respondent


**ICSID Case No. ARB/11/11**

---

# DECISION ON JURISDICTION

---


*Tribunal members*
Mr. Fernando Mantilla-Serrano, Chairman
Mr. Patrick Hubert, Arbitrator
Mr. Gaston Kenfack-Douajni, Arbitrator


*Tribunal Secretary*
Mrs. Aurélia Antonietti


*Date sent to Parties: March 13, 2013*

**PARTY REPRESENTATION**

| | |
|---|---|
| The Claimants are represented by: | The Respondent was represented until March 14, 2012, by: |
| Mr Rasseck Bourgi,<br>10, rue du Chevalier de Saint George<br>75001 Paris<br>France | Mr Ibrahim M. Djermakoye<br>4, rue de la Tapoa, Ancien Plateau<br>BP 12651 Niamey<br>Niger<br><br>and by<br><br>The Minister of Transport<br>and the Director of Transport<br>Immeuble Caisse Nationale de Sécurité Sociale<br>(Quartier Terminus) Niamey<br>BP 12.130 Niamey<br>Niger<br>and<br>The Director of State Litigation and the<br>Government General Secretariat<br>BP 550 Présidence de la République<br>Niamey<br>Niger<br><br>Since March 13, 2012, the Respondent has been in default. |

| | | |
|---|---|---|
| **I. INTRODUCTION AND PARTIES** | .................................................. | **1** |
| **II. HISTORY OF THE PROCEEDINGS** | .................................................. | **2** |
| **III. REMINDER OF THE FACTS** | .................................................. | **6** |
| **IV. SUMMARY OF THE PARTIES' POSITIONS** | .................................................. | **6** |
| **IV.1** Position of the Claimants | .................................................. | 6 |
| A. On jurisdiction | .................................................. | 6 |
| B. Background | .................................................. | 7 |
| C. Claimants' request | .................................................. | 7 |
| **IV.2** Respondent's position | .................................................. | 7 |
| **V. JURISDICTION** | .................................................. | **7** |
| **V.1** Applicable provisions | .................................................. | 7 |
| **V.2** Jurisdiction *ratione personae* | .................................................. | 8 |
| A. Niger | .................................................. | 8 |
| B. MMEA | .................................................. | 9 |
| C. AHS Niger | .................................................. | 9 |
| **1. Position of the Parties** | .................................................. | **9** |
| **2. Tribunal decision** | .................................................. | **9** |
| a) The status of AHS Niger | .................................................. | 10 |
| b) With regard to the Investment Code | .................................................. | 14 |
| c) With regard to the ICSID Convention | .................................................. | 16 |
| **V.3** Jurisdiction *ratione voluntatis* | .................................................. | 19 |
| A. Analysis of applicable instruments | .................................................. | 20 |
| **1. The act of approval** | .................................................. | **20** |
| **2. The terms and conditions of arbitration set forth in the act of approval** | ...... | **23** |
| **3. Parties covered by the act of approval** | .................................................. | **25** |
| B. Niger | .................................................. | 26 |
| C. AHS Niger | .................................................. | 27 |
| D. MMEA | .................................................. | 27 |
| **V.4** Jurisdiction *rationae materiae* | .................................................. | 30 |
| A. Investment Code | .................................................. | 31 |
| B. The ICSID Convention | .................................................. | 32 |
| **VI. COSTS AND EXPENSES** | .................................................. | **33** |
| **VII. OPERATIVE PART OF THE AWARD** | .................................................. | **33** |

## GLOSSARY

| | |
|---|---|
| AHS | Aviation Handling Services S.A. |
| AHS Niger | Aviation Handling Services Niger S.A. |
| Decree 1 | Decree no. 000001/MT/AC/DAC of January 5, 2010 |
| Decree 2 | Decree no. 000002/MT/AC/DAC of January 5, 2010 |
| Decree 15 | Decree no. 015/MT/T/DAC of February 19, 2004 |
| Decree 16 | Decree no. 016/MT/T/DAC of February 19, 2004 |
| Decree 66 | Decree no. 066/MT/DAC of December 30, 2003 |
| Decree 103 | Decree no. 103/MTT/A/DAC of December 14, 2010 |
| Decree 104 | Decree no. l04/MTT/A/DAC of December 14, 2010 |
| Decree 105 | Decree no. l05/MTT/A/DAC of December 14, 2010 |
| Decree 106 | Decree no. 106/MTT/A/DAC of December 14, 2010 |
| Decree 108 | Decree no. 00108/MTT/A/DRF/M of December 29, 2010 |
| Decision 799 | Decision no. 00799/MTT/A/DAC of December 14, 2010 |
| C | Claimants' Exhibit |
| ICSID or the Center | International Center for Settlement of Investment Disputes |
| Investment Code | Investment Code of the Republic of Niger of December 8, 1989, amended by decrees in 1997 and 1999 and by a law in 2001 |
| ICSID Convention or Washington Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States of March 18, 1965 |
| Investment Agreement | Investment Agreement signed on December 15, 2004, between AHS Niger and the Republic of Niger |
| Def. | Respondent |
| Def. Memorial | Respondent's Memorial of April 6, 2011 |
| Plaint. | Claimants |
| Plaint. Memorial | Claimants' Memorial of November 14, 2011 |
| MAG | Menzies Aviation Group |
| MMEA | Menzies Middle East and Africa S.A. (named Menzies Afrique S.A. prior to March 18, 2011) |
| Arbitration rules | Rules of procedure for ICSID arbitration proceedings |
| Request | Claimants' request for arbitration dated March 4, 2011 |

## I. INTRODUCTION AND PARTIES

1. This case concerns a dispute submitted to the International Center for Settlement of Investment Disputes ("ICSID" or the "Center") on the basis of an Investment Agreement concluded in 2004 between AHS Niger and the Republic of Niger ("Investment Agreement"), the Niger Investment Code of 1989, and on the basis of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States of March 18, 1965, in force since October 14, 1966 ("ICSID Convention" or "Washington Convention"). The dispute concerns the legality of the withdrawal by the Republic of Niger of a license granted to AHS Niger to provide ground handling services at Niamey international airport, and the validity of the termination of the Investment Agreement concluded between AHS Niger and the Republic of Niger.

2. The Claimants are Aviation Handling Services Niger S.A. ("AHS Niger") and Menzies Middle East and Africa S.A. (named Menzies Afrique S.A. before March 18, 2011) ("MMEA"), (hereinafter jointly referred to as the "Claimants"). The registered office of AHS Niger is at Aéroport International de Niamey, BP 10006[1]; MMEA's registered office is at 127, rue de Mühlenbach, L-2168, Luxembourg[2].

3. The Respondent is the Republic of Niger (hereinafter "Niger" or the "Respondent") in the person of the Minister of Transport, the Director of Transport and the Director of State Litigation.

4. The Claimants and the Respondent will hereinafter be collectively referred to as the "Parties". The respective representatives of the Parties and their addresses are mentioned above.

5. The Tribunal will first present a background to the proceedings (II) and a brief review of the facts (III), before recalling the position of the Parties (IV). The Tribunal will then examine the question of jurisdiction (V).

---

[1] Exhibits C1 and C44.
[2] Exhibits C2 and C36.

## II. PROCEDURAL HISTORY

6. On March 11, 2011, ICSID received a request for arbitration dated March 4, 2011, from AHS Niger and Menzies Afrique SA against the Republic of Niger, accompanied by exhibits C1 to C30 and exhibits JP1 to JP10 (the "Request").

7. By letters dated March 16 and 30, 2011, the Center put questions to the Claimants in connection with the examination of the Request. The Claimants replied by letter dated March 21, 2011, with exhibits C31 to C35 and JP11 and JP12, and by letter dated April 5, 2011. with exhibits C36 to C42 and JP13 to JP16.

8. On April 6, 2011, Mr. Ibrahim M. Djermakoye submitted on behalf of Niger a "Defense Memorial " "*seeking to prove the lack of jurisdiction of CIRDI to hear the dispute* " accompanied by exhibits 1 to 9 ("Def. Memorial").

9. The Claimants replied by letters dated April 7 (accompanied by new exhibits C43 to C45) and April 18, 2011, and Niger replied by letter dated April 15, 2011.

10. On April 26, 2011, the Secretary-General of the Center registered the Request in accordance with Article 36(3) of the ICSID Convention. The Parties were notified of this registration on the same day. In the Notification of Registration, the Secretary-General invited the Parties to proceed as soon as possible with the constitution of the Arbitral Tribunal in accordance with Article 7 of the Institution Rules.

11. The Parties agreed, in accordance with Article 37(2)(a) of the ICSID Convention, that the Tribunal would be composed of three arbitrators, with each party appointing one arbitrator and the chairman being appointed by the co-arbitrators. The Claimants nominated Mr. Patrick Hubert, a French national, who accepted his appointment. The Respondents nominated Dr. Gaston Kenfack-Douajni, of Cameroonian nationality, who accepted the nomination. Mr. Hubert and Mr. Kenfack-Douajni appointed Mr. Fernando Mantilla-Serrano as President of the Tribunal. Mr. Mantilla-Serrano, of Colombian nationality, accepted his appointment.

12.  In accordance with Article 6(1) of the Rules of Procedure for ICSID Arbitration Proceedings ("Arbitration Rules"), the Secretary-General notified the Parties on July 22, 2011, that the three arbitrators had accepted their appointment, and that the Tribunal was deemed to be constituted and the proceedings commenced on that date. The Parties were also informed that Ms. Aurélia Antonietti, Legal Counsel at ICSID, was the Secretary of the Tribunal (the "Secretary").

13.  On September 15, 2011, the Tribunal held its first session with the Parties. It was agreed that each party would be represented at the first session, but on the eve of the session, September 14, 2011, the Director of State Litigation informed the Center that no representative of the Republic of Niger would be present at the session, referring to a letter addressed to AHS Niger S.A. on September 13, 2011, indicating the Respondent's willingness "*to enter into direct negotiations with AHS-NIGER with a view to an amicable and consensual settlement of the dispute between them, and at the same time requesting a suspension of the arbitration proceedings initiated before ICSID to enable the parties to conclude as soon as possible an agreement safeguarding their respective interests*". Counsel for the Claimants objected by e-mail on the same day to the suspension of the proceedings and the postponement of the session. On September 14, 2011, the Secretary informed the Parties by e-mail that the Tribunal had decided to maintain the session for the following day. On September 15, 2011, the Tribunal held its first session in the presence of the Claimants' representatives and discussed the items on the agenda that had been communicated to the Parties on August 2, 2011. By letter from the Center dated September 19, 2011, draft minutes of the first session were sent to the Parties for comment. By letters dated September 20 and 30, 2011, the Claimants submitted their comments, and the Respondent submitted its comments by letter dated September 30, 2011. The final minutes of the first session dated October 5, 2011, signed by the Chairman and the Secretary, were sent to the Parties on October 6, 2011.

14.  The minutes of the first session show that the Parties noted that the Tribunal had been properly constituted and that they had no objections to the declarations of its members. It was also agreed that the applicable Arbitration Rules would be those which entered into force in January 2003, that the place of proceedings would be Washington, DC and that

the proceedings would be conducted in the French language.

15. Insofar as the Respondent had not yet indicated whether it intended to formally raise an objection to jurisdiction, the Tribunal decided that the timetable for the exchange of pleadings would be as follows:

- The Claimants would file their Memorial on the merits before November 15, 2011.

- The Respondent would file its Counter-Memorial on the merits and/or any declination of jurisdiction before January 16, 2012. It would indicate in its submission whether it requested bifurcation of the proceedings.

- No later than January 30, 2012, the Claimants would respond to any request for bifurcation. The Tribunal would then promptly decide on bifurcation.

16. On November 14, 2011, the Claimants filed their Memorial on the Merits ("Plaint. Memorial") together with exhibits C46 to C72, case law A17 to A20, the witness statement of Mr Pierre Agbogba, the witness statement no. 2 of Mr Rachid Riffi, the witness statement of Mr Forsyth Black, the report of Mr John S. Willis and the legal opinion of Prof. Serge Sur.

17. On January 15, 2012, the Republic of Niger did not make a submission. On January 17, 2012, the Center received a letter from the Secretary General of the Government dated January 13, 2012, requesting additional time to organize its defense. Niger was then asked to kindly inform the Center how many days it would need to present its written submissions. On January 25, 2012, Niger was again asked to indicate as soon as possible the basis for its extension request, as well as the duration of the requested extension.

18. On January 27, 2012, the Claimants filed a request for a declaration of default by the Respondent and for an award pursuant to Article 42 of the Arbitration Rules. This request was officially notified to Niger by letter from the Center dated February 1, 2012. In the same letter, the Respondent was invited to indicate by February 6, 2012, the grounds for its request for an extension, the number of extension days required, and whether it intended to assert its claims in this instance. The Tribunal expressed its strong wish that these proceedings should continue in the presence of all the parties. By letter from the Center dated February 7, 2012, the Tribunal noted the absence of any reaction from the Republic

of Niger within the time limit set. In these circumstances, and pursuant to Article 42(2) of the Arbitration Rules, the Tribunal set a deadline of February 29, 2012 for "[t]*he Respondent to file its Counter-Memorial on the merits and/or any declination of jurisdiction and also to indicate whether it requires the proceedings to be bifurcated*", in accordance with the minutes of the first session of the Arbitral Tribunal of September 15, 2011.

19. By letter dated March 13, 2012, the Tribunal noted the Respondent's failure to file its Counter-Memorial on the merits and/or a lack of jurisdiction. In these circumstances, the Tribunal indicated that:

    - It would grant the Claimants' request dated January 27, 2012, to declare the Respondent in default and make an award pursuant to Article 42 of the Arbitration Rules.

    - If the party in default refrains from appearing or presenting its case, it is not deemed to have acquiesced to the other party's claims.

    - Under the terms of Article 42(3) and (4) of the Arbitration Rules, it would therefore examine whether or not the dispute fell within its jurisdiction and, if so, whether the conclusions were well-founded in fact and in law.

    - It could ask the Claimants at any time to submit observations, new evidence or oral explanations.

20. By letter dated March 14, 2012, Mr. Djermakoye, counsel for the Respondent, informed the Tribunal of his withdrawal from the case.

21. By letter dated April 18, 2012, the Center informed the Parties that the Tribunal intended to get back to the Parties regarding the status of its work and with any questions.

22. By letter dated August 10, 2012, the Tribunal asked the Parties nine questions to which they were invited to reply by September 3, 2012. The Claimants replied on August 31, 2012, and submitted exhibits C73 to C76 and A21 to A23.

23. By letter dated September 25, 2012, and in order to ensure that the Respondents had the complete file on this case, the Center sent a hard copy of all correspondence exchanged in this file by e-mail since the beginning of 2012 to the Minister of Transport and the State Litigations Department, copying in the Niger Embassy in Washington, DC, so that the latter could forward the file to the relevant departments of the State of Niger. In letters dated November 5 and 29, 2012, counsel for the Claimants confirmed the changes in the Government.

24. By letter dated October 23, 2012, the Claimants sent the Tribunal a copy of the Ruling of the Niger State Court, Administrative Chamber no. 12-054 of October 10, 2012, and its notification, which will be discussed below.

25. In a letter dated January 16, 2013, the Claimants reiterated their request that the "The *Arbitral Tribunal should rule solely on the heads of claim submitted to it*" by the Claimants in all their pleadings.

## III. THE FACTS

26. The Tribunal will briefly review the facts as they emerge from the Claimants' pleadings, the Respondent's Memorial submitted prior to the filing of the Request, and the exhibits produced during the proceedings.

27. In December 2003, following the bankruptcy filing in January 2002 of Air Afrique, which was in charge of ground handling, notably at Niamey airport, the State of Niger launched an international tender invitation for ground handling services at Niger's airports (hereinafter the "Tender Invitation"),[3]

28. By Decree No. 066/MT/DAC of December 30, 2003 (hereinafter referred to as "Decree 66") establishing the Specifications for the provision of ground handling or self-handling services at Niger airports, the Minister of Transport defined, inter alia, the services to be

---

[3] Exhibit C4.

provided and the conditions for approval of service providers. The approval period for ground handling services was set for 5 years, and 3 years for self-handling services.[4]

29. Menzies Aviation Group (MAG) decided to participate in this international tender and submitted a bid in conjunction with Aviation Handling Services (AHS), its exclusive partner in Africa. According to the Claimants, Menzies Aviation Group, a subsidiary of John Menzies Plc, is a leader in ground handling services in several African countries.[5] Within the Menzies Aviation Group, Menzies Afrique SA, now known as MMEA, and its partner AHS Dakar were responsible for developing ground handling activities in Africa and the Middle East.

30. In a letter dated January 29, 2004, the Menzies Aviation Group-AHS consortium submitted its technical and financial bids.[6] In its bid, the group undertook to:
   - invest 1.7 billion CFA francs;
   - purchase the equipment of the former Air Afrique for 295 million CFA francs;
   - take on former Air Afrique employees needed to run the business and who have not reached the age limit; and
   - pay the State 5% of its gross sales as a concession fee.

31. In a letter dated January 26, 2004, Menzies Aviation Group-AHS requested that the license be for a period of 10 years, the length of time required for the amortization of the investment[7].

32. In a letter dated February 8, 2004, the Minister of Transport informed the Group that it had been declared the successful bidder[8].

33. In accordance with the tender documents, a company incorporated under Nigerien law was to be set up to provide the services covered by the tender. AHS Niger was thus incorporated on February 18, 2004.[9] Its main shareholder was MMEA (75%). The remaining 25% was held by two Nigerien shareholders, with AHS International Limited

---

[4] Exhibit C6.
[5] Request, §§ 11-12.
[6] Exhibits C8 and C31.
[7] Exhibit C46.
[8] Exhibit C48, addressed to the President of Aviation Handling Services S.A. (AHS S.A.) in Dakar, stating that: "*Your group has been awarded the contract*".
[9] Exhibit C1.

owning just one share.[10]

34.     On February 19, 2004, Decree No. 015/MT/T/DAC (hereinafter "Decree 15") was issued for ground handling and self-handling services at Niger airports, amending the 2003 specifications. This decree stipulated that approval would be valid for ten years and limited the number of approved service providers to a single service provider for ground handling at Niamey airport.[11] This decree specified that "[t]he *number of approved service providers on this platform may be modified by ministerial decree if the number of passengers exceeds* [sic] *five hundred thousand (500,000) per year and subject to the absence of particular constraints in terms of space or facility capacity and compliance with airport and passenger safety and security constraints.*

35.     On the same day, Decree No. 016/MT/T/DAC (hereinafter "Decree 16") approving a 10-year approval to "*Aviation Handling Services Niger S.A. (Menzies Aviation Group Partner) to provide ground handling services at Niamey's Diori Hamani international airport*" was issued.[12] It stated that the ground handling activity included passenger, baggage, freight and mail handling, ramp operations, aircraft cleaning and servicing, line maintenance, flight operations and crew administration, air transport and catering.

36.     On December 15, 2004, the Government of Niger and AHS Niger signed an Investment Agreement, which was to take effect on the same day.[13]

37.     According to the Claimants, over the first five years, from December 15, 2004, AHS Niger invested 2,418,500,792 CFA francs, created 101 jobs and complied with its accounting and financial obligations.[14]

---

[10] Exhibit C33
[11] Exhibit C5.
[12] Exhibit C3.
[13] Exhibit C7.
[14] Request, §§ 27.

38. By means of Decree No. 000001/MT/AC/DAC of January 5, 2010 (hereinafter "Decree 1") amending Decree 16, the duration of the Investment Agreement was reduced to 5 years and all previous provisions to the contrary were repealed.[15] A second decree of the same date, No. 000002/MT/AC/DAC (hereinafter referred to as "Decree 2"), amended and supplemented Decree 66 of 2003, by setting, inter alia, the number of service providers at Niamey airport at three (ground handling, freight and post handling, and self-handling).[16]

39. In a letter dated January 6, 2010, addressed to AHS Niger, the Minister of Transport, citing "...*contradictions in the texts governing the ground handling and self-handling activities*" in Niamey, indicated that, in accordance with the 2003 Specifications, the number of service providers was three (ground handling, freight and post handling, and self-handling) and that the duration of the Investment Agreement was 5 years....[17]. The same letter asked AHS Niger to take the necessary steps to renew its approval, which expired on February 18, 2009.

40. AHS Niger objected to this measure in a letter dated January 25, 2010.[18]

41. AHS Niger continued to operate the ground handling service, allegedly with the agreement of the Government, and on March 8, 2010, obtained renewal of the annual operating license for the 2010-2011 period.[19]

42. According to the Respondent, "[i]*n December 2010, an inspection carried out by the transitional authorities concluded that a license had been wrongly granted to AHS NIGER S.A., owing to its failure to meet its commitments to the State of Niger and failure to comply with Nigerien legislation, among other deficiencies.*"[20]

43. On December 14, 2010, Niger's Minister of Transport issued Decree No. 106/MTT/A/DAC (hereinafter referred to as "Decree 106")[21] immediately repealing

---

[15] Exhibit C12.
[16] Exhibit C13.
[17] Exhibit C11.
[18] Exhibit C14.
[19] Exhibit C43.
[20] Claim. Mem., p. 3.
[21] Exhibit C17.

Decree 16, as well as Decision No. 00799/MTT/A/DAC (hereinafter "Decision 799") terminating the Investment Agreement.[22] According to the Claimants, these two documents were notified to AHS Niger by hand delivery on December 15, 2010.

44. The following decrees were also issued:
   - Decree No. 103/MTT/A/DAC of December 14, 2010 (hereinafter "Decree 103") "*creating a ground handling unit at Niamey's DIORI HAMANI International Airport* [the Cellule d'Assistance en Escale]." It was specified that this unit would be responsible for ensuring, under the direction of a management committee, the continuity of public service in terms of aircraft assistance[23];
   - Decree No. 104/MTT/A/DAC of December 14, 2010 (hereinafter "Decree 104") "*requisitioning the personnel from the company AHS dedicated to providing ground handling assistance at Niamey's DIORI HAMANI International Airport*"[24];
   - Decree No. l05/MTT/A/DAC of December 14, 2010 (hereinafter "Decree 105") "*requisitioning the ground handling equipment made available to AHS*"[25];
   - Decree No. 00108/MTT/A/DRF/M of December 29, 2010 (hereinafter "Decree 108") "*establishing and assigning a committee responsible for the financial management of ground handling resources at Niamey's DIORI HAMANI International Airport.*"[26]

45. On December 15, 2010, according to the Claimants, AHS Niger was expropriated of its investment.

46. The Claimants claim that the Acting Director of Civil Aviation called a meeting of the staff of AHS Niger, informing them that he was now the new General Manager of the Ground Handling Unit.

47. They also claim that the Managing Director of AHS Niger, Mr. Rachid Riffi, a Moroccan national, was threatened and forced to leave his workplace and that, accompanied by a delegation including the former head accountant of AHS Niger, the Managing Director of ASECNA27 (a member of the cell's management committee), two bailiffs, a gendarme, and AHS Niger's lawyer (who had arrived on the scene in the meantime), he was forced to visit the banks in which accounts had been opened in the name of AHS Niger in order

---

[22] Exhibit C18.
[23] Exhibit C21.
[24] Exhibit C22.
[25] Exhibit C23.
[26] Exhibit C24.
[27] Agency for Air Navigation Safety in Africa and Madagascar.

to obtain account balances, signatures on the accounts and the right of access to the accounts. This, he refused to do. He was then expelled from his office and his company vehicle was seized.

48. According to the Claimants, since December 15, 2010, "*AHS Niger has no longer had access to its headquarters and equipment, and the Cellule d'Assistance en Escale has confiscated AHS Niger's accounting documents and records, making it physically impossible for AHS Niger to meet its tax obligations.*"[28]

49. The Claimants go on to assert the following:

> "*92. In addition, for the purposes of this expropriation, the Cellule d'Assistance en Escale is making use of AHS Niger materials and equipment.*
> *93. In a vain attempt to conceal its activities, the Cellule d'Assistance en Escale had all AHS logos and markings removed from AHS Niger equipment in early 2011, even though it had been operating the same equipment with MENZIES-AHS logos and markings.*
> *94. However, the Cellule d' Assistance en Escale and all staff continue to operate in AHS Niger uniforms with AHS-MENZIES group insignia, in flagrant violation of the latter's property rights which reserve them exclusive use of the group's registered name and sign.*
> *95. Since that date, no measures have been taken by the State of Niger to remedy these various infringements*"[29].

50. On December 17, 2010, AHS Niger filed two requests for review against Decree 106 and Decision 799.[30] On January 12, 2011, AHS Niger filed four requests for review against the other four decrees mentioned above (see § 44 above).[31] All these appeals were addressed to the Minister of Transport, Tourism and Crafts of the Republic of Niger.

---

[28] Claim. Mem., § 90.
[29] Claim. Mem., §§ 92-95.
[30] Exhibits C19 and C20.
[31] Exhibit C25.

51. Having received no response from the Government, in May 2011 AHS Niger filed three requests with the Administrative Chamber of the State Court, within the two-month time limit following the Government's implicit rejection of the appeals, for abuse of power against Decree 106, Decision 799 and the four other decrees mentioned above.[32]

52. Ruling no. 12-054 of October 10, 2012, sent by the Claimants on the same day, states that the appeals for annulment against Decree 106, Decision 799, Decrees 103, 104, 105, and 108 were deemed admissible by the Administrative Chamber of the Niger State Court, and that the appeal for annulment against the implied rejection by the Minister of Transport was declared inadmissible. On the merits, the Court annulled Decree 106 for having been issued "*without grounds, in violation of Articles 4 and 5 of the investment agreement and Article 9 of Decree No. 066/MTT/A/DAC of December 30, 2003*" related to the Specifications. Accordingly, Decrees 103, 104, 105, 106, 108, and Decision 799 were also annulled by the Court, which also ordered the Treasury to pay the costs.

53. To date, the Arbitral Tribunal has not been informed of the effects of this ruling of October 10, 2012. The Tribunal does not know whether the execution of this ruling has reinstated the Investment Agreement or whether it has resulted in a restitution, even partial, of the assets which the Claimants consider having been expropriated.

## IV. SUMMARY OF THE PARTIES' POSITION

54. The Tribunal will briefly review the position of the Parties and will detail certain aspects, if necessary, in its analysis.

---

[32] Exhibits C50 and C52.

**IV.1    Position of the Claimants**

**A.    On jurisdiction**

55.    According to the Claimants, they meet the nationality requirements of the ICSID Convention.

56.    MMEA is incorporated under Luxembourg law. As for AHS Niger, a company incorporated under local law, the parties to the Investment Agreement agreed to treat it as a non-national from the outset. The successful bidder was required to incorporate under Niger law. The tender documents also stipulated that the company would be majority-controlled by the foreign strategic partner.

57.    Consequently, AHS Niger must be considered a non-national within the meaning of Article 25(2)(b) of the ICSID Convention and Article 6(2) of the French Investment Code.[33] Niger implicitly agreed to this and intended to treat AHS Niger as a non-national, which is clear from the stipulations of the Investment Agreement and the customs and tax benefits enjoyed by AHS Niger.[34]

58.    MMEA "*should be considered as the entity actually covered by the name "Menzies Aviation Group Partner" (sic) systematically associated with AHS Niger in the accreditation and body of the Approval Decree.*"[35]

59.    For this reason, MMEA must be deemed to have consented to the Investment Agreement and to the arbitration clause inserted therein and is therefore a party to the Investment Agreement and to the act of approval.[36] The Claimants invoke ICC arbitral law with regard to the extension of the arbitration clause to companies belonging to the same group.

60.    Niger's consent to ICSID arbitration in the event of a dispute with a non-national is found in Article 6 of the Investment Agreement, which refers to the Investment Code, and constitutes Niger's written consent required by Article 25(1) of the ICSID Convention.[37] For the Claimants, the arbitration clause inserted in Article 6 of the Investment Agreement

---

[33] Claim. Mem., §§ 109-133.
[34] Claim. Mem., §§ 147-148, §§ 150-151.
[35] Claim. Mem., § 139.
[36] Claim. Mem., §§ 142 and 144.
[37] Claim. Mem., § 164 et seq.

13

refs to the provisions of Article 6 of the Investment Code and to the ICSID Convention.[38]

61. The investment at issue in this case is MMEA's stake in the capital of AHS Niger, which constitutes an investment within the meaning of Article 11 of the Investment Code, as well as AHS Niger's tangible and intangible assets.[39]

62. The dispute between the parties is legal in nature and relates directly to the investment.

## B. Background

63. For the Claimants, the Investment Code, Tender Regulations, 2003 Specifications, 2004 Decrees, and the Investment Agreement are particularly applicable in this dispute.

64. The Claimants consider that Niger has reneged on the Investment Agreement and withdrawn the authorization for the exercising of ground-handling and self-handling in an irregular, unfounded and wrongful manner, thus violating the Investment Agreement, applicable law and customary international law.[40]

65. Niger has failed to comply with the contractual and legal preconditions, i.e., prior written formal notice, the possibility of suspending approval and then withdrawing it and, in any event, seeking an amicable resolution to the dispute.[41]

66. It should only be possible to cancel the approval order after two months' formal notice to remedy deficiencies, followed (if necessary) by a six-month temporary suspension.[42]

67. Furthermore, the Claimants note the absence of any justification on the merits for the above-mentioned denunciation and withdrawal.[43] They consider that AHS Niger has in no way recognized its obligations under the Investment Agreement, Investment Code and Specifications.

---

[38] Claim. Mem., § 166.
[39] Request, §§ 68-70.

[40] Claim. Mem., § 293.

[41] Claim. Mem., §§ 228-242.
[42] Claim. Mem., §§ 243-264.
[43] Claim. Mem., §§ 266 et seq.

68.  Niger has manifestly violated its obligations, thereby committing an abuse of power[44] and has implemented these measures by means of coercion, in violation of Articles 2 and 7 of the Investment Code.[45] A "voie de fait" is an unlawful administrative act defined as "*conduct perpetrated when the administrative authority takes a decision or commits an action that is manifestly unlikely to be linked to a legislative or regulatory text. It is therefore the seriousness of the irregularity that distorts the administration's action, to the point of taking it outside the scope of the administrative field.*"[46] It occurs when the Administration's action causes serious damage to property and involves an irregularity.

69.  AHS Niger was expropriated for no good reason.[47]

70.  The Claimants emphasize that the Tribunal has jurisdiction to assess the financial and material consequences notwithstanding the existence of a request for review,[48] which was implicitly rejected and annulled, along with the decision challenged by the appeal, by the Niger State Court (see § 52 above).

71.  The Claimants were entitled to operate the ground handling and self-handling business for another four years.

72.  They are entitled to full compensation for their material and non-material loss, which can be broken down into economic loss (loss of earnings and loss of property), non-material loss, infringement of their intellectual property rights, and reimbursement of costs related to the arbitration, including counsel and expert fees.[49]

73.  The valuation of the loss of earnings is based on a projection of expected net profits for the period from December 15, 2010, to February 2014, resulting, inter alia, from turnover growth projections for the years 2011 to 2014, i.e., a total of 2,634,302,000 CFA francs (€4,015,967.51).[50]

---

[44] Claim. Mem., § 299.
[45] Claim. Mem., § 300.
[46] Claim. Mem., § 318, citing the legal opinion of Prof. Sur.
[47] Claim. Mem., §§ 304-312.
[48] Claim. Mem., § 302.
[49] Claim. Mem., § 320.
[50] Claim. Mem., §§ 335-226.

74. The valuation of the loss due to the expropriation of the investments made by the Claimants (i.e., 2.1 billion CFA francs over the period 2004-2010) is based on the net book value of the Assets and on the Receivables estimated at the overall sum of €944,336.95, i.e., 619,444,433 CFA francs, broken down into 410,382,837 CFA francs for the net book value of the Assets and 209,061,596 CFA francs for the Receivables.[51]

75. Amounts due in respect of advances and loans to employees are equivalent to 40,758,174 CFA francs, or €62,135.44.[52]

76. The Claimants also claim compensation for damage to their image and commercial reputation. They also claim infringement of their intellectual property rights (acronyms and trade names) in connection with the exploitation by Niger of equipment and uniforms bearing the names and initials of Menzies and AHS. This loss is estimated at €2,200,000.[53]

### C. Claimants' request

77. The Claimants in their Memorial of November 14, 2011, asked the Tribunal to:

> " 401. Find that the State of Niger has terminated the Investment Agreement in an irregular, unfounded and wrongful manner;
>
> 402. Record the irregular, unfounded and wrongful withdrawal of the Approval Decree by the State of Niger;
>
> 403. Find that the Claimants have fully complied with their contractual obligations under the Investment Agreement;
>
> As a result,
>
> 404. Declare that the State of Niger has failed to comply with its contractual obligations under the Investment Agreement;
>
> 405. Declare that the State of Niger has also violated its legal obligations under both the Investment Code and the Specifications;
>
> 406. Declare that the State of Niger has improperly and without cause terminated the Investment Agreement and revoked the Approval Decree;
>
> 407. Consequently, order the State of Niger to pay the sums covering all the damages suffered by AHS Niger and MMEA:

---

[51] Claim. Mem., § 337.
[52] Claim. Mem., § 339.
[53] Claim. Mem., §§ 359-396.

- *Four million fifteen thousand nine hundred sixty-seven euros and fifty-one cents (€4,015,967.51) as compensation for the loss of earnings suffered by AHS Niger and MMEA as a result of the irregular, unfounded and wrongful early termination of the Investment Agreement and the sudden and immediate cessation of AHS Niger's and MMEA's activities;*

- *Nine hundred forty-four thousand three hundred thirty-six euros and ninety-five cents (€944,336.95) as compensation for the loss suffered by AHS Niger and MMEA, consisting of repayment of the net book value of the expropriated assets and the lost Receivables;*

- *Sixty-two thousand one hundred thirty-five euros and forty-four cents (€62,135.44) as compensation for sums owed by AHS Niger staff requisitioned by the State of Niger, in respect of advances and loans granted by AHS Niger;*

- *Two million two hundred thousand euros (€2,200,000) as compensation for the moral prejudice suffered by AHS Niger and MMEA as a result of the damage to their image and reputation on the African continent and in the Middle East, as well as to their intellectual property rights;*

- *Interest with capitalization on the aforementioned amounts from December 14, 2010, the date of repeal of the Approval Decree;*

- *All costs relating to the arbitration, including lawyers' fees, as well as those of any expert, in particular financial and legal experts, engaged by AHS Niger and MMEA in connection with these proceedings.*"[54]

## IV.2 Respondent's position

78. In its Memorial of April 6, 2011, submitted prior to the registration of the Request, Niger objected to the Center's registration of the Request, on the grounds that the dispute manifestly exceeded the Center's jurisdiction.

79. The reasons given by Niger were:

---

[54] Claim. Mem., §§ 404-107.

- the absence of Niger's written consent. Under the Investment Code, the only document recognized as proof of Niger's acceptance is the act of approval, which contains no reference to ICSID arbitration;[55]

- the Nigerien nationality of AHS Niger, which Niger has not agreed to treat as a national of another state;[56]

- the fact that MMEA is not a party to the Investment Agreement, and therefore "*cannot act within the framework of an agreement to which it is not a party.*"[57]

## V.  JURISDICTION

80.  As the Respondent has defaulted, it is up to the Tribunal to examine whether the dispute falls within the jurisdiction of the Centre and its own, in accordance with the provisions of Article 42(4) of the Arbitration Rules.

## V.1  Applicable provisions

81.  Article 6 of the Investment Agreement of December 15, 2004, states:

*"Disputes arising from the interpretation or application of this Protocol shall be settled amicably. In the absence of an amicable agreement between the 2 parties, disputes shall be settled by arbitration in accordance with the provisions in force in Niger concerning the settlement of investment disputes.*"

82.  Article 6 of the 1989 Investment Code states:

*"**Art .6** - The settlement of disputes relating to the validity, interpretation or application of the act of approval and to the determination of any compensation due for the breach or non-observance of commitments will be subject to one of the following arbitration procedures to be determined in the act of approval.*

*1)* [ad hoc and *ex aequo bono* arbitration].

*2) The possibility for non-nationals to have recourse to the International Center for Settlement of Investment Disputes (ICSID) created by the International Bank for Reconstruction and Development (IBRD) convention of March 18, 1965.*"

---

[55] Claim. Mem. of April 6, 2011, p. 5. For Niger, the approval instrument is Decree 16 (see § 35 above), which is contested by the Claimants.
[56] Claim. Mem. of April 6, 2011, p. 6.
[57] Claim. Mem. of April 6, 2011, p. 7.

83.     The relevant provisions of Article 25 of the ICSID Convention are as follows:

*"(1) The jurisdiction of the Center shall extend to legal disputes between a Contracting State (or such public authority or agency thereof as it may designate to the Center) and the national of another Contracting State which are directly related to an investment and which the parties have consented in writing to submit to the Center. Once the parties have given their consent, neither may withdraw it unilaterally.*

*(2) "National of another Contracting State" means:*

*(a) any natural person who possesses the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit the dispute to conciliation or arbitration and on the date on which the request was registered in accordance with Article 28 (3) or Article 36 (3), excluding any person who, on either of these dates, also possesses the nationality of the Contracting State party to the dispute;*

*(b) any legal person which possesses the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit the dispute to conciliation or arbitration and any legal person which possesses the nationality of the Contracting State party to the dispute on the same date and which the parties have agreed, for the purposes of this Convention, to regard as a national of another Contracting State by reason of the control exercised over it by foreign interests."*

84.     The Tribunal notes that, as indicated by the Claimants, there is no bilateral investment protection and promotion treaty between Niger and Luxembourg.[58]

85.     The Tribunal will first examine its jurisdiction *ratione personae*, then *ratione voluntatis*, and finally *ratione materiae*.

## V.2     Jurisdiction *ratione personae*

86.     The Tribunal must examine the nationality requirement in the light of both the Investment Code and the ICSID Convention, cited above.

---

[58] Claim. Letter, March 21, 2011, p. 5.

### A. Niger

87.    There is no doubt that the Respondent is a Contracting State within the meaning of the ICSID Convention. The ICSID Convention entered into force for Niger on December 14, 1966.

### B. MMEA

88.    The Investment Code applies to natural or legal persons, regardless of nationality, as long as they carry out an activity in one of the sectors covered by the Code, including the aviation sector.[59]

89.    MMEA is a company incorporated under Luxembourg law. MMEA is a non-national within the meaning of Article 6(2) of the Investment Code mentioned above.

90.    Nor does the Tribunal doubt, and this point has not been disputed, that it is a national of a Contracting State other than Niger for the purposes of the Washington Convention. The ICSID Convention entered into force for Luxembourg on August 29, 1970.

### C. AHS Niger

91.    AHS Niger is a company incorporated under Nigerien law, with its registered office in Niamey, and all its activities based in Niger. The questions that arise, however, are whether (*i*) for the purposes of the Investment Code AHS Niger can be considered a "*non-national*" with access to ICSID arbitration, and whether *(ii)* it can be considered a "*national of another Contracting State by reason of the control exercised over it by foreign interests" within the* meaning of Article 25(2)(b) of the Washington Convention.

### 1. Position of the Parties

92.    *According to the Claimants, "the actual nationality of a company created for the*

---

[59] Exhibit C32, section 2.

*purposes of a tender in the form of a company established under local law is obviously not determined solely in light of its registered office and place of registration."*[60]

93.     According to the Claimants, under Nigerien law, in order to determine the nationality of a company, "*in addition to the criterion of the company's registered office, it is necessary to take into account the circumstances of its incorporation.*[61] They rely on a ruling by the French Court of Cassation, which stated that the criterion of a company's registered office is no more than a simple presumption that can be rebutted if the center of effective management is located elsewhere.[62] Also, according to the Claimants, this case law "*is perfectly applicable under Niger law, which is similar to French law in this respect, as evidenced by the content of the Uniform Act on Commercial Companies and Economic Interest Groups.*"[63]

94.     Finally, according to the Claimants' Memorial, "[t]*his provision of the Investment Code must be analyzed in light of the provisions of Article 25(2)(b) of the ICSID Convention, which has higher authority than Niger's domestic law in accordance with Article 171 of the Constitution of Niger of November 26, 2010.*"[64]

95.     For the Claimants, AHS Niger meets the "*non-national*" requirements of the Investment Code for the following three reasons:[65]

96.     Firstly, the Respondent wished to associate itself with an operator recognized on the international market and of foreign nationality. For this reason, MMEA was chosen and AHS Niger was created for the sole purpose of the bidding procedure and in accordance with Articles 3 and 4 of Decree 66 of 2003, pursuant to which the Investment Agreement was concluded. In addition, the Respondent associated AHS Niger with MMEA in Decree 16 of February 19, 2004.[66]

---

[60] Claim. Letter, April 18, 2011, p. 1.
[61] Claim. Letter, April 5, 2011, p. 5.
[62] Claim. Mem., §§ 130-132.
[63] Claim. Letter, April 5, 2011, p.6; Claim. Mem., §§ 130-132.
[64] Claim. Mem., § 104.
[65] Claim. Letter, April 5, 2011, pp. 2-9; Claim. Letter, April 7, 2011, pp. 5-6; Claim. Mem., §§ 108-133.
[66] Claim. Letter, April 5, 2011, pp. 2-4; Claim. Mem., November 14, 2011, §§ 109-122.

97. Secondly, the majority of AHS Niger's capital is held by non-nationals, MMEA's shareholding in AHS Niger constitutes an investment within the meaning of Article 11 of the Investment Code, none of AHS Niger's directors is of Nigerien nationality, and its effective management is based in Luxembourg.[67]

98. Thirdly, there is an implicit agreement by the Respondent to treat AHS Niger as a non-national. According to the Claimants, this can be inferred from the terms of the Investment Agreement, in particular the following undertakings, which are "*only adopted with respect to non-nationals:*"

- guaranteeing the allocation of foreign currency to ensure payment of foreign suppliers (Article 2);

- protection against "*expropriation or nationalization*" measures (Article 2), in accordance with Article 7 of the Investment Code;

- tax exemption (Article 2);

- the obligation to "*keep accounts in accordance with the accounting system in force in Niger*" (Article 4); and

- the obligation to comply with Niger's social regulations (Article 4).[68]

99. The Tribunal notes that the Claimants also rely on these three reasons to argue that the Parties agreed to treat AHS Niger as a national of a State other than Niger within the meaning of Article 25(2)(b) of the ICSID Convention.[69]

100. On the contrary, according to the Respondent, "*the presence of foreign capital and the fact that management is exercised by a foreign national cannot, under ordinary Niger law, confer foreign nationality on AHS Niger; nationality must necessarily be assessed in light of its articles of association and registration with the Trade and Personal Property Credit Register.*"[70]

---

[67] Claim. Letter, April 5, 2011, pp. 4-6; Claim. Letter, April 7, 2011, p. 6; Claim. Mem., §§ 123-127.
[68] Claim. Letter, April 5, 2011, pp. 6-9; Claim. Letter, April 7, 2011, p. 6.
[69] Claim. Mem., November 14, 2011, §§ 108, 133, 156.
[70] Claim. Letter, April 12, 2011, p. 2.

101. According to the Respondent,

> "... point II of the bidding regulations provides ample proof that the State of Niger expressly intended to exclude from the investment agreement any legal entity governed by foreign law (as soon as the candidate was required to incorporate under Niger law)" [71]

> "Article 2 of the Investment Agreement of December 15, 2004, cannot be interpreted as meaning that AHS Niger S.A. is a legal entity governed by foreign law, since it merely reiterates the advantages offered by the Investment Code in the Republic of Niger to any investor, including national investors. [72]

> "... the privileges and advantages granted to AHS Niger cannot be considered as an 'implicit agreement by the State to treat the company established under local law as a non-national' insofar as these are not linked to the nationality of the State's co-contractor but rather to the nature of the activity it carries out or wishes to carry out." [73]

### 2. **Tribunal decision**

102. The Tribunal must first review the facts of this case in order to ascertain the intentions of the parties regarding the status of AHS Niger (a), and then analyze the legitimacy of the latter's claim to non-national or foreign national status under both the Investment Code (b) and the ICSID Convention (c).

a) The status of AHS Niger

103. With regard to the incorporation of AHS Niger, the Tribunal notes that AHS Niger was incorporated as a Nigerien company for the purposes of the project and as a necessary condition imposed by the tender invitation issued by the Ministry of Transport of the Republic of Niger. [74]

104. This is because, on the one hand, as is clearly stated on the cover page of the Tender Documents, this is an "*International Tender*" aimed at attracting a "*strategic partner*"

---

[71] Claim. Mem., April 6, 2011, p. 6.
[72] Claim. Mem., April 6, 2011, p. 6.
[73] Claim. Letter, April 12, 2011, p. 2.
[74] International Tender Regulations (December 2003), § II on p. 2 "*The candidate must incorporate under Nigerien law. This company may open its capital to other partners*" (Exhibit C4). See also the Information Memorandum of the Bidding Documents, pp. 12-13 (Exhibit C4).

"*whose professionalism* [is] *recognized by international airlines*"[75]. The tender was therefore necessarily aimed at a foreign partner. On the other hand, as explained in the Information Memorial of the Tender  Documents, it was intended that this "*strategic partner*" be associated (while retaining control) with "*private Nigeriens, with the possibility of a symbolic participation by the State*". It was therefore necessary to set up a company in Niger to allow this (minority) participation by Niger nationals, and possibly that of the State of Niger.

105. Indeed, the International Tender Documents stated:

> "*... we need to find a <u>buyer whose professionalism is recognized by international airlines</u> and who can provide the following guarantees:*
>
> • *Renewal of investments in technical equipment essential to the business;*
>
> • *the taking out of an international insurance policy to cover business risks (personnel, machinery, third parties, etc.);*
>
> • *training and maintaining the qualifications of technical handling personnel on all types of aircraft;*
>
> • *recruiting all or part of the staff of the former Air Afrique.*" (Underlined in the text)
>
> " *3.3.2.3. Tender invitation for the selection of a strategic partner*
>
> <u>*A company incorporated under Nigerien law will be set up*</u> *for this purpose, with the* <u>*strategic partner holding a majority stake*</u>.
>
> *The other shareholders will be private Nigeriens, with the possibility of a symbolic participation by the State.*
>
> • *In particular, bidders must meet the following requirements:*
>
> • *a sound financial position;*
>
> • *internationally recognized technical expertise;*
>
> • *the ability to take out an insurance policy covering international risks;*
>
> • *a commitment to make minimum priority investments in the short term;*
>
> • *a commitment to providing services that meet international standards;*
>
> • *a commitment to respecting the environment;*
>
> • *a commitment to comply with social legislation in force in Niger;*
>
> • *a commitment to pay a concession fee.*"[76] (underlined in the text)

---

[75] Exhibit C4.
[76] Exhibit C4

- 

106. The specifications appended to the International Tender Documents stipulated that:

*"The provision of ground handling or self-handling services by a service provider or air carrier is subject to approval by the Minister of Civil Aviation.[77]"*

*"Any natural or legal person wishing to be approved for ground handling or self-handling must meet the following criteria:*

*- be duly incorporated under Nigerien law[78]"*.

107. The need for a foreign partner and its role, both in the tender process and in the management of AHS Niger, are also clear from the witness statements submitted to the Tribunal.

108. Pierre Agbogba, Chairman of the Board of Directors of AHS Niger since 2004, said:

*"As part of the negotiations between our group and the State of Niger, it was clear that <u>the Niger-based operating company we were to set up would be considered and treated, in terms of international investment regulations, as a foreign national,</u> insofar as our group was obviously welcomed as a foreign investor, which can be seen from the entire tender process.*

*It was for this reason that the State of Niger specified and insisted that the company incorporated under Nigerien law to operate the market should be majority-owned by the foreign bidder.*

*The representatives of the State of Niger also confirmed this to me, as they wanted to ensure that the Niger-based company owned by our Group had the financial resources to make the major investments made necessary by the outdated state of the equipment and technical facilities required for the ground handling business.[79]"* (emphasis added).

---

[77] Exhibits C4 and C6, section 3.
[78] Exhibits C4 and C6, section 4.
[79] Statement from Mr. Agbogba dated October 18, 2011, § 29.

109. In addition, Mr Forsyth Rutherford Black, Senior Vice President Africa and Middle East of Menzies Aviation PLC, said:

> *"As part of the negotiations between our group and the State of Niger, it was clear that <u>the Niger-based operating company we were to set up would be considered and treated as a foreign national in terms of international investment regulations.</u>*
>
> *It was for this reason that the State of Niger specified and insisted that the company incorporated under Nigerien law should be majority-owned by the successful bidder. It was therefore clear that the successful bidder would be responsible for the governance and supervision of the activities of the Niger-based subsidiary.*
>
> *The State of Niger's concern was to ensure that the company, incorporated under Nigerien law, would be able to make the major investments made essential by the outdated technical equipment required to carry out the ground handling activity, and would have the financial resources of the group."[80]* (emphasis added).
>
> *"... for MENZIES AVIATION GROUP-AHS, it has always been clear that <u>the State of Niger actually intended to do business with us and not with the company incorporated under Nigerien law,</u> which, according to the very terms of the international tender invitation, was to be placed under foreign control."[81]* (emphasis added).

110. In the view of the Arbitral Tribunal, these statements are not contradicted by the other evidence submitted which, in several respects, confirms them[82]. Furthermore, Niger did not consider it necessary to challenge the testimony of Messrs. Agbogba, Riff and Black or to request their examination at a hearing.

111. The Tribunal is therefore convinced that the call for tenders was aimed at a strategic partnership with a foreign company with a worldwide reputation in airport services.

112. In this case, a foreign company responded to the tender and was awarded the contract. In fact, the response to the tender invitation was entitled "*Offer of services from Menzies*

---

[80] Statement from Mr. Black dated October 13, 2011, § 17. The Tribunal notes an error in the formatting (which does not affect the content of the statement), with the numbering of the paragraphs not identical in the French and English versions of the statement. The Tribunal will use the French version of |Mr. Black's statement as a reference.
[81] *Idem*, § 20.
[82] See, in particular, exhibits C1, C4, C6, C8, C34, C35, C38, C39, C40 and C41.

*Aviation Group - AHS*"[83]. As explained in the tender, Menzies Aviation Group (MAG) "*operates in West Africa, Central Africa and North Africa through Aviation Handling Services SA ('AHS')*"[84]. This was confirmed by the Claimants in their reply to the questions put by the Tribunal, when they clarified that AHS[85] has been Menzies Aviation Group's exclusive partner in Africa and the Middle East since 2003 and is part of the worldwide Menzies Aviation Group network[86].

113. There is therefore no doubt that the Menzies Aviation Group - AHS bid has been selected[87]. This is confirmed by the letter dated February 8, 2004, sent by the Niger Minister of Transport to the President of Aviation Handling Services in Dakar, informing him that "*your group has been awarded the contract*"[88].

114. In accordance with its commitments and in strict application of the conditions set forth in the Tender Invitation, Menzies Aviation Group-AHS chose its affiliates Menzies Afrique SA, a company incorporated under Luxembourg law (now Menzies Middle East and Africa SA - MMEA) and AHS International Ltd to form Aviation Handling Services Niger - AHS Niger, a company incorporated under Nigerien law, on February 18, 2004[89].

115. At the time of its incorporation on February 18, 2004, AHS Niger was therefore majority-owned by Luxembourg[90]. AHS Niger's capital subscription and payment declaration shows that MMEA (under its former name, Menzies Afrique S.A.91) held 75% of the shares of AHS Niger[92]. In February 2004, control appeared to be direct and in the majority - MMEA's 75% share enabled it alone to reach a quorum at ordinary and extraordinary general meetings[93] and take all decisions[94]. In its pleadings, Niger confirms that "*the MENZIES AVIATION GROUP/AHS collective was declared the successful bidder*" and

---

[83] Exhibit C8.
[84] *Idem*, p. 3 of the Financial Bid.
[85] The registered office of AHS is located in Dakar (Senegal), see exhibits C48, C61 and C62.
[86] See Claimants' Letter dated August 31, 2002, pp. 8-9.
[87] See bid evaluation report dated February 2, 2004 (exhibit C47).
[88] Exhibit C48.
[89] Exhibits C1 and C33.
[90] Exhibit C33.
[91] See Minutes of the Extraordinary General Meeting of March 18, 2011 (Exhibit C36).
[92] *Idem.*
[93] Exhibit C1, sections 27(2)-(3) and 28(2).
[94] Exhibit C1, sections 27(4) and 28(3).

also confirms control of AHS Niger.[95]

116. The Tribunal noted that the directors of AHS Niger appointed at its creation were all non-Nigeriens[96]. Similarly, the Managing Director has always been of non-Nigerien nationality since 2004[97]. The Managing Director of AHS Niger at the time of its creation, Mr. Willem Debeurme, was the representative of Menzies Afrique SA.[98]

117. According to Mr. Black, Menzies Afrique SA, now MMEA, "*had been chosen not only to be the majority shareholder, but also to ensure the management and effective control of the company incorporated under Nigerien law, which the successful bidder was obliged to set up.*"[99]

118. According to Mr. Rachid Riffi, Managing Director of AHS Niger between August 15, 2010, and the end of 2010, all major decisions that are not part of day-to-day management "*are always validated or authorized before implementation by Menzies Afrique SA and its directors. In addition, weekly operational and financial reports are sent to the Menzies Afrique and Menzies Aviation head offices.*"[100]

119. Similarly, according to Mr. Riffi, "*all the investments required to acquire the assets of AHS Niger needed to carry out its ground handling activities were financed by bank loans guaranteed by Menzies Afrique SA and by capital injections from this majority shareholder of AHS Niger.*"[101]

120. On February 19, 2004, just 24 hours after the formation of AHS Niger, the Minister of Transport and Tourism (at the time, Mr. Souleymane Kane) issued Decree 16 approving the services covered by the tender invitation.[102] This decree had already been envisaged in the Tender Specifications.[103]

---

[95] See Resp. Mem. of April 6, 2011, p. 2.
[96] See Board of Directors' resolution of February 19, 2004 (Exhibit C39). See also, statement from Mr. Rachid Riffi dated April 4, 2011 (Exhibit C42).
[97] Statement from Mr. Rachid Riffi dated April 4, 2011.
[98] Statement from Mr Agbogba as mentioned above, § 28.
[99] Statement from Mr. Black, as mentioned above § 15.
[100] Statement from Mr. Riffi, April 4, 2011.
[101] *Idem.*
[102] Exhibit C3.
[103] Exhibit C4, Decree No. 66 MT7DAC of December 30, 2003, article 6.

121. The Arbitral Tribunal notes that Decree 16 refers to the tender documents and, on several occasions, identifies the company "AVIATION HANDLING SERVICES NIGER S.A. (MENZIES AVIATION GROUP PARTNER)" as the entity authorized to carry out the activities referred to in the Tender Invitation.

122. For the Tribunal, there is no doubt that Decree 16 was aimed at the Menzies Aviation Group-AHS through the reference to Aviation Handling Services Niger S.A. (Menzies Aviation Group Partner). The Tribunal considers, in the light of the evidence provided, that the reference (in brackets) to the Menzies Aviation Group clearly shows that the State of Niger, through its Ministry of Transport, understood, accepted and recognized that its partner and approved service provider was in fact companies belonging to the "*Menzies Aviation Group*" (in particular, MMEA as majority shareholder of the recently formed AHS Niger), of non-Nigerien nationality, and that, following instructions from the State, these companies had just incorporated a hitherto non-existent Nigerien company. As a result, the State of Niger understood, accepted and recognized that AHS Niger was, de facto, a national of a country other than Niger as far as the processing of its investment was concerned.

123. This was the context in which, ten months later, Niger (again under the signature of Mr. Soulaymane Kane[104], Minister of Transport, and those of the Ministers of Commerce and Economy and Finance), concluded the Investment Agreement of December 15, 2004, which lies at the heart of this dispute[105].

b) With regard to the Investment Code

124. The Bidding Documents refer to the Investment Code as one of the fundamental elements of the legislative and regulatory environment from which the successful bidder would benefit[106]. As already indicated, the Investment Code applies to natural or legal persons, whatever their nationality, provided they carry out activities in one of the sectors covered by the Code, including the aviation sector[107]. The Investment Code does, however, contain

[104] Mr. Kane was also the Minister when Decree 16 was issued (see ¶ 120 above).
[105] Exhibit C7.
[106] Exhibit C4, pp. 6-7.
[107] Exhibit C32, section 2.

a specific provision for non-nationals in Article 6, concerning the settlement of disputes, from which the Tribunal deduces that this text recognizes the notion of non-national, even if it does not define it. The only specificity that this provision recognizes for non-nationals is the possibility of having recourse to ICSID arbitration, which leads the Tribunal to consider that the definition of non-national within the meaning of the Investment Code is either identical to the definition given by the ICSID Convention or must be interpreted as taking into account the criteria identified in relation to the ICSID Convention.

125. Other considerations must also be taken into account, and the Tribunal wishes to point out that the Call for Tenders was aimed in particular at a strategic partnership with a foreign company recognized worldwide in the airport services sector[108].

126. In this case, Menzies Aviation Group - AHS applied for Regime B of the Investment Code[109] but seems to have ended up benefiting from Regime C[110], also known as the conventional regime, granted "*to large companies of exceptional importance for the implementation of national economic and social development programs*"[111]. It should be noted that Regime C is granted by means of an agreement between the beneficiary company and the State[112]. According to Article 36(f) of the Investment Code, this agreement defines, in particular, "*the arbitration procedure that will be implemented in the event of a dispute between the parties*".

127. Although regime C is not linked to a condition of nationality, the Tribunal considers that the content of the Investment Agreement sheds light on the position of the State of Niger with regard to the nationality of the investor, within the meaning of the Investment Code. The Tribunal notes that some of the advantages enjoyed by AHS Niger under the Investment Agreement are by their very nature reserved for foreign investors. This is particularly true of tax exemptions, especially when they are almost total and for a

---

[108] See *supra*, ¶¶ 104 *et seq.*
[109] See Response to Tender Invitation, p. 9 (Exhibit C8).
[110] See attachment to letter ref. 421 dated September 19, 2011, from the Ministry of Transport (Exhibit C-55): "*The company AHS Niger SA, in order to successfully carry out its technical activities, asked and obtained from the government the <u>right to regime C provided for in the Investment Code</u>. This benefit was formalized through the signature of an agreement binding on both parties.*" (underlined in the text).
[111] Investment Code, Article 30 (Exhibit C32).
[112] *Idem*, Article 31.

significant period, as well as access to foreign currency and, more importantly, the prohibition on any expropriation or nationalization measures (see art. 2 of the Investment Agreement)[113].

128. In view of these factual elements, which supplement the considerations set forth in (a) above, and of the position set forth below on the notion of "non-national" within the meaning of the ICSID Convention, the Tribunal concludes that the Parties' intention to consider AHS Niger as having a nationality other than Nigerien nationality[114] allows AHS Niger to be considered a "*non-national"* within the meaning of the Investment Code.

129. As far as the Investment Code is concerned, "*non-national"* status is important only in terms of dispute settlement. Indeed, as stated in Article 6, only non-nationals may have recourse to ICSID arbitration.

130. We must now examine whether the nationality conditions required by the ICSID Convention have been met.

c) With regard to the ICSID Convention

131. The question in this sub-section is whether AHS Niger, a company incorporated in Niger, can be a Claimant under the second part of Article 25(2)(b) of the ICSID Convention, which states:

> *"National of another Contracting State" means* [...].
>
> *any legal person which possesses the nationality of the Contracting State party to the dispute on the same date* [date on which the parties consented to submit the dispute to arbitration] *and which the parties have agreed, for the purposes of this Convention, to consider as a national of another Contracting State by reason of the control exercised over it by foreign interests*" (emphasis added).

132. An agreement between the Parties to treat AHS Niger as a national of another Contracting State due to foreign control at the date of consent to arbitration must therefore be established.

---

[113] The Tribunal notes in this respect that the Investment Code (applicable to all investors regardless of nationality) offers less protection and allows expropriation or nationalization in the event of a public interest as provided for by law (see art. 7 of the Investment Code).
[114] See § 122 above.

133. The date of the Investment Agreement which, according to the Claimants, contains the consent to arbitration is December 15, 2004. The Tribunal will therefore take this date as the reference date for consent for determining whether the objective condition of foreign control over AHS Niger is met.

134. It follows from an examination of the shareholder structure of AHS Niger at the time of its incorporation (see above, §§ 115 *et seq.*), that the control exercised over AHS Niger came from a company that was a national of a contracting state to the ICSID Convention.

135. In response to a question put by the Tribunal, the Claimants confirmed that this control had not changed as of December 15, 2004[115]. Mr. Riffi's statement also confirms this[116].

136. The Tribunal therefore finds that on December 15, 2004, the date of the Investment Agreement, AHS was under foreign control and, more specifically, under the control of a national of a contracting State to the ICSID Convention. The Tribunal must now consider whether the parties to the Investment Agreement agreed to treat AHS Niger as a national of another State by virtue of this control.

137. The Tribunal notes that this type of agreement is generally found in the instrument containing the consent to arbitration or may be laid down in a separate deed. However, several decisions have recognized that such an agreement may be implicit[117]. The presence of an ICSID clause, for example, has been recognized as indicative of such an agreement[118]. Such an agreement has also been inferred from the fact that advantages reserved for foreign investors have been granted to the local company[119].

138. The Tribunal also notes that the tribunal in *LETCO v. Liberia* held that *"Unless*

---

[115] See Letter from the Claimants to ICSID dated August 31, 2012, p. 10.

[116] Exhibit C42.

[117] Schreuer, Article 25, §§ 775-794.

[118] *Klöckner Industrie-Anlagen GmbH et al. v. Republic of Cameroon and Société Camerounaise des Engrais*, ICSID Case No. ARB/81/2, Award, Oct. ICSID No. ARB/81/2, Award, October 21, 1983, 2 ICSID Report 16; *LETCO v. Liberia*, Case No. ARB/83/2, Decision on Jurisdiction, October 24, 1984, 2 ICSID Report 349, p. 352, JP 15.

[119] *CableTelevision of Nevis, Ltd. and CableTelevision of Nevis Holdings, Ltd v. Federation of St Kitts and Nevis*, ICSID Case ICSID No. ARB/95/2, Award, January 13, 1997, §§ 5.17-5.18, JP 16.

*circumstances clearly indicate otherwise, it must be presumed that where there exists foreign control, the agreement to treat the company in question as a foreign national is 'because' of this foreign control*"[120].

139. The Tribunal considers the LETCO decision (which also inspired the Tribunal in *Millicom v. Sénégal[121]*) is particularly interesting insofar as the Tribunal considered that the obligation to set up a company under local law reinforced the presumption of an agreement by the State to treat the latter as a non-citizen, based on the presence of an ICSID arbitration clause in the agreement in question[122].

140. In this case, there is, strictly speaking, no "ICSID arbitration clause" in the Investment Agreement. However, the latter does refer to the Investment Code, which refers to the possibility of ICSID arbitration for "*non-nationals*", and the Arbitral Tribunal has already come to the conclusion that Niger considered AHS Niger to be of a nationality other than Nigerien[123].

141. In its Statement of Defense dated April 6, 2011, the Respondent claims that the Tribunal finds that the (Nigerien) nationality of AHS Niger is such as to deprive the Tribunal of jurisdiction over it and argues in this regard that by requiring the incorporation of a company under Niger law, the State "*expressly intended to exclude from the investment agreement any legal entity under foreign law*"[124].

142. The Arbitral Tribunal considers that Niger's reasoning cannot be accepted.

143. Firstly, as the Tribunal has already noted[125], the conduct of the Parties, and Niger in particular, constitutes at least implicit recognition of AHS Niger's non-national status.

144. Secondly, in the opinion of the Tribunal, the conduct of the Parties also indicates a legitimate belief on the part of AHS Niger, and its majority shareholders, that AHS Niger would be considered a foreign national and would enjoy all the benefits inherent in that

---

[120] *Liberian Eastern Timber Corporation (LETCO) v. Liberia*, Award of March 31, 1986, JP15, p. 5.
[121] *Millicom International Operations B. See & Sentel GSM S.A. v. Republic of Senegal*, ICSID Case ICSID No. ARB/08/20, Decision on jurisdiction, July 16, 2010.
[122] *LETCO v. Liberia*, p. 6.
[123] See *above*, §§ 122 and 128.
[124] See Resp. Mem., April 6, 2011, p. 6.
[125] See *supra*, §§ 103 *et seq.*

status with respect to its investments in Niger.

145.  Thirdly, the Tribunal is not convinced that the requirement that a company be incorporated under Nigerien law was motivated by Niger's concern to deny AHS Niger the benefits proper to a non-national investor, including the possibility of ICSID arbitration under Article 6(2) of the Investment Code. On the contrary, the Tribunal considers that this requirement is fully and sufficiently explained by the interest expressed by the State that private Niger shareholders and the State of Niger should take minority stakes in the successful bidder[126].

146.  Finally, as the Tribunal rightly pointed out in *Millicom v. Senegal*, "[i]*t is on the contrary because of requirements of this nature, relatively common in practice, that, from the point of view of nationality, the notion of the protected investor has been extended by Article 25(2)(b) in fine*"[127].

147.  Lastly, the Tribunal notes that Niger, in its pleadings before the Niger State Court, argued that the ICSID proceedings were not available because AHS had full recourse to ICSID to assert its rights[128]. Niger therefore acknowledges that AHS's referral to ICSID is valid.

148.  In view of the foregoing and the evidence already analyzed above, the Tribunal considers that Niger has implicitly agreed to consider AHS Niger as a non-citizen within the meaning of Article 25(2)(b) of the ICSID Convention due to its Luxembourg shareholding and the effective control exercised over it by MMEA.

---

[126] See § 104 *above*.
[127] *Millicom International Operations B. See & Sentel GSM S.A. v. Republic of Senegal*, ICSID Case ICSID No. ARB/08/20, Decision on Jurisdiction, July 16, 2010, § 114, available on the ICSID website.
[128] Decree no. 12-054 of the Administrative Chamber of the Niger State Court of October 10, 2012, communicated by the Claimants on October 10, 2012.

## V.3 Jurisdiction *ratione voluntatis*

149. The Arbitral Tribunal must examine whether all the Parties have consented in writing to submit the dispute to ICSID and to the Tribunal's jurisdiction.

### A. Analysis of applicable instruments

150. In the absence of an amicable agreement, the Investment Agreement invoked in this case refers to arbitration. Article 6 of the Investment Agreement clearly and expressly states that disputes arising therefrom shall be settled by arbitration: "*disputes will be settled by arbitration*".

151. Concerning the procedures for such arbitration, the said Article 6 adds: "*in accordance with the provisions in force in Niger concerning the settlement of investment disputes*".

152. The Tender Documents define the project's legislative and regulatory environment as including customs duties, taxation, the 1989 Investment Code and labor laws[129]. The Tribunal notes that the 1989 Investment Code represents and forms part of the legislation in force for the settlement of investment disputes referred to in the Investment Agreement.

153. In the Investment Code, as last amended in 2001, Niger agreed in Article 6 that "*the settlement of disputes relating to the validity, interpretation or application of the act of approval and the possible determination of compensation due to the disregard or breach of commitments shall be the subject of one of the arbitration procedures hereinafter to be determined in the act of approval*" (emphasis added). These procedures are none other than *ad hoc* arbitration in good faith or ICSID arbitration.

154. It is therefore necessary to identify *the "act of approval"* (1) and then determine the type of arbitration to which the parties have consented (2). The Tribunal will then address the question of who the parties are who have consented to and are the beneficiaries of the "act of approval" (3).

---

[129] Exhibit C4, pp. 5-6.

### 1. The act of approval

155.   For the Claimants, *the "act of approval"* within the meaning of the Investment Code can only be the Investment Agreement[130].

156.   For Niger, the "*act of approval*" is Decree 16 of February 19, 2004 "*approving ground handling activities at Diori Hamani international airport in Niamey*". As Decree 16 contains no provisions concerning the settlement of disputes, the Respondent concludes that no choice has been made by the Parties and that, consequently, there is no possible recourse to ICSID arbitration.

157.   It is clear from the documents submitted and the allegations made by the parties that the term "approval" can be misleading. In the Tribunal's view, a distinction should be made between, on the one hand, "investment approval", i.e. the act which authorizes the investment, sets the conditions for it and, as a result, establishes the possibility for it to be covered, under certain conditions, by the Investment Code and by one of the privileged regimes provided for by this Code and, on the other hand, "approval for the exercising of the activity", i.e., an administrative decision which authorizes the exercising of an activity, in this case ground handling, which concerns State property or affects the public interest.

158.   On reading the International Bidding Documents[131] and, more specifically, the Information Memorial, the Tribunal notes that, under the heading "*Legal development of the activity*" (which is a separate section from that devoted to the "*Legislative and regulatory environment*", referring to the Investment Code), it is stated that "[a]*n approval and an operating license are planned to formalize the concession of the activity to the selected structure*"[132].

159.   In turn, Decree 66 of December 30, 2003, laying down the specifications, which form part of the Tender Documents, stipulates in Article 3, under "*CONDITIONS OF OPERATION*", that the provision of ground handling or self-handling services "is subject to the obtainment of approval issued by the Minister responsible for Civil Aviation" (none

---

[130] Claim. Mem., § 200.
[131] Exhibit C4.
[132] Information memorandum, p. 12, § 3.3.2.2 (Exhibit C4).

other than the Minister of Transport) and confirms, in Article 6, that the approval takes the form of a ministerial decree: "*Approval to provide ground handling services is granted by decree of the Minister of Transport*".

160. The Tribunal considers that Decree 16 constitutes the act of approval for the exercising of the activity, allowing AHS Niger to carry out a regulated activity which takes place on the public domain of Niamey airport, under the control of the State of Niger. The Tribunal noted that AHS Niger had also obtained an annual operating license issued by the Civil Aviation Directorate-General in exchange for payment of an operating fee.

161. Decree 16 is, of course, an important and necessary act for the investment. It is a preparatory and necessary act for the approval of the investment. However, on its own, it is not sufficient to confer the benefits provided for in the Investment Code and, as such, it cannot be considered as the act of approval provided for in Article 6 of the Investment Code.

162. In the Arbitral Tribunal's view, the notion of an act of approval in Article 6 must be analyzed in the context of the Investment Code itself. Indeed, from a reading of the Code, it can be concluded that its special advantages (set forth as one of the strengths of the Nigerien legal framework in the Tender Documents) are granted, depending on the regime granted, by decree or order (see Article 17) and, in the case of regime C (applicable to AHS Niger, see *supra*, § 126), by an agreement signed with the State. In the latter case, as expressly indicated in the Code (see art. 36(f)), the Convention defines the arbitration procedure to be followed for the settlement of disputes.

163. Two main elements emerge from a reading of Article 6 of the Investment Code and are essential to guide the Arbitral Tribunal in its approach to identifying the "*act of approval*".

164. Firstly, according to this Code, the arbitration provided for in the act of approval settles any dispute relating to the validity, interpretation or application of the act of approval. Thus, the act of approval is the very object of arbitration jurisdiction. This is also true of the Investment Agreement, which, as its name suggests, is a legal agreement governing relations between the parties with regard to investment. On the other hand, Decree 16 is a regulatory act of the State and, as such – as was rightly pointed out by the Niger courts

(see above, §§ 52 and 147) - its validity and legality fall within the exclusive jurisdiction of the Niger courts, which renders Niger's position in this arbitration that Decree 16 should be recognized as the "*act of approval*" referred to in the Investment Code groundless.

165. Secondly, according to Article 6 of the Code, the act of approval must include undertakings, breach of which will be the subject of arbitration proceedings. Decree 16 does not contain any undertakings as such. This decree is merely the administrative authorization given to the operator, laying down the conditions for the exercising of its activities. On the other hand, the Investment Agreement, signed by the State and the investor, contains commitments on the part of both the investor and the State.

166. Consequently, the Tribunal concludes that the "*act of approval*" referred to in Article 6 of the Investment Code can only be the Investment Agreement dated December 15, 2004.

## 2. <u>The terms and conditions of arbitration set forth in the act of approval</u>

167. The parties to the Investment Agreement have agreed in writing that disputes arising out of the interpretation or application of the Investment Agreement, failing amicable settlement, shall be settled by arbitration in accordance with the "*provisions in force in Niger concerning the settlement of investment disputes*".

168. As previously indicated, the "*provisions in force*" referred to in the second paragraph of Article 6 of the Investment Agreement are those of the Investment Code. However, the Investment Code, while requiring recourse to arbitration, offers a choice between an *ad hoc* procedure and an ICSID procedure "*to be determined in the act of approval*", i.e., as we have just seen, in the Investment Agreement.

169.    Firstly, the question is whether, notwithstanding the willingness expressed in Article 6 of the Investment Agreement to resort to arbitration, the fact that the "*act of approval*" does not expressly choose between the two procedures offered by the Code deprives Article 6 (entitled "*Settlement of disputes*") of said Convention of any effect. Secondly, if it is to be effective, the arbitration procedure to which the parties may have recourse must be determined.

170.    In their written submissions, the parties did not express an opinion on the interpretation criteria to be followed by the Arbitral Tribunal. It was only in response to questions put by the Tribunal that the Claimants referred to the provisions of the Niger Civil Code concerning the interpretation of agreements[133]. In interpreting an arbitration agreement and noting that the parties have not made the agreement subject to any particular law, the Tribunal will base its interpretation on the common will of the parties as reflected in the Investment Agreement, the performance thereof and the documents produced by the parties, in particular the Tender Documents.

171.    The Tribunal starts from a fundamental observation: the Investment Code, in general (see arts. 6 and 36(f)), and the Investment Agreement, in particular (see art. 6), submit disputes relating to the act of approval (i.e., the Investment Agreement) to arbitration. Article 6 of the Investment Agreement expressly provides for recourse to arbitration.

172.    In these circumstances, the Tribunal cannot accept Niger's contention that, since the Investment Agreement makes no choice between the two modes of arbitration provided for in the Code, there would simply be no consent to ICSID arbitration, and therefore necessarily recourse to the other branch of the alternative, *ad hoc* arbitration. Indeed, if the absence of an express reference to ICSID arbitration means no consent, the same should apply to *ad hoc* arbitration, for which there would be no consent either.

---

[133] See Claimants' letter to ICSID of August 31, 2012, p.15 and the general reference to Articles 1156 to 1164 of the Niger Civil Code.

173. This would lead to an absurd result, contrary not only to the parties' desire to have their dispute settled by arbitration, but also to the object and purpose of Article 6 of the Investment Agreement and the Code, which is to settle by arbitration any dispute arising from this investment.

174. The Tribunal therefore finds, firstly, that Article 6 of the Investment Agreement constitutes an arbitration agreement which clearly expresses the parties' intention to have recourse to arbitration.

175. The fact remains, however, that this arbitration agreement does not choose between *ad hoc* arbitration and ICSID arbitration. In the light of the texts invoked by the Parties, and inspired by the search for useful effect which must guide the interpreter, the Tribunal finds that the Investment Agreement expresses a common will not to choose between *ad hoc* arbitration and ICSID arbitration.

176. As we have just seen, this decision not to choose between the two types of arbitration proposed by the Investment Code cannot be interpreted as expressing a desire not to submit to arbitration or not to submit to ICSID arbitration. In the Tribunal's view, the wording of Article 6 of the Investment Agreement leaves the choice open for the Claimant to make when the dispute materializes. The other party is deemed to have consented to this choice in advance at the time the Investment Agreement was concluded.

177. The parties to the Investment Agreement have therefore agreed to either *ad hoc* arbitration or ICSID arbitration, with no hierarchy between the two possibilities. The choice rests with the party requesting arbitration, with it being understood that ICSID arbitration is available on the sole condition of being "*non-national"*. This last condition is met in this case, with the Tribunal having determined (see *supra* § 128) that Niger has agreed to consider AHS Niger as "*non-national"* within the meaning of the Investment Code, and MMEA as a Luxembourg company. Consequently, the "nationality" requirements for ICSID arbitration have been met in this case.

### 3. Parties covered by the act of approval

178. The Claimants have alleged[134]:

> *"138. In this respect, since the creation of AHS Niger, MMEA, the founding majority shareholder, has not only controlled the company's capital but also its effective management since the Managing Director has always been a non-Nigerien MMEA representative.*
>
> *139. MMEA must therefore be considered as the entity actually targeted by the wording "MENZIES AVIATION CROUP PARTNER" (sic) systematically associated with AHS Niger in the authorization and the body of the Approval Decree.*
>
> *140. As the Claimants have endeavored to demonstrate above, the Parties to the Investment Agreement, including the State of Niger, have implicitly agreed to consider AHS Niger as a non-national.*
>
> *141. The foreign 'strategic partner' of the State of Niger, which financed the investment and underwrote the international insurance policy, is therefore MMEA, the majority shareholder and founder of AHS Niger.*
>
> *142. Thus, MMEA, as the founding parent company of AHS Niger, handling both the control and the effective management of its subsidiary, must be considered as having consented to the Investment Agreement and to the arbitration clause inserted therein."* (Citations omitted).

179. In this respect, the Tribunal refers to the history of the relationship between the parties and the preparatory acts that culminated in the signing of the Investment Agreement, as referred to above in paragraphs 111 to 123 of this decision.

180. The Tribunal agrees with the Claimants. It considers that the group covered by Decree 16 is the same group that was selected at the end of the tender process. This Decree is at the origin of, and forms the basis for, the Investment Agreement or "*act of approval.*"[135]

181. In particular, the Tribunal has come to the conclusion that, throughout the procedure leading up to the signing of the Investment Agreement, Niger understood, accepted and acknowledged that its partner and approved service provider was Menzies Aviation Group - AHS, and in particular MMEA, which has always controlled and financed AHS Niger,

---

[134] Claim. Mem., p. 29.
[135] See § 161 *above*.

41

incorporated as a Niger company at the request of the State and for the exclusive purpose of providing the services that are the subject of the present arbitration[136].

182. Consequently, the Arbitral Tribunal considers that MMEA is a "beneficiary party" of the approval given under Decree 16 and the Investment Agreement, as described below. As such, MMEA is fully entitled to the protection and benefits that Niger has offered it as an investor, including the right to have recourse to arbitration under the Investment Agreement and the Investment Code.

### B. Niger

183. According to the Claimants, Niger's consent was given in Article 6 of the Investment Agreement, which was signed by the State of Niger, and by Niger's Investment Code[137] which refers to the ICSID Convention.

184. The Tribunal wishes to make two preliminary remarks: firstly, contrary to what the Claimants suggest[138], it is an established principle in arbitration that the mere fact of participating in the constitution of the tribunal does not imply consent to its jurisdiction and waiver of the right to raise objections thereto[139]. Secondly, contrary to the Claimants' assertions, the mere fact that a State is a party to the ICSID Convention does not imply consent to ICSID arbitration.[140]

185. With regard to Niger's consent to ICSID arbitration, the Tribunal refers to the analysis developed in the preceding paragraphs. In the Tribunal's view, Niger accepted the jurisdiction of ICSID, and of the Tribunal that would be constituted under its aegis, when it entered into the Investment Agreement on December 15, 2004. On that day, by virtue of Article 6 of the Investment Agreement and the reference it makes to Niger's legislation "*on*

---

[136] See above, §§ 115 to 123 and 126. See also exhibits C37 and C41.
[137] Request, March 4, 2011, §§ 73 and 79-81; Claim. Mem., November 14, 2011, §§ 161-162, 169.
[138] Claim. Mem., § 171.
[139] See in particular Article 16(2) of the UNCITRAL Model Law on International Trade Law and Article 23(2) of the UNCITRAL Arbitration Rules, which provide that "[t]he *fact that a party has appointed an arbitrator or participated in the appointment of an arbitrator does not deprive that party of the right to raise* [the plea of lack of jurisdiction]". This provision has been taken up, more or less verbatim, by many countries (e.g., Article 31 of the United Kingdom's 1996 Arbitration Act, or Article 1297.162 of the Canadian Code of Civil Procedure).
[140] See Preamble of the ICSID Convention.

*the settlement of investment disputes*" (i.e., the Investment Code, which provides for ICSID arbitration), Niger granted its consent to ICSID arbitration, if the party requesting arbitration so chose.

186. The Tribunal would like to point out that at no time did Niger express its intention to refer the matter to another jurisdiction (including the *ad hoc* arbitral tribunal referred to in Article 6 of the Investment Code). On the contrary, as already indicated (see above, § 147), Niger even availed itself of the existence of the ICSID arbitration proceedings before the Nigerien courts.

### C.     AHS Niger

187. AHS Niger also consented to arbitration on December 15, 2004, in the Investment Agreement. It chose ICSID arbitration, as it was entitled to do, in the Request, on March 4, 2011.

### D.     MMEA

188. MMEA is not a signatory to the Investment Agreement of December 15, 2004.

189. In their Memorial, the Claimants consider that MMEA is the company referred to in the act of approval of February 19, 2004[141]. They further allege that MMEA gave its consent in the Investment Agreement, which must be extended to it in accordance with ICC case law, in particular the *Dow Chemical Company[142]* case law and that MMEA is a non-national within the meaning of Article 6(2) of the Investment Code and a foreign national within the meaning of the ICSID Convention.

190. According to the Claimants, the date of MMEA's consent to arbitration would therefore be December 15, 2004.[143]

---

[141] Claim. Mem., § 139.
[142] See Claim. Letter of March 21, 2011, p. 6.
[143] Claim Letter of March 21, 2011, p. 7.

191. There is no doubt, as stated above, that MMEA is a non-national. The question is whether MMEA has granted its consent.

192. The Claimants have referred to the ICC arbitration in their pleadings to justify the extension of an ICSID arbitration clause to a company belonging to the same group or to the parent company.

193. Indeed, the Procedural Decree issued on September 23, 1982, by the ICC Tribunal in *Isover-Saint-Gobain v. Dow Chemical*[144] established that "[...] *the arbitration clause expressly accepted by certain of the companies of the group should bind the other companies which, by virtue of their role in the conclusion, performance, or termination of the contracts containing said clauses, and in accordance with the mutual intention of all parties to the proceedings, appear to have been veritable parties to these contracts or to have been principally concerned by them and the disputes to which they may give rise*"[145].

194. This decision was ratified by the Paris Court of Appeal on October 21, 1983, in the context of a request to set aside an arbitration award, with the Court stressing the importance of the parties' real intention, which alone was sufficient to extend the benefit of the arbitration clause to the other companies in the Dow Chemical group, notwithstanding the fact that they had not signed the contract.[146]

195. This case law has since been confirmed on numerous occasions, notably in *Sponsor v. Lestrade*[147], *Korsnas Marma v. Sté Duranz-Auzias*[148], *Kis France v. Société générale*[149] or *V 2000 (Jaguar) v. Renault.*[150]

---

[144] ICC Case No.4131.
[145] Fouchard, Gaillard, Goldman on International Commercial Arbitration (ed. Kluwer Law International), p. 287, § 503.
[146] CA Paris, October 21, 1983, *Isover-Saint-Gobain v. Dow Chemical France*, 1984 *Rev. Arb*. 98.
[147] Pau Court of Appeal, Nov. 26, 1986.
[148] Paris Court of Appeal, November 30, 1988: "[...] *The validity and effectiveness of an arbitration clause inserted in an international contract require that its effects be extended to the parties directly involved in the performance of the contract, insofar as their situation and activities give rise to a presumption that they were aware of the existence and scope of this clause, stipulated in accordance with the practices of international trade*".
[149] Paris Court of Appeal, October 31, 1989.
[150] Paris Court of Appeal, December 7, 1994: "[...] *in international arbitration law, the effects of the arbitration clause extend to parties directly involved in the performance of the contract, provided that their respective situations and activities raise the presumption that they were aware of the existence and scope of the arbitration clause, so that the arbitrator can consider all economic and legal aspects of the dispute*" (quoted in Fouchard, Gaillard, Goldman, *op.cit.* p. 282, § 499) and 1st Civil Court of Cassation, May 21, 1997.

196. The position commonly adopted in international arbitration on this question of the scope of application of the arbitration clause is summarized in the 1990 Geneva award by an ICC tribunal, which stated that "[...] *the fact that two companies belong to the same group, or the domination of one shareholder, are never, in themselves, sufficient reasons to justify the lifting of the corporate veil as of right. However, when a company or an individual appears to be the pivot of the contractual relationships involved in a particular case, it is appropriate to examine carefully whether the legal independence of the parties should not, exceptionally, be set aside in favor of a global award. Such an exception will be accepted where there is confusion on the part of the group or the majority shareholder*"[151].

197. The Tribunal also finds ample illustrations in ICSID jurisprudence.

198. In *Holiday Inns v. Morocco,* the question of extending a clause to non-signatory parties, in this case the parent company, arose. The tribunal agreed that the clause should be extended to the parent company because of its role in the performance of the contract[152]. In the case of *AMCO v. Indonesia*, the Tribunal also accepted such an extension because the foreign investor was the parent company, with the local subsidiary merely the instrument by which the investment was made and the purpose of the ICSID clause was to protect the investor.[153]

199. As noted by Schreuer:

*"These cases show that the tribunals take a realistic attitude when identifying the party on the investor's side. They look for the actual foreign investor and are unimpressed by the fact that the consent agreement only names a subsidiary. The operation of ICSID clauses will not be frustrated through a narrow interpretation of the investor's identity. What matters is that the parent company acts in the preparation and possibly the implementation of the investment operation and that the ICSID clause is designed to work for its benefit. This may work to the investor's advantage and detriment. Where companies other than those named in the consent agreement are not necessarily parties but are merely economically associated with the investment or the investor, they will not be*

---

[151] ICC Case No. 5721, see *Bull. CCI*, vol 2, nº 2 (1991), p. 20.
[152] See Schreuer, §§ 322-323.
[153] Schreuer, § 324. See also E. Gaillard, ICSID Jurisprudence (ed. Pédone), Vol. I, p. 54.

*given standing in ICSID proceedings. But the parties before the tribunal may be given the right to represent their interests and to claim on their behalf.*"[154]

200. According to the Tribunal (see above, §§ 103 to 123), it is clear from the facts of the case that Niger considered MMEA, which took part in the Tender Invitation, in the formation of AHS Niger and in the performance of the services provided, as a party to the Investment Agreement. This active participation by MMEA makes it a genuine party to the Investment Agreement, and the State of Niger has considered it as such (see above, §§ 179 to 182).

201. In view of the foregoing and the role played by MMEA in the history and development of the project, the Tribunal considers that MMEA is a party to the Investment Agreement and has consented to the arbitration agreement contained in Article 6 thereof.

**V.4    Jurisdiction *rationae materiae***

202. Finally, the Tribunal must consider whether it is dealing with *(i)* a dispute and an investment that fall within the  scope of Article 6 of the Investment Code and *(ii)* a legal dispute directly related to an investment within the meaning of the ICSID Convention.

**A.    Investment Code**

203. Article 6(2) refers to "*the settlement of disputes relating to the validity, interpretation or application of the act of approval and to the determination of any compensation due for breach or non-observance of the undertakings.*"

204. There can be no doubt that the dispute, as described above, between the Claimants and Niger relates to the validity, interpretation or application of the approval act, i.e., the Investment Agreement, and to the possible determination of the compensation due by Niger for the alleged breaches of the undertakings made in said agreement.

---

[154] Schreuer, The ICSID Convention, 2010, Article 25, § 329.

205. Under the terms of Article 11 of the Investment Code (applicable to "*activities*" carried out in the air transport "*sector*"[155]), the following are considered investments:

> "*contributions of capital of any kind to Niger, and reinvestment of funds from previous investments if intended for the creation of new businesses, or the expansion, diversification, conversion or modernization of existing units;*
>
> - *contributions in kind to a newly created company, or in connection with the expansion, diversification, conversion or modernization of an existing company;*
>
> - *shareholdings consisting of a contribution of capital or property to any company established in Niger in exchange for the granting of shares entitling the holder to a share in profits and liquidation proceeds;*
>
> - *loans assimilated to equity investments, i.e., loans granted to any person other than the State, legally established in Niger, when these loans, with a minimum term of ten (10) years, have supplemented the equity capital and made it possible to obtain the bank loans required to finance the planned investment. However, these loans may not represent more than half of the equity capital.*

206. Under the terms of the Investment Agreement, AHS Niger was to carry out an investment program over the first five years, with a minimum commitment of 7,767,232.157 CFA francs and minimum job creation, which meet the above-mentioned criteria. The Claimants allege, and this has not been disputed, that they have made this investment.

207. As far as MMEA is concerned, its contribution to the capital of AHS Niger represents its investment and also meets the above criteria.

208. MMEA's stake in the capital of AHS Niger and the activities of AHS Niger therefore constitute an investment within the meaning of Article 11 of the French Investment Code.

---

[155] See Art. 9(g), Exhibit C32.

### B.    The ICSID Convention

209.    Moreover, there can be no doubt that the dispute submitted to the Tribunal is a legal one, as the parties are in conflict over both the existence of a right and the scope of compensation.

210.    The Tribunal is also of the opinion that the condition relating to the existence of an investment, within the meaning of Article 25(1) of the ICSID Convention, has been met. The ICSID Convention does not define the notion of investment. However, as a number of ICSID and UNCITRAL tribunal rulings have noted, the term "investment" has an ordinary and inherent meaning, which presupposes the presence of contributions over a certain period of time and participation in the risks of the operation.[156]

211.    The Tribunal is therefore satisfied that the term "investment" must be taken in its ordinary and inherent sense[157]. In this case, the Tribunal has no doubt that, as far as Claimants' activities in Niger are concerned, there has been a substantial contribution with an original duration of ten years and which entailed a risk as described above.

***

212.    In conclusion, the Arbitral Tribunal considers that AHS Niger, Menzies Afrique SA (now MMEA) and the Republic of Niger are parties to and have consented to be bound by the arbitration agreement included in Article 6 of the Investment Agreement,[158] which offers non-nationals the alternative of ICSID arbitration[159]. By virtue of their nationality (effective or recognized by Niger), the Claimants were legitimately able to make this choice[160] and have thus brought before ICSID arbitration a legal dispute concerning an investment covered by the ICSID Convention, Investment Agreement and Investment Code.[161]

---

[156] See *Mr. Saba Fakes v. Republic of Turkey*, ICSID Case No. ARB/07/20, Award of July 12, 2010, and *Romak S.A. Vs. Republic of Uzbekistan*, Case CPA No. AA280, Award of November 26, 2009, §§ 197-205. See also Schreuer, §§ 152-174.
[157] Schreuer, §§ 152-174. See also *Romak S.A.* v. *Uzbekistan,* Award of November 26, 2009, §§ 197-205.
[158] See *supra*, §§ 109, 111-114, 121-123, 1 *et seq*. and §§ 185-186, 187 and 200-201.
[159] See *supra*, §§ 150 *et seq*. and §§ 167 *et seq*.
[160] See *supra*, §§ 102 *et seq*. and §§ 176-177.
[161] See *supra*, §§ 202 *et seq*.

213.   In these circumstances, the Tribunal decides that it is competent to hear the dispute between the Claimants and the Republic of Niger.

## VI.   COSTS AND EXPENSES

214.   The Tribunal notes that the Claimants have paid in full the sum of US$150,000 requested on July 27, 2011, as the first instalment in this case and the sum of US$300,000 requested on March 13, 2012, as the second instalment in this case.

215.   The Tribunal has taken note of the Claimants' request for arbitration costs.[162] The Tribunal will rule on the question of costs at the end of the proceedings on the merits.

## VII.   OPERATIVE PART OF THE AWARD

216.   For these reasons, the Tribunal decides as follows:

1.   The Tribunal has jurisdiction over the claims of the Claimants against the Republic of Niger;

2.   The costs of the arbitration will be decided by the Tribunal at the end of this procedure;

3.   The organization of the next phase of the proceedings will be the subject of a procedural order from the Tribunal.

---

[162] Claim. Mem., §§ 397 to 399.

_____[signed]_____          _____[signed]_____

Patrick Hubert                        Gaston Kenfack-Douajni



_____[signed]_____
Fernando Mantilla-Serrano



## TRANSLATION CERTIFICATION

I, Gabriela Vasallo, president and owner of Lexico Translations LLC., certify that my company has translated from French into English the document "AHS Niger and Menzies Middle East and Africa S.A. v. Republic of Niger ICSID Case No. ARB/11/11 – Award and Decision on Jurisdiction" to the best of our professional translators' ability and knowledge, and it is a correct and true translation of the original.

Signature

Gabriela Vasallo

SEE ATTACHED CERTIFICATE OF ACKNOWLEDGMENT

12/12/2023

Date

**FLORIDA INDIVIDUAL ACKNOWLEDGMENT**
F.S. 117.05(13)

State of Florida

County of _____Manatee_____ }

The foregoing instrument was acknowledged before me by means of

☐ Physical Presence,

**— OR —**

☒ Online Notarization,

this __12th__ day of ___December___, __2023__, by
   *Date*       *Month*      *Year*

_____Gabriela Vasallo_____.
*Name of Person Acknowledging*

*Dixie L Hackworth*
_____
*Signature of Notary Public — State of Florida*

Dixie L Hackworth, Online Notary
_____
*Name of Notary Typed, Printed or Stamped*

☐ Personally known

☒ Produced Identification

Type of Identification Produced: _____

_____Florida Drivers License_____

**DIXIE L HACKWORTH**
Notary Public - State of Florida
Commission # HH 219481
My Comm. Expires Jan 23, 2026

The notarial act was an online notarization, along with multi-factor authentication and audio/video recording.

*Place Notary Seal Stamp Above*

---

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: __Transalation Certificate_____

Document Date: ___12/12/2023_____ Number of Pages: __2_____

Signer(s) Other Than Named Above: _____None_____

©2020 National Notary Association